# EXHIBIT H

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    1

1    ****** UNCERTIFIED DRAFT COPY - DO NOT CITE ******

2

3         ROUGH DRAFT TESTIMONY OF

4          RYAN GARLICK  Ph.D.

5         TAKEN ON DECEMBER 2, 2022

6    **************************************************

7         WARNING:  This unedited rough draft of the

8    proceedings was produced in realtime and is not

9    certified.  The rough draft transcription may not be

10   cited or used in any way or at any time to rebut or

11   contradict the certified transcription of

12   proceedings.  There will be discrepancies in this

13   form and the final form, because this realtime

14   transcription has not been edited, proofread,

15   corrected, finalized, indexed, or certified.  There

16   will also be a discrepancy in page numbers appearing

17   on the unedited rough draft and the edited,

18   proofread, corrected, and final certified

19   transcript.

20         NOTE:  THE RECEIPT OF THIS INTERACTIVE

21   REALTIME BROWSER FEED AND/OR ROUGH DRAFT IS

22   CONTINGENT UPON AND CONSTITUTES AN ORDER FOR THE

23   FINAL CERTIFIED TRANSCRIPT BY THE RECEIVING PARTY.

24

25

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    2

1    THE REPORTER:  This is the videoconference

2   deposition of Dr. Ryan Garlick taken in the matter

3   of Cutting Edge Vision, LLC, versus TCL Technology

4   Group Corporation, et al., filed in the United

5   States District Court for The Western District of

6   Texas, Waco Division, Civil Action No.

7   6:22-cv-00285-ADA.

8       Today's date is December 2, 2022.  The

9   time is 9:04 a.m.  My name is Karen Shelton, and I

10  am reporting this deposition remotely from

11  Fort Worth, Texas.  The witness is located in

12  Flower Mound, Texas.

13      Counsel, please state your appearances,

14  beginning with the noticing attorney.

15      MR. LISA:  My name is Steven Lisa,

16  L-I-S-A.  I am counsel for plaintiff, CEV

17  Technologies.  Cutting Edge Vision, LLC.  Sorry.

18      MR. LESKO:  Justin Lesko on behalf of the

19  plaintiff, Cutting Edge Vision, LLC.

20      MR. XU:  My name is Jason Xu from Rimon

21  Law on behalf of the TCL defendants.

22      (Mr. Konicek joins the deposition)

23      MR. KONICEK:  Hi.  This is Jeff Konicek.

24  I am sorry for the confusion this morning.

25      THE REPORTER:  Good morning.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                3

1      MR. LISA:  Jeff, you should state your

2   name, your location, and that you're with Cutting

3   Edge Vision for the record, please.

4      MR. KONICEK:  Yeah.  I'm in Champaign,

5   Illinois.  My name is Jeff Konicek, K-O-N, as in

6   Nancy, I-C-E, as in Edward, K.  And I am CEO of CEV.

7      (The witness was sworn by the reporter.)

8   BY MR. LISA:

9   Q.  Good morning, Dr. Garlick.  A few

10   questions, please.  A few instructions that I'd like

11   to get if I can.  I've done a lot of Zoom meetings.

12   This will be my first time using Veritext, so I'm

13   going to ask for your patience and tolerance if I'm

14   a bit awkward or slow.  I'm sure Justin will be able

15   to help us if that happens.  But --

16   A.  Sure.

17   Q.   And if anyone else has issues, obviously

18   let's all be patient and make that happen.

19      There's -- I've been -- there's a couple

20   of simple rules.  One is want to make sure that you

21   only have open on your desktop the actual Zoom

22   meeting and that obviously no other documents other

23   than those that are being used in the deposition for

24   examination are open and that you're not having

25   active text chats with any colleagues or anything

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                4

1 like that.  Do you understand that?

2     A.  Sure, yes.  And that is the situation.  I

3 do have a window open that I use to access the link

4 and I will close that.  So now Zoom is the only

5 thing that is open.

6     Q.  Okay.  And I ask questions relatively

7 slowly.  I'll ask if you can be patient.  Let me

8 finish the questions so that you have the full

9 question before you answer.  Okay?

10     A.  I will.

11     Q.   If you don't understand a question, please

12 be sure to let me know and I'll rephrase that for

13 you so there's no confusion for the record.

14     A.  I will.

15        MR. LISA:  I'd like to mark as Exhibit 1

16 the deposition notice, please.  We should mark as

17 PX-1 the plaintiff's notice of deposition to

18 Dr. Ryan Garlick.  Do you see that?

19        THE WITNESS:  I need to activate the

20 document share, I believe.

21        (Off record from 9:10 to 9:17)

22 BY MR. LISA:

23     Q.  Dr. Garlick, do you see the plaintiff's

24 notice of deposition of Dr. Ryan Garlick?

25     A.  I do.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    5

1      Q.   Have you seen that previously?

2      A.  I have not.

3      Q.   Would you state your full name and

4  residence for the record, please.

5      A.  Sure.  My name is Ryan Garlick,

6  G-A-R-L-I-C-K, and I live in Flower Mound, Texas.

7      Q.   And you've submitted a declaration in

8  support of a claim construction submitted by the TCL

9  group.  Is that right?

10     A.  That's correct.

11     Q.   And as a convenience, instead of referring

12  to all the defendants, I'll just refer to them

13  globally as TCL and I'll refer to Cutting Edge

14  Vision as CEV.  Is that understood by everyone?

15     A.  Yes.

16     Q.   Like to mark as Exhibit 2 Dr. Garlick's

17  declaration.  While we're marking that, Mr. Xu,

18  under Rule 26A2BII, we're supposed to receive all

19  the facts or data considered by Dr. Garlick in

20  forming his opinions.  And I understand that you and

21  Mr. Lesko have corresponded on that issue.  Have we

22  in fact received all the facts or data considered by

23  the witness?

24        MR. XU:  Yes, that has been confirmed in

25  the email.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    6

1       MR. LISA:  So there's nothing additional

2   for you to deliver today?  Is that right.

3       MR. XU:  Not from mine.

4       Q.  So we should marked as Exhibit 2 the

5   declaration of Dr. Ryan Garlick.  Do you see that,

6   Dr. Garlick?

7       A.  I do.

8       Q.  Can you confirm that that is in fact the

9   declaration that you filed and that's your

10   signature?

11      A.  It appears to be, yes.

12      Q.  And attached to that document is your CV,

13   correct?

14      A.  That's correct.

15      Q.  Could you explain your -- what your

16   current employment is and describe it?

17      A.  Yes.  I'm currently a clinical associate

18   professor at the University of North Texas in

19   Denton, Texas.

20      Q.  And are you actively teaching at this

21   time?

22      A.  Yes.

23      Q.  Teach courses these last few semesters?

24      A.  I'm sorry.  I didn't get the first part of

25   the question.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                7

1    Q.   You've been teaching currently IE in the

2  last few semesters?

3    A.   Yes.

4    Q.   Attached to your resume, you've got a list

5  of your courses taught.  Which of those are you

6  currently or actively teaching?

7    A.   I'm sorry.  I do want to amend the last

8  answer.  I'm teaching courses this semester.  You

9  mentioned the last few semesters.  I did take the

10  previous semester off, but I regularly teach.  That

11  was the first break I'd had in 19 years, I think.

12  So last semester I did not teach.  This semester I

13  am teaching.

14    Q.   Go ahead.  I'm sorry.

15    A.   Oh, and this semester I'm teaching IT

16  project management, internet programming, and

17  database systems.

18    Q.   So the undergraduate courses that you've

19  taught listed on your resume or CV, can you identify

20  when you last taught each of the unique courses for

21  the last few years?  So when did you last teach

22  computer science 1, computer science 2, symbolic

23  processing, et cetera?  Just step down and give us

24  generally an idea of when each of those courses were

25  taught.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    8

1    A.  Okay.  Yeah, it's going to be a rough

2   estimate because some of them it has been some time

3   that I've -- that I've taught them.  But roughly

4   speaking, computer science 1 and 2 were courses that

5   I took earlier in my career.  IT project management

6   is a course that I'm currently teaching.  Symbolic

7   processing, it has been several years.  Human

8   computer interfaces, I believe about a year and a

9   half ago.  Advanced programming was a -- sort of a

10  special topics course that was many years ago.

11        Internet programming I'm currently

12  teaching.  Computer networks, it's been about one

13  year.  Introduction to artificial intelligence, that

14  was one earlier in my career, so probably at least

15  ten years ago.  Database systems I am currently

16  teaching.  Software development 1 and 2, it's been

17  awhile on those.  Those were -- like it says there,

18  kind of a capstone course, and I want to say it's

19  been at least five years or so.  Again, these are --

20  these are rough -- rough time frames.  Sometimes we

21  don't know our schedule until a week before the

22  semester starts, so -- secure electronic commerce I

23  teach regularly.  I believe I taught it in -- about

24  one year ago.  Like I said, I took a break last

25  semester.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                9

1       The directed studies courses were taught

2   irregularly.  I haven't done one of those in several

3   years.  The software development capstone is similar

4   to software development 1 and 2.  It's been a few

5   years on that one.  And IT capstone, that was also

6   probably, yeah, ten years ago or so.

7       The graduate courses were in conjunction

8   with the undergraduate courses listed.  So, for

9   example, the artificial intelligence was the

10   graduate component of the introduction to artificial

11   intelligence course that's listed under the

12   undergraduate section.  Same with secure electronic

13   commerce.  I believe there may have been a separate

14   section of that for graduate students, but those

15   were several years ago also, many years.

16       Q.  Thank you.  The -- this resume or CV that

17   you've attached to your declaration is a little bit

18   different than the one that's attached -- that's

19   listed on your professor site at the school,

20   correct?

21       A.  I have several versions.  As you can see

22   at the bottom, I try to update it roughly monthly.

23   So there may be a slightly older version there.

24       Q.  I'd like to mark as Exhibit 3 the CV that

25   we've downloaded from the school, if we can.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    10

1        (Exhibit no.    marked)

2      Q.   Dr. Garlick, do you have that in front of

3    you now?

4      A.   I do, yes.  This appears to be the web

5    version, so I've uploaded a PDF to the school site

6    and then this is sort of a summary in HTML format.

7      Q.   It includes much of the same information

8    that was in your PDF that was attached to your

9    declaration, correct?

10     A.   Yes, it's going to be similar.

11     Q.   What this seems to add is the legal

12    experience that you have, correct?

13     A.   Let me compare.

14     Q.   If you look at page 2 of Exhibit 3, you'll

15    see down at the bottom there's a qualification

16    section entitled legal, IT litigation consultant.

17    Do you see that?

18     A.   On Exhibit 3?  Yes, I do.

19     Q.   Then further down onto page 3 of that

20    Exhibit 3, begins a section called litigation

21    support.  Do you see that?

22     A.   Yes, I see that.

23     Q.   And that information was omitted from the

24    PDF that's attached to your declaration, correct?

25     A.   Yes, it -- it appears that that litigation

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                11

1   support section is not on the CV.

2      Q.  Is that accidental or did you do that for

3   a reason?

4      A.  No, I -- I don't believe that I did that.

5   I think that occurred because it was my

6   understanding that there was a desire, I guess, to

7   have that experience listed separately, and so I

8   guess it was my understanding that those documents

9   were submitted separately and so that's my

10  understanding of why that might have been omitted.

11     Q.  Where is that information submitted in

12  your declaration?

13     A.  I don't -- I didn't know that it wasn't.

14     Q.  Explain what you mean by that.

15     A.  So, no, there was no intentional omission

16  of this information.  For purposes of, I guess,

17  submitting my CV with regards to legal matters, I'm

18  often asked to submit my CV and also to submit a

19  list of the litigation support that I've

20  participated in.  And I have just put it all

21  together in a CV and then it's my understanding that

22  sometimes, for example, an expert witness consulting

23  service will remove that section to submit

24  separately, and I believe that's what happened here.

25     Q.  So you actually submitted that litigation

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                12

1  support information to TCL, but it was not included

2  in the CV that was attached to your declaration.  Is

3  that what you're saying?

4      A.  I don't -- I don't recall if -- if that

5  was submitted.  I've submitted the CV to both an

6  expert witness agent, I guess, if that's the proper

7  term, and to TCL.  I don't recall what version was

8  submitted to each one, but again, it was not in an

9  effort to omit a certain section.

10     Q.  Well, your declaration states that it's

11  based on your personal information, correct?  So you

12  did review your CV before you signed the

13  declaration, correct?

14     A.  I signed the declaration.  I don't recall

15  if the exhibit was attached at that point or if I

16  overlooked the fact that that section was missing.

17  Yeah, I just don't recall.  Like I say, there's

18  several versions of the CV.  As it gets updated, not

19  all of them are updated at the same time and it's

20  actually a bit of work to form this HTML version in

21  Exhibit 3 from a PDF, and so I don't do that as

22  often as I should.

23     Q.  Well, did you happen to consider any of

24  your prior testimony in your prior litigation or

25  consulting matters in connection with the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    13

1  declaration and opinions you've provided here?

2    A.   No, I don't believe so.

3    Q.   So you did not review in connection with

4  creating your opinions or this declaration any of

5  your prior testimony provided as an expert in a

6  patent matter?

7    A.   I did not rely on testimony I had

8  previously given to form my opinions in the

9  declaration.

10    Q.   Well, I'm asking whether you read it.

11    A.   I'm sorry.  Could you state the question

12  in full?

13    Q.   Sure.  I'm not asking whether you relied

14  on it.  I'm asking whether you reviewed or

15  considered any of the prior testimony that you've

16  given in connection with any of the litigation

17  support matters listed on Exhibit 3 in connection

18  with your being retained here by TCL.

19    A.   I did not review any of my prior

20  testimony.

21    Q.   And I just want to make clear.  You're

22  saying that unequivocally you did not review your

23  prior testimony to determine whether what you're

24  saying here on behalf of TCL is consistent or

25  inconsistent with what you've stated previously in

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    14

1  other testimony, correct?

2      A.  I -- I did not review any prior

3  transcripts or any of the testimony that I had

4  previously given.

5      Q.  And that would include declarations that

6  you've signed previously, correct?

7      A.  That's correct.

8      Q.  Now, I want to make sure as well that --

9  and this comes from just personal experience over

10  years.  I want to make sure that you're feeling good

11  today about testifying, that there's no medication

12  or illness issues that would impair your ability to

13  testify today.  Is that correct?

14      A.  That's correct.

15      Q.  You'd be surprised.  I've had witnesses

16  come back later and say, you know, they were under

17  medication and things weren't right, so I just

18  wanted to make sure you're clear and good to go

19  medically, right?

20      A.  I'm feeling well.  Thank you.

21      Q.  Very good.  I'm glad to hear that in these

22  times.

23      A.  Yeah.

24      Q.  Now, the -- obviously the declaration was

25  provided subject to the final paragraph which is a

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                15

1  declaration under penalty of perjury under the laws

2  of the United States of America that the foregoing

3  is true and correct, right?

4      A.   Yes.

5      Q.   You're aware of the seriousness of that,

6  correct?

7      A.   Yes.

8      Q.   And you state in paragraph 1 of your

9  declaration, which is Exhibit 2, that you're

10  competent to testify about the matters set forth

11  herein, right?

12     A.   Paragraph 2.

13     Q.   Paragraph 1 of Exhibit 2.

14     A.   Yes, I believe I'm competent.

15     Q.   Can you explain what that means?

16     A.   That I am of sound mind, as you mentioned,

17  that I am not under -- sorry.  Was there an

18  objection?

19     Q.   No, I'm just asking you to explain what

20  you're intending by that sentence.

21     A.   Just that I am of sound mind, as you

22  mentioned, I'm not under medication, I'm not feeling

23  ill, I'm confident and ready to express my opinions

24  in this declaration.

25     Q.   And obviously some time has passed since

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    16

1  you signed the declaration, so that hasn't changed,

2  correct?

3      A.  That's correct.

4      Q.  And does that also mean that you consider

5  yourself to be qualified as an expert to provide

6  those opinions?  Is that part of the competency that

7  you're referring to there?

8      A.  Yes.

9      Q.  The very next sentence of paragraph 1 on

10  Exhibit 2, could you read that, please, state it out

11  loud for the record.

12     A.  "I have been asked by defendants to submit

13  this declaration in support of their brief regarding

14  the proper construction of claim terms set forth in

15  Section 7 below."

16     Q.  Referring to the last sentence of

17  paragraph 1 of Exhibit 2.

18     A.  I apologize.  "All the facts and

19  statements contained herein are within my personal

20  knowledge and are believed to be true and correct."

21     Q.  And again, you signed that several weeks

22  ago.  Has anything changed between the signing of

23  that declaration and the present deposition?

24     A.  No.

25     Q.  Did you review your declaration just to

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    17

1   make sure before the deposition?

2      A.  Could you repeat the question?

3      Q.  Sure.  Did you review your declaration

4   just to be sure that everything remains true and

5   correct prior to the deposition?

6      A.  I did.

7      Q.  And if you find out during this deposition

8   that something is not true or correct or believed to

9   be true or correct, you would certainly change that

10  testimony, correct?

11         MR. XU:  Objection, form.  I'll just put

12  an objection, vague.

13     A.  If I found a statement that I believed was

14  not true, then yes, I would point that out.

15     Q.  Thank you.  True or correct.  If you

16  believe a statement is not correct, you would take

17  this opportunity under oath to correct it, right?

18     A.  Yes.

19     Q.  And I think we all want you to do that.

20  I'm just making sure that one of the goals here is

21  to make sure that we get from you what you still

22  believe to be true and correct.  Is that understood?

23     A.  Yes.

24     Q.  Can you identify for me, Dr. Garlick, what

25  else you may have reviewed or did review prior to

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    18

1   this declaration?  I'm sorry.  Prior to the

2   deposition.

3      A.  So I believe there's a paragraph in the

4   declaration that explains that.  I reviewed both of

5   the patents, and I reviewed their histories.

6      Q.  And was that in preparation for the

7   declaration or in preparation for the deposition?

8         MR. XU:  I just want to caution the

9   witness not to disclose attorney-client privilege,

10  but with that caution, you can answer.

11     A.  Could you repeat the question, please?

12     Q.  Sure.  Your answer was referring to what

13  the declaration stated that you had reviewed, which

14  was both of the patents and the histories for the

15  patents.  And I'm asking whether there is anything

16  additional that you reviewed in preparation for the

17  deposition?

18         MR. XU:  Same caution.

19     A.  No, I don't believe -- I don't believe

20  there was any additional information that I

21  reviewed.

22     Q.  So just to be clear, for today's

23  deposition, you reviewed your declaration, both of

24  the patents, the file histories, and nothing more?

25     A.  That's correct.  I believe that's correct,

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    19

1  yes.

2      Q.  So referring to, for the record,

3  Exhibit 2, your declaration, paragraph 21, I believe

4  that's the paragraph you're referring to that

5  describes what you looked at.  Is that correct?

6      A.  Yes.  So as far as documents go, I

7  reviewed the patents, their histories, and, yes,

8  just my general knowledge.  And there were

9  conversations with the attorney as well.

10     Q.  I'm sorry.  We lost our telephone link

11  here.  Can you hear me now?

12     A.  Yes.

13     Q.  So I'm going to ask you, Dr. Garlick,

14  rather than me trying to find the live transcript to

15  just repeat your answer or I can ask the question

16  again and then you can review, provide the answer.

17  So we're now on my computer audio, gentlemen, so

18  that we have that.  Our phone line died and we were

19  having issues with phones yesterday.  So

20  Dr. Garlick, I was referring you to paragraph 21 of

21  your declaration, Exhibit 2.  Do you see that?

22     A.  Yes.

23     Q.  All right.  And is that the paragraph you

24  were referring to previously that described what you

25  had reviewed in preparation for your declaration?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                20

1    A.  Yes.

2    Q.  All right.  And the only documents you

3  identify in paragraph 21 is the '761 patent, the

4  '472 patent, and their respective prosecution

5  histories, correct?

6    A.  That's correct.

7    Q.  All right.

8    A.  Those are the only documents that I

9  reviewed.

10    Q.  And the rest of the information there is

11  referring to general knowledge of those in the field

12  such as pictures over network or transmitting data

13  such as pictures over a network to a server as of

14  October 17, 2005, right?

15    A.  Yes.

16    Q.  So it's the '761 patent, the '472 patent,

17  the respective prosecution histories, and the

18  general knowledge of those in the field.

19    A.  What was the question?

20    Q.  That's what you considered in preparation

21  for the declaration?

22    A.  Those were the documents that I

23  considered.  There were also -- in preparation for

24  the deposition?  Is that what the question's

25  regarding?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    21

1    Q.   No.  Let's back up and be clear.  So in

2   preparation for the declaration, I'm trying to

3   identify all the documents that you relied on and

4   what else you have relied on or considered.

5        So presently you've identified by way of

6   documents the '761 patent, the '472 patent, and the

7   respective prosecution histories, and that's all by

8   way of documents?

9    A.   Those are the documents that I relied upon

10  in preparation for the declaration.

11    Q.   All right.  So I'm using a different word.

12  I'm using considered.  It may be that you looked at

13  something and thought it's awful and therefore don't

14  want to rely on so there's a difference between rely

15  and consider.  So I'm asking a very specific

16  question.  All right?

17        In preparation for the declaration, what

18  documents did you review?

19        MR. XU:  Vague.

20    Q.   I'm trying to be as clear as I can.  What

21  document did you pick up or put on your computer

22  screen and look at, Dr. Garlick, in preparation for

23  the declaration?

24    A.   As I sit here today, the version of the

25  declaration that is submitted, these are the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    22

1   documents that I considered.

2     Q.   No other documents were considered?

3     A.   Not for the declaration that was

4   submitted.

5     Q.   Well, what about for earlier versions of

6   the declaration?

7        MR. XU:  I just caution the witness not to

8   disclose attorney-client privileged information.

9        MR. LISA:  Well, if there's

10   attorney-client privileged information, Dr. Garlick,

11   that you're not going to describe to us, we're

12   entitled to know that you are -- that there's

13   information you're not providing us.

14        It's clear under the rules that we're

15   entitled to know every document that this witness

16   has considered and looked at in preparation for his

17   testimony, and that's not just the final version of

18   the testimony.

19        So your objection is noted.

20     Q.   But, Dr. Garlick, I'm asking a very simple

21   and specific question.  What documents did you

22   review prior to filing a declaration in this case?

23        MR. XU:  Same objection.

24     A.   So for -- for the version that was

25   submitted, as I sit here today, these are the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    23

1  documents that were reviewed.

2      Q.  Prior to any declaration being drafted,

3  what documents did you review prior -- I'm sorry.

4  Strike that.

5          Prior to any declaration being submitted,

6  what documents did you review as part of the process

7  of forming your opinions in this case?

8          MR. XU:  Objection, vague.

9      A.  So -- could you repeat the question?

10     Q.  Sure.  What documents did you review in

11  this case in preparation for drafting any

12  declaration?

13     A.  For the declaration that is Exhibit 2,

14  these are the documents that I reviewed.

15     Q.  I'm asking a different question.  This has

16  nothing to do with Exhibit 2.  Okay?  I'm asking,

17  Dr. Garlick, after you were retained in this case,

18  what documents did you review?

19         MR. XU:  Objection.  Outside the scope

20  because Dr. Garlick here is to be deposed here

21  regarding the declaration he filed in support of

22  TCL's claim construction opening brief.

23         MR. LISA:  The rule provides that we're to

24  see facts or data considered by the witness in

25  forming his opinion, not in forming the a final

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                24

1  opinion.  We're not limited to what is carefully

2  drafted.  But your objection's noted, so I'll ask it

3  again.

4      Q.  Dr. Garlick, what documents did you review

5  after being retained in this case in preparation for

6  forming your opinions?

7        MR. XU:  I just want to inject because

8  there might be opinions unrelated to the claim

9  construction, so I think if you -- Steve, if you

10  clear your scope regarding the claim construction,

11  that that's where the vagueness is coming.

12      Q.  Dr. Garlick, after being retained in this

13  case, what documents did you review or consider in

14  connection with forming your opinions relating to

15  claim construction or indefiniteness.

16      A.  My opinions are contained in the

17  declaration that was submitted, and those opinions

18  are based on the documents listed in paragraph 21.

19      Q.  What documents did you review that you

20  decided not to rely upon?

21      A.  There -- I'm sorry.  Could you repeat the

22  question?

23        MR. LISA:  Ms. Shelton, could you repeat

24  the question, please.

25        THE REPORTER:  Question:  "What documents

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                25

1  did you review that you decided not to rely upon?"

2    A.  There -- there were -- there were no

3  documents that I reviewed that -- that were

4  formed -- that formed my opinions in the report.

5  Hold on.  That's -- that's not what I meant to say.

6      As I sit here today, my opinions are

7  contained within this declaration, and my opinions

8  relied on the documents listed in paragraph 21.

9      MR. LISA:  Ms. Shelton, can you repeat the

10  question again for the witness?

11      THE REPORTER:  Question:  "What documents

12  did you review that you decided not to rely upon?"

13    A.  Yeah, I don't have anything to add to my

14  previous answers.

15    Q.  Dr. Garlick, I'm going to ask you to

16  listen to the question carefully and answer the

17  question that is asked.  Ms. Shelton, please repeat

18  the question again.

19      MR. XU:  Same objection.

20    A.  For this declaration, there were no

21  documents.

22    Q.  So to be clear, you did not look at a

23  document in preparation for this declaration that

24  you decided not to rely upon?

25      MR. XU:  Same objection.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    26

1      A.  In preparing this declaration, I

2  considered the '761 patent, the '472 patent, and

3  their respective prosecution histories.

4      Q.  So what other documents did you look at

5  after you were retained?

6         MR. XU:  Objection.  I'll caution the

7  witness not to disclose attorney-client privileged

8  information.

9         MR. LISA:  Mr. Xu, if the witness is

10  withholding documents that he reviewed based on a

11  claim of attorney-client privilege, then we will

12  need a list from you of the documents that are being

13  withheld and the basis for the claim of privilege.

14  Is that request understood?

15         MR. XU:  Yes, understood.

16         MR. LISA:  So Ms. Shelton -- go ahead, I'm

17  sorry.

18         MR. XU:  I'm not instructing the witness

19  not to answer.  I'm just cautioning would be my

20  objection.

21         MR. LISA:  Given the way the witness is

22  answering or not answering these questions and given

23  your objections, I'm making a request on behalf of

24  CEV that TCL provide to us a withheld documents

25  list, any documents that were withheld from the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                27

1  production that was supposed to be provided under

2  26.a.2.B sub ii.  All right?  And so if the witness

3  reviewed documents and there is a claim of privilege

4  that's being made right now by TCL, then let's just

5  get a list and we can get that issue before the

6  court.  So it's not a big debate.  It's just let's

7  get the standard withheld document list.  Okay?  Is

8  that clear?

9         MR. XU:  Yeah, if there are, obviously.

10         MR. LISA:  Ms. Shelton, I'm going to ask

11  if you would to compile any requests separately at

12  the back of the deposition if that's possible.

13         THE REPORTER:  Okay.

14         MR. LISA:  Thank you.

15     Q.  So Dr. Garlick, let me ask this again.

16  Besides documents identified in paragraph 21 of your

17  declaration, Exhibit 2, did you review any other

18  documents, yes or no, and that does not require that

19  you identify them?

20     A.  In preparing this declaration, I have

21  considered the '761 patent, the '472 patent and

22  their respective prosecution histories.

23     Q.  I'm going to keep asking this question

24  until we get an answer, Dr. Garlick.  I'm asking,

25  after you were retained, did you review any other

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                28

1  documents other than those listed in paragraph 21,

2  and that is not keyed to only those in connection

3  with this declaration.

4       To be clear, I'll say it again.  After you

5  were retained, did you review at any time any other

6  documents other than those listed in paragraph 21 of

7  your declaration, Exhibit 2?

8       MR. XU:  Objection because Dr. Garlick

9  here is -- after he was retained may or may not have

10  tasked to do other things related to the case.  But

11  he's here to be deposed regarding the declaration he

12  compiled supporting TCL's claim construction opening

13  brief.

14       MR. LISA:  That's fine.  And you can

15  object on relevance, but a speaking objection isn't

16  necessary.  It's a simple yes or no question.  He's

17  not revealing anything, Mr. Xu.

18  Q.  I'm just asking, yes or no, Dr. Garlick,

19  did you review other documents after being retained

20  other than those identified in paragraph 21?

21  A.  Yes.

22  Q.  What else -- which of those documents

23  related in any way to claim construction?

24  A.  None of them.

25  Q.  So it is your testimony that not a single

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    29

1  document that you reviewed after being retained by

2  TCL, other than those in paragraph 21, related to

3  claim construction?

4     A.  I believe that's correct.

5     Q.  So the flip side of that is that all of

6  the opinions that you've provided on behalf of TCL

7  are based solely on the '761 patent, the '472

8  patent, and their respective prosecution histories,

9  at least with respect to documents?

10    A.  Yes, I believe that's correct.

11    Q.  Now, when you say the '761 patent and the

12  '472 patent, what do you mean by that?

13    A.  I mean the patent document, the claims and

14  the specification, the entire document.

15    Q.  I'd like to mark as Exhibit 4 the '761

16  patent and Exhibit 4A the '472 patent.

17        (Exhibit no.    marked)

18    Q.  Okay.  Those should be in the file now.

19  So if you look at Exhibit 10 and exhibit -- I'm

20  sorry, Exhibit 4 and 4A.

21    A.  Yes, I see them in the folder.

22    Q.  Are those the patents that you reviewed?

23    A.  Take a look here.

24    Q.  That's Exhibits 4 and 4A.

25    A.  Yes, they appear to be the patents.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    30

1    Q.   So when you -- if you would look first at

2    Exhibit 4, Dr. Garlick.

3    A.   Sure.

4    Q.   And you said you reviewed the patent,

5    '761 patent.  What parts of the patent did you

6    review?

7    A.   The entire thing.

8    Q.   So there's quite a few items of foreign

9    patents and references and other publications.  Did

10   you review them?

11   A.   No, I didn't go through all of the

12   references cited.  I meant that I read the abstract,

13   the specification, the claims.  I looked at the

14   diagrams.

15   Q.   So when you -- to be clear, when you state

16   that you reviewed the patent, '761 patent,

17   Exhibit 4, it was the text and the drawings of the

18   actual patent, correct?

19   A.   That's correct.

20   Q.   All right.  So you did not review the

21   materials listed on pages 2, 3, 4 of the patent,

22   Exhibit 4, correct?

23   A.   I did not go through any of the referenced

24   documents, that's correct.

25   Q.   And if you look at Exhibit 4A, is it also

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                31

1  correct that you did not review the materials on

2  pages 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,

3  15, correct?

4      A.  I scanned over this material, but I did

5  not look up the referenced -- the references.

6      Q.  So you're aware that you can go to a

7  document like Google patents or go to the patent

8  office and plug in a patent number and look at them,

9  correct?

10     A.  Yes, I'm aware of that.

11     Q.  And you've done that previously, right?

12     A.  Yes.

13     Q.  Okay.  But you did not do that for any of

14  the references that are listed in the -- what I will

15  say the preliminary pages of either Exhibits 4 or

16  4A, correct?

17     A.  That's correct.

18     Q.  So when your declaration states that you

19  reviewed the two patents-in-suit, the '472 and '761

20  patents, what you intend by that is that you

21  reviewed the abstracts and the text beginning after

22  the title of the invention through to the claims,

23  correct, and the figures?

24     A.  Yes, that's correct.

25     Q.  So is it fair to say you didn't study any

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                32

1    of the related references or prior arts or other

2    publications in the patents, cited in the patents?

3        A.   I did not review the citations, the cited

4    patents.

5        Q.   There is in both patents a listing of

6    related U.S. application data.  Do you see that?

7    It's on page 2 of the '472 patent, Exhibit 4A and

8    also on page 2 of the '761 patent, Exhibit 4.  Do

9    you see that?

10       A.   Yes, I see that section.

11       Q.   Did you -- when you said you reviewed the

12   file histories of the patents, did you review the

13   file histories or related patents listed in those

14   paragraphs on page 2 of Exhibit 4 and 4A?

15       A.   If those were contained within the file

16   history, then it's something that was briefly looked

17   at.  Those patent histories are very lengthy, and so

18   I don't recall if this information was contained

19   specifically there for these references, but --

20   yeah, that's my answer.

21       Q.   Did you review separately any of the

22   related U.S. applications identified on page 2 of

23   Exhibits 4 or 4A?

24       A.   Not separately, no.

25       Q.   So you -- to be clear, you reviewed, if at

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    33

1  all, only the parts of those file histories that

2  were contained in the two specific file histories

3  for these patents, Exhibits 4 and 4A?

4      A.  The lengthy file histories that were

5  attached to the '472 and the '761 are what I -- are

6  what was reviewed.  And that's my answer.

7      Q.  So you didn't make any effort to go back

8  and review any of the specific file histories for

9  the earlier related patents, correct?

10     A.  I did not specifically look up a previous

11  application number.

12     Q.  Did you look -- do you see that there are

13  other patents listed in the related U.S. application

14  data that issued to Mr. Konicek based on this

15  specification?

16     A.  Which section are you referring to?

17     Q.  The related U.S. application data on page

18  2 of Exhibits 4 and 4A.

19     A.  The related U.S. application data.  I see

20  that section here.  And I'm sorry.  What was the

21  question?

22     Q.  You see that there are patent numbers

23  identified there as well, correct?

24     A.  Yes.

25     Q.  Did you separately review any of the other

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                34

1  patents that are not '761 or the '472 patents?

2    A.  It's the same answer as before.  If those

3  were referenced in the history of the '472 or the

4  '761 patent, then I looked through the file

5  histories.  I did not separately go, as you

6  referenced, to Google patents and insert any of

7  these numbers.

8    Q.  Well, to be clear, Google patents was just

9  an example, Dr. Garlick.

10    A.  Sure.

11    Q.  There's other ways of getting a patent as

12  well.  But my point that I'm making is that these

13  patents are in fact referenced in the file history.

14  So your answer would seem to imply that you did

15  review that.

16    A.  I -- I reviewed them, as I said, as a

17  component of the file histories.  What was --

18    Q.  Go ahead.

19    A.  But your question before was about

20  specifically and separately looking up these

21  numbers, and I did not do that.

22    Q.  Let me ask it a different way.  If you

23  look at Exhibit 4, the related U.S. application

24  data, at the very bottom of that section there's a

25  patent number, 7697827.  Do you see that?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    35

1     A.  I'm sorry.  You're going to have to give

2   me a page number here.  This is Exhibit 4A?

3     Q.  Exhibit 4, page 2.

4     A.  Switch to 4, page 2.  Okay.  I'm on

5   Exhibit 4.  Sorry.  Page 2?

6     Q.  Related U.S. application data.  Do you see

7   that?

8     A.  Yes.

9     Q.  And do you see the patents listed there

10   following the now patent number, and then there are

11   patent numbers listed?

12     A.  Yes.

13     Q.  Is it your testimony that you, as part of

14   your review, reviewed those patents that are listed

15   there?

16     A.  I would say as they were contained within

17   the file history of the '472 or '761 patent.

18     Q.  You mean if the patent in its entirety was

19   contained within the file history, one of these

20   patents, you reviewed it?

21     A.  I'm saying I reviewed the file history.

22     Q.  Okay.  So I'm -- and that's the question

23   you keep answering.  I'm asking a different

24   question.  You can say you don't recall.  You can

25   say you don't know.  You can say anything other than

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    36

1   not answering.  All right?

2        Question is, did you review, for example,

3   7697827?  It's the last patent listed in the related

4   U.S. application.  Did you review that patent?

5        A.   Not separately, as I said before, but

6   as -- as it is referenced in the file history or as

7   it was -- as these documents were referenced or if

8   they were cited in the file history, then that was a

9   part of the document that I reviewed.

10       Q.  Explain your answer if you can.

11       A.  I think that's the -- that's my answer.

12       Q.  So you read from front to back patent

13   number 7697827?  You actually picked it up and read

14   the patent as it is referenced in the file history?

15       A.  No.

16       Q.  So you didn't read the patent.  You read

17   that it was referenced in the file history.  Is that

18   correct?

19       A.  The file histories for one of them I

20   believe was over 10,000 pages.  I -- I don't recall

21   every section of it that I -- that I looked at.

22       Q.  So is your answer you don't recall whether

23   you reviewed that patent?

24       A.  I -- I used search tools on the file

25   histories.  I read sections of them.  I skimmed

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    37

1  sections of them.  Sections of them are in different

2  languages.  And so I don't recall every specific

3  detail of the 10,000-plus pages that were contained

4  in that document.

5      Q.  Is it your testimony that the file

6  histories for these two patents, Exhibit 4 and 4A,

7  contain parts of the earlier file histories?  Is

8  that what you're saying?

9      A.  Could you repeat the question?  Sorry.

10  Could you repeat the question?

11      Q.  Sure.  I withdraw the question.  I'll move

12  on.  Like to mark as Exhibit 5 --

13          (Exhibit 5 marked)

14      Q.  Dr. Garlick, I've asked to mark as

15  Exhibit 5 a group of documents that relate to the

16  syllabus that you have and that you teach at the

17  university.  Should be up there shortly.

18      A.  All right.

19      Q.  Do you have that in front of you now,

20  Dr. Garlick?

21      A.  I do, yes.

22      Q.  Have you seen that previously?

23      A.  Not in this form.  This is something that

24  is automatically generated by the university, I

25  believe, based on our internal systems.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                38

1    Q.  Do you recognize what is reflected there

2  on Exhibit 5?

3    A.  Yes.  It appears to be a list of the

4  scheduled courses.

5    Q.  Could you explain in more detail what that

6  shows on Exhibit 5, please?

7    A.  Just the list of courses that I've taught

8  in the past.

9    Q.  And the courses are listed on the left by

10  course title and the date that you taught them,

11  correct?

12    A.  Yes.  I would add that some of the courses

13  here are automatically generated, and, for example,

14  on the first page here, I notice CSCE4999.749.  That

15  749 is a code for me.  That was not a class that I

16  actually taught.  It's just that, you know, every

17  semester if someone were to take a senior thesis

18  with me, that would be the course number.  So this

19  isn't an accurate reflection of every -- everything

20  that was taught.

21    Q.  So to clarify for the record, the -- on

22  page 1 of Exhibit 5, there is partway down a senior

23  thesis spring 2021.  That's what you're referring

24  to, correct?

25    A.  Yes, yes.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                39

1    Q.  You may or may not have had a student

2  taking it, correct?

3    A.  That's correct.  In fact, for that one

4  there was not.

5    Q.  Are there any other inaccuracies you see

6  on that first page?

7    A.  I mean, like when we went through this

8  before, I -- you know, I have a rough recollection

9  of the time frames of teaching certain things, and

10  so I would have to cross-reference this with our

11  canvass system to see exactly where things are.  I

12  notice also it looks like some -- there's a summer

13  course listed in 2017 at the bottom of page 2, and I

14  don't recall that.  I haven't taught summers in

15  quite awhile.

16        Again, this is an automatically generated

17  thing that comes from a system and our registration

18  system changes frequently, updates are made,

19  schedules are revised towards the end of the

20  semester and sometimes all the information isn't

21  accurately captured by these systems.

22    Q.  Okay.  So this is something kept in the

23  regular course of the school's business, correct?

24    A.  It's something that's automatically

25  generated, I believe, from -- from a snapshot that's

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              40

1  taken from the registrar's office based on our class

2  assignments is my understanding.  I don't know for

3  sure.  This is an internal system that I --

4     Q.  Have you ever looked at this before?

5     A.  I submit information to the faculty

6  information system and -- but as far as the courses

7  go, I don't submit this data.  It's generated

8  automatically.

9     Q.  But my question was, have you gone to this

10  part of the system and looked at, clicked on

11  previously-scheduled teaching and looked at this

12  previously?

13     A.  We have a separate system called "My UNT,"

14  and that's where I go to look up my teaching

15  information.

16     Q.  So my -- my question was whether you've

17  gone to this site, clicked on previously-scheduled

18  teaching and looked at this data ever before.

19     A.  Normally -- I don't recall.  I may have in

20  the past.  It's not something that I regularly

21  consult to, you know, form a list of the courses

22  that I've taught or something like that.  Our main

23  interaction with FIS, the faculty information

24  system, is to submit our performance information, so

25  the committees we were on, things like that, so that

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                41

1  they can evaluate us at the end of the year.  That's

2  our main use of this system.

3      Q.  So the answer is yes, you've looked at it

4  previously?

5      A.  This page, I don't know that I can say

6  that.  Again, this is -- we're talking about over

7  the last probably ten years that this was in use.  I

8  don't know.  I may have.  It's not something that I

9  recall.

10      Q.  If we were to take the courses taught

11  listed on your CV attached to the declaration,

12  Exhibit 3, and correlated that to the list of

13  courses here on Exhibit 5, would that generate a

14  relatively accurate listing of the courses you've

15  taught?

16      A.  Well, I mean, you'll recognize some of the

17  names here.  I would say in general, no, because, as

18  I mentioned, this is going to have courses for which

19  I have a code assigned, the 749 code, and that do

20  not translate into an actual class.  It's a number

21  for students to use to register with.  And so, I

22  mean, this will give you an idea that I have taught

23  secure electronic commerce, but as far as a direct

24  mapping, no.

25      Q.  If there's a syllabus shown as there is on

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    42

1   Tab 4, would that indicate that you very likely

2   taught the class?

3       A.  Yes, a syllabus attachment, the syllabi

4   are uploaded to the system and so yes, if there's a

5   syllabus there, it's likely that I taught the

6   course.

7           There were occasionally substitutions.

8   And again, like I said, this is a snapshot of a

9   moment in time and instructors change.  It's

10  possible that I can upload a syllabus for a course

11  and then someone else gets assigned to it the day

12  before the class starts and they forget to upload

13  their syllabus and so forth.  So this is an

14  automatically generated document that is -- you

15  know, and like I mentioned, it includes information

16  that may vary from the final actual taught courses.

17      Q.  If you cursor down to page 2 of Exhibit 5,

18  you'll see a course CSCE3410, advanced programming,

19  Android.  Do you see that?

20      A.  3410.

21      Q.  It's the second page -- I'm sorry.  It's

22  the -- it's page 6.  It's the actual course

23  syllabus.

24      A.  Okay.  Sorry.  Page 6.  Ah, okay, yes,

25  advanced programming Android.  Yes.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              43

1    Q.  It lists you as an instructor.  Do you see

2  that?

3    A.  Yes.

4    Q.  So did you teach an advanced programming

5  Android course?

6    A.  Yes.

7    Q.  And you recall teaching that course,

8  right?

9    A.  It's been awhile, but yes.

10    Q.  And did you recommend a textbook for that

11  course?

12    A.  Yes.  It looks like Professional Android 2

13  Application Development by Meier.

14    Q.  Are you familiar with that book?

15    A.  It's been quite awhile.  It's been awhile

16  since I looked at it.

17    Q.  Well, why did you recommend that book or

18  use that textbook?

19    A.  I believe I had -- I had read it and

20  thought it was -- it was a worthwhile book.  For a

21  lot of my courses, we will use a textbook.  For some

22  we just use online resources.  And so I think that's

23  why it was recommended because that some students

24  won't read the book and we know that, and so we'll

25  leave them with the online resources.  But for those

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                44

1  who like to read, I thought that was a good one.

2    Q.  All right.  So you thought that the

3  Professional Android 2 Application Development book

4  by Meier was a good book?

5    A.  I --

6    Q.  And you taught from it?

7    A.  I don't -- I wouldn't say that I taught

8  from it.  It's -- it's something that we may have

9  referenced within the course or that I used to

10  prepare course materials.

11    Q.  Some of your syllabi have online course

12  materials as you noted.  This one doesn't.  You see

13  that?

14    A.  I'm sorry.  I don't see what you're

15  referring to here.

16    Q.  Well, there are some of your syllabi

17  that -- syllabuses that actually say that there are

18  no textbooks and online materials are used.

19    A.  Uh-huh, yes.

20    Q.  And this one lists as the only textbook to

21  use Android 2 application development by Meier,

22  right?

23    A.  Yes.  As a recommended book.

24    Q.  And in fact, you used that for many

25  semesters, correct?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                45

1    A.   I don't recall.

2    Q.   Well, in fact, you later substituted

3   exhibit -- I mean the Android 4, the updated edition

4   by Meier for use in teaching Android advanced

5   programming, correct?

6    A.   Again, I don't recall the versions of

7   textbooks that I used in courses.

8    Q.   So you have no recollection of whether you

9   later went to the updated book or used the updated

10   book Android 4 application development, Professional

11   Android 4 Application Development by Meier?

12    A.   The field of app development changes very

13   rapidly, and so if there were a new book available,

14   I probably would have recommended it.

15    Q.   Trying to find a page number for you,

16   Dr. Garlick.  If you would cursor down to page 13.

17   There's another instance of advanced programming

18   Android showing you as an instructor.

19    A.   Okay.  I see that.

20    Q.   All right.  What textbook do you recommend

21   there?

22    A.   There it says the Professional Android 4

23   Application Development.

24    Q.   And I'll just kind of hold it up there.

25   You've seen that before, right?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                46

1    A.  I have.

2    Q.  Do you recognize that book?

3    A.  The terminator book.

4    Q.  Right, right.  Okay.  So in fact, you've

5    used multiple editions of that book to teach the

6    course multiple times, right?

7    A.  It appears so.  I will admit to the

8    occasional mistake and error in my syllabi, which my

9    students point out regularly.

10    Q.  All right.  So is this an error or not?

11    A.  I don't believe so.

12    Q.  Okay.  All right.  And in fact, and under

13    oath, you believe the Android 4 professional

14    application development book to be a good book for

15    you to teach from, correct?

16    A.  I recommended it for the course.

17    Q.  All right.  And certainly students were

18    taking the course, you wouldn't want them to use a

19    bad book, right?

20    A.  That's right.

21    Q.  On the record, a lot of universities in

22    fact require that you teach from authoritative

23    books, right?

24    A.  I'm sorry.  The audio broke up a little

25    bit.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                47

1    Q.  Sure.  Are you aware that many

2  universities require that professors teach from

3  books that they consider to be authoritative?

4    A.  I would say that the textbook approval

5  process is confusing.

6    Q.  Well, I teach at the law school, so I

7  understand that.  But isn't it true that if you

8  actually select a course book to teach from as

9  opposed to creating your own lecture notes that

10  there is a requirement for what you can use as a

11  textbook, right?

12    A.  It usually goes through a committee.  That

13  doesn't always happen.

14    Q.  Did it happen in this case?

15    A.  I don't recall.

16    Q.  But certainly in meeting your duties to

17  provide textbooks that you believe to be worth while

18  and accurate, the Meyer book, professional Android

19  application development is one of them, correct?

20    A.  I'm sorry.  A book that I believe to be

21  what?

22    Q.  Worthwhile and accurate to use for

23  teaching.

24    A.  I think that's fair.

25    Q.  Yeah, I'd like to actually mark as

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                48

1  Exhibit 5 the cover and copyright page of the

2  Android 4 Application book by Mr. Meier.

3      MR. XU:  So Steve it's Exhibit 5?  I think

4  you already --

5      MR. LISA:  I'm sorry, Exhibit 6.  You're

6  seeing my inability to keep up with technology here.

7  Q.  All right.  So that should be there now.

8  A.  Okay.  Yes.

9  Q.  All right.  So marked as Exhibit 6 is the

10  Professional Android 4 Application Development book.

11  And do you recognize that?

12  A.  I do, yes.

13  Q.   And that is in fact the book we've been

14  discussing over the last few minutes, correct?

15  A.  Yes.

16  Q.   And that is the book that's used in at

17  least the course on Android application development

18  by you, correct?

19  A.  I believe so, yes.

20  Q.  Turning back to your syllabus.

21  A.  This is --

22  Q.  You teach a course on computer networks,

23  correct?

24  A.  I have in the past, yes.

25  Q.  I'd like to mark as Exhibit 7 a book that

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    49

1   is listed in your syllabus and see if you recognize

2   that, entitled Computer Networking, 5th Edition, a

3   Top-Down Approach.  That should be in your file now,

4   Dr. Garlick.  Do you see that?

5       A.  I do, yes.

6       Q.  Do you recognize that book?

7       A.  I believe that's a book that we used in an

8   earlier version of the networking class.  I'm not

9   sure about the version number or --

10      Q.  Well, if you go back to Exhibit 5, your

11  syllabus course --

12      A.  Okay.

13      Q.   -- and you cursor down, there is a course

14  entitled Introduction to Computer Networks, CSCE3530

15  listing as instructor Ryan Garlick.

16      A.  And sorry.  Which page are we on?

17      Q.  Oh, page 10 of 26.

18      A.  Okay.  Okay.  Yes.

19      Q.  So do you recognize that as a course

20  you've taught at the university?

21      A.  Yes.

22      Q.  And do you see the book, the textbook that

23  is referenced there?

24      A.  I do.

25      Q.  And is it fair to say that you recommend

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    50

1  that book and use that book as a textbook because

2  you believe it to be a good book to use for the

3  course you're teaching?

4      A.  Yes.  I will add that in later versions of

5  this, as the course moved to an online format, I

6  think we had less focus on textbooks and more on

7  video materials.  The pandemic really threw a wrench

8  in everything related to school, as I'm sure you

9  know, and so -- but the answer to your question is

10  yes.

11      Q.  Thank you.  And certainly the further, you

12  know, if you look back through your syllabus

13  listings, they go all the way back to 2010.  So

14  that's well prior to the pandemic, correct?

15      A.  Yes.

16      Q.  So in and around the time period of 2010

17  through up until when the pandemic came, you were

18  probably more likely to use textbooks, correct?

19      A.  We moved to online a bit before the

20  pandemic, just to alleviate some of our congestion

21  problems with classroom space.  So it wasn't a

22  perfect coinciding of online courses with pandemic

23  arrival, but yes, that is a textbook that we used.

24      Q.  Mark to mark as exhibit 8 another textbook

25  called How to Program, 6th edition.  Do you see that

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                51

1  book, Dr. Garlick?

2      A.  I do, yes.

3      Q.  Do you recognize that book?

4      A.  This -- this looks familiar.  This would

5  have been, like I say, from a course early in my

6  career, if this is the version that was used and so

7  on.  You can see 6th edition.  I don't recall

8  edition numbers.  The cover is very unique and looks

9  familiar.

10     Q.  If you would go back to your syllabus,

11  Exhibit 5, and go down to page 9 of 26.

12     A.  Okay.  Sorry.  Syllabus is Exhibit --

13     Q.  5.

14     A.  -- 5.  Okay.  To page 7, you said?  Okay.

15     Q.  Page 9 of 26.  Page 9, not page 7.

16     A.  Okay.  Let's see.  Okay.  Page 9, I see

17  CSCE1040, course policies.

18     Q.  Instructor Ryan Garlick, right?

19     A.  Page 9, I have -- I have course policies.

20     Q.  All right.  Go up a page then.

21     A.  Okay.  Okay.  Yes.  I see textbook there.

22     Q.  Right.  And that's the textbook that we

23  just marked as Exhibit 8, correct?

24     A.  Yes.

25     Q.  And that is the textbook that you used at

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    52

1   or about the time you taught that course, correct?

2       A.   It appears so, yes.  I -- I list textbooks

3   here.  We tend to use in-class materials extensively

4   also, so --

5       Q.   But you listed this textbook because you

6   believed it to be a good textbook for computer

7   networking, correct?

8       A.   This is a programming course.

9       Q.   Why did you list the book?

10      A.   That's the topic of the course.  This is

11  computer science 2.

12      Q.   Did you list this book because you

13  believed it to be a good book to use as a textbook

14  for this course?

15      A.   Yes.

16      Q.   Thank you.  Did you review any of these

17  textbooks prior to submitting your testimony in a

18  declaration, Exhibit 2?

19      A.   Did I review the books for the

20  declaration?

21      Q.   Before submitting the declaration.

22      A.   Well, I mean, I've reviewed these books

23  for the courses, and that --

24      Q.   When was the last time you reviewed each

25  of these books?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                53

1      A.  Oh, it's -- I mean, I can't tell you

2   individually for each book.  This book, the see how

3   to program, it's probably been at least a decade.

4      Q.  Did you review any of these books after

5   you were retained in this matter?

6      A.  No.

7      Q.  So your opinions don't take into

8   consideration anything that might be said in these

9   books specifically, correct?

10     A.  That's correct.

11     Q.  How about your course notes and lecture

12  notes?  Did you consider any of them after you were

13  retained in this case?

14     A.  Not that I recall.

15     Q.  Are any of your courses recorded online

16  via Zoom?

17     A.  I have some lectures that I have recorded

18  online.

19     Q.  And they're available for students to

20  review even after the date of the lecture, correct?

21     A.  Our canvass system, I don't know.  I think

22  it may close that off for student access.  I don't

23  know the answer to that.

24     Q.  All right.  Would you be surprised if

25  they're available to review after the date that you

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT               54

1  record it?

2    A.  No, that wouldn't surprise me.

3    Q.  So did you review any of those to see if

4  your testimony in the declaration was consistent

5  with any of your statements made while teaching?

6    A.  Did I review the videos to see if they

7  were consistent with my statements made --

8    Q.  In the declaration.

9    A.  Oh, in the declaration.  I did not review

10  the videos prior, after being retained.

11    Q.  So --

12    A.  Maybe in the course of teaching but not in

13  regards to the case.

14    Q.  In connection with your Android

15  application course, did you teach them how to

16  actually create an application?

17    A.  So, again, a rough recollection of this

18  because it has been awhile.  We went over the tools

19  that are used to create apps.  I showed them some

20  sample code.  They went through some code.  I

21  believe the students made some apps on their own.  I

22  don't recall all the specific details of the -- of

23  the curriculum.

24    Q.  You have taught courses in which the goal

25  was to actually create an Android application,

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                55

1  correct?

2      A.  I believe that -- I always encourage that.

3  And so whether or not it was a requirement, I don't

4  recall.

5      Q.  What level student would have taken the

6  Professional Android 4 Application Development

7  program, course?

8      A.  You're referring to the Android course

9  that I taught?

10     Q.  Yes.

11     A.  That would have been -- I believe if that

12  course number starts with 3, that's generally a

13  course designed for juniors.  4 is seniors and so

14  on.  But we get a mixture generally.  But that's --

15  the prerequisite structure means it will typically

16  be an upper division student.

17     Q.  So did that course include teaching

18  students at or about the junior level how to program

19  menus and user interfaces and things such as that in

20  an Android environment?

21     A.  So in those courses at that time period in

22  my career, I was focused on project-based learning,

23  and a component of that is that you provide tools

24  and say create something.  And so the students would

25  take it in different directions using the materials

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    56

1  and the things that we discussed in the class.  And

2  so there would be quite a difference in that, but we

3  tried to cover as much of, you know, the relevant

4  material as we could get through.

5      Q.   So did that include teaching students how

6  to program a user interface with menus and buttons

7  and dropdowns and things such as that?

8      A.   Menus specifically, I don't recall the

9  details of the course.  It's a -- generally a

10  graphical user interface, so those elements are

11  likely to come up.  But again, I don't recall all

12  the specific curriculum details.

13      Q.   So those are likely to come up, you said?

14      A.   User interface elements in general are

15  something that would likely come up.

16      Q.   And what are user interface elements in

17  your professional experience for an Android app?

18      A.   The components that make up the screens,

19  the buttons, the controls that are present.

20      Q.   What components and buttons are you

21  referring to?

22      A.   Just that a programmer, a developer could

23  place a button that had some functionality attached

24  to it.

25      Q.   Explain what you mean by that.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                57

1    A.  Well, a programmer can place elements from

2    the user interface onto the screens of an app and

3    then tie code to a user pressing that button.

4    Q.  And what happens when a user presses a

5    button?

6    A.  Well, depends on how you program it.

7    Q.  All right.  Well, let's use a -- let's use

8    a dropdown menu.  What happens when a user presses

9    an option on a dropdown menu?

10    A.  Well, that's what the programmer

11    determines through the code creation.

12    Q.  All right.  So what's the purpose of

13    having those buttons with functionality on a user

14    interface?

15    A.  There are elements for the user to

16    interact with to perform some function.

17    Q.  So let's step through how that happens.

18    Provide an example of how that happens.

19        MR. XU:  Steve, I think we're over the

20    hour.  So whenever we have a good time we can take a

21    break if you want.

22        MR. LISA:  Sure.  Let's get through this

23    little bit and we'll take a break, so five or ten

24    minutes and we'll stop.

25    Q.  So you're an expert in and you've actually

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                58

1   programmed Android applications yourself, correct?

2      A.   That's correct.

3      Q.   Okay.  So you know what menu options there

4   are available in Android and in Apple and in other

5   environments, even web-based HTML and things like

6   that, correct?

7      A.   I'm not sure the terminology that we're

8   using here.  You're saying -- your question implies

9   that there are menus that are present in every

10  Android app and they have certain functionality, and

11  you can create an app that has no menu at all or no

12  buttons or anything like that.  I'm a bit confused

13  by the question, I guess.

14     Q.   You've programmed apps that have a user

15  interface with programming buttons having

16  functionality.  Isn't that correct?

17     A.   Yes.

18     Q.   In fact, each your commercial websites

19  that you've identified in your various CVs have

20  exactly that, don't they?

21     A.   Yes.

22     Q.   Dropdown menus with the words options,

23  with buttons that follow, right?

24     A.   Yes.  Well, menu items.

25     Q.   And it says menu options on your websites,

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 59

1   right?

2      A.   Okay.  Yeah, if we want to use options.

3      Q.   Well, let's use that as an example, all

4   right?  Let's mark as Exhibit 10 -- what's next -- 9

5   and 9A some screenshots we've taken from your

6   websites, okay?

7      A.   Okay.

8      Q.   And while we're waiting for that to

9   happen, let's start with the wood framing website.

10  Did you program that yourself initially?

11     A.   Hang on.  I'm still waiting on --

12     Q.   No, no, I'm just asking you in general.

13  Did you program the wood framing site that you

14  mention in your various background documents?

15     A.   So it's based on a platform called Miva.

16  I wrote some code that interacts with Miva.  I've

17  written code that interfaces various components and

18  ties in various APIs and so on.

19      So like most software, you know, not the

20  entire system, but I have, let's say, contributed to

21  the code that runs the site.

22     Q.   The declarations you've filed in other

23  cases say that you actually were responsible for,

24  created and managed and brought that business to its

25  present state, right?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                60

1   A.  Yes.

2      MR. XU:  Objection.

3   Q.  Okay.  So you're actually materially

4  involved in supervising and directing how that wood

5  framing business and website operates, and that's

6  what you say in your declarations, correct?

7   A.  So I have recently sold this business, but

8  as far as the development, the creation, yes, I was

9  materially involved.

10   Q.  Let's look at, if you would, please,

11  Exhibit 9.

12   A.  Okay.  And if we could take a break when

13  you're done with this.

14   Q.  Okay.  That's fine.  We can take a break.

15  Let's take a five-minute break and we'll be back.

16  Okay?

17   A.  Sounds good.

18      (Recess from time    to time   )

19  BY MR. LISA:

20   Q.  Dr. Garlick, I've marked as Exhibit 9 a

21  screenshot of some of the pages from this website

22  Wordyisms.  Are you familiar with that?

23   A.  Yes.

24   Q.  And why don't you explain again what your

25  involvement was in this.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                61

1    A.  So this was my family's business.  I set

2  up the e-commerce portion of the business, you know,

3  using some shopping cart software called Miva

4  merchant, and I developed the -- some of the code

5  that did some of the customization involved.

6  They're highly customizable products.  And did some

7  of that code, did some of the user interface design

8  and managed the site after my mother retired.

9    Q.  And so you recognize what you see in

10  Exhibit 9.  Is that correct?

11    A.  Yes.

12    Q.  Okay.  And as you said, the items were

13  highly customizable, right?

14    A.  Yes.

15    Q.  And I notice on your website that there

16  are a number of buttons and dropdown menus, right?

17    A.  Yes.

18    Q.  And you actually refer to them as options,

19  right?

20    A.  I guess in regards to the frame that you

21  can choose, there are different options.

22    Q.  And the text you can put in is custom,

23  correct?

24    A.  Yes.

25    Q.  All right.  So you have buttons if you

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 62

1   look at page 2 that you can -- a user can select to

2   select different text, right?

3       A.   Yes, those are radio buttons for the font

4   I think you're referring to.

5       Q.   And then there's -- those are called radio

6   buttons, right?

7       A.   Yes.

8       Q.   Okay.  And then there's radio buttons for

9   mat color, right?

10      A.   Yes.

11      Q.   And for the frame and for acrylic,

12  correct?

13      A.   Yes.

14      Q.   And those are all referred to as options

15  by you, correct?

16      A.   I guess above it says options in bold are

17  required.

18      Q.   And example would be document direction,

19  orientation, you don't want the user to get it

20  wrong, right?

21      A.   Right.

22      Q.   Okay.  So the -- what happens -- well,

23  sorry.  Question -- strike that question.

24          Were you involved in laying this out at

25  all, originally?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                63

1    A.  Yes.

2    Q.  Okay.  So what happens when a user selects

3  a radio button, for example, for document

4  orientation?  There's two choices.  What happens?

5    A.  So when a user selects one or the other

6  option, a field is captured that collects that

7  information that is then collected as part of the

8  order process.  So an order will see that either

9  horizontal or vertical has been chosen.

10    Q.  How is a field captured?

11    A.  So in this case, the element will have a

12  selected property attached to it.  The code will go

13  in, see that, and then append to the order

14  information that's passed through the system, either

15  the word vertical or horizontal.

16    Q.  So that's stored somewhere, that

17  selection, correct?

18    A.  That's correct.

19    Q.  And that selection then directs what is to

20  be the document orientation through the ordering

21  process, correct?

22        MR. XU:  Objection, vague.

23    A.  I'm sorry.  The -- I didn't catch one of

24  the words.  Did you say directs the -- could you

25  repeat the question?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    64

1    Q.  It controls, it defines, it defines that

2  option, right?

3    A.  It just appends a word to the options

4  field that is then passed along in an email to the

5  ordering system.

6    Q.  Where is the options field in the code?

7    A.  I don't know how to answer that question.

8    Q.  You said that the field caption is --

9  trying to -- I don't have your testimony, so I

10  can't -- give me a second here as I go back and look

11  at what your answer was.  You say the code will go

12  in is what your answer is -- you said so when a user

13  selects one or the other option, a field is

14  captured.  Do you recall saying that?

15    A.  Yes.

16    Q.  What do you mean by a field is captured?

17    A.  So, again, it's been quite a long time

18  since I've looked at the code here and I'm not sure

19  I'm going to be able to give you specifics on how

20  this particular feature is implemented.  But in

21  general, that the user selection is marked and then

22  code recognizes that one of those options has been

23  chosen and appends a string, a text field, to I

24  believe it's an options array.

25          Again, I don't recall the specifics of

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                65

1  this line of code, but that is then going to be

2  stored in a database as part of this order and

3  passed along in an order email that is received by

4  the people who actually build the frames.

5      Q.  So where is that code?

6      A.  I don't know what you mean by that

7  question.

8      Q.  It says the user selection is marked and

9  then code recognizes that one of those options has

10  been chosen.

11     A.  Uh-huh.

12     Q.  What code?

13     A.  Are you asking for like a file name or

14  where that code --

15     Q.  Where is the code?

16     A.  The code is residing -- where physically?

17     Q.  You wrote the code, right?

18     A.  Part of this -- some of this is part of

19  the Miva merchant system.  Some of it was added on

20  by me, modified and so forth.

21         So the code is a file that exists on the

22  Miva servers.

23     Q.  Thank you.  Then you said that then this

24  is going to be stored in a database.  What does that

25  mean?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                66

1    A.  There's a database associated with the --

2  with the shopping cart system, and that database

3  stores order information, product information, all

4  sorts of things like that.  And that -- these

5  options are attached to an order as part of an order

6  and stored in the database.

7    Q.  Is it fair to say that the user selection

8  of an option is stored in a database in memory

9  somewhere?

10        MR. XU:  Objection, vague.

11    A.  I'm sorry.  I didn't hear the objection.

12        MR. XU:  Objection, vague.

13    A.  Oh.  Databases can be in memory.  They're

14  also typically in fixed storage also.  Can you

15  repeat the question?

16    Q.  Dr. Garlick, you're the one who said the

17  database stores the user options.  So what did you

18  mean by that?

19    A.  I mean that this is a database table that

20  stores orders and as part of that data, the option

21  that is selected as part of the order is stored in

22  that database.

23    Q.  And is it your testimony as an expert that

24  it's not stored in a memory somewhere?

25    A.  Memory typically refers to the operating

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    67

1  memory of a computer.  Databases are typically more

2  permanent storage.

3      Q.  So do you know where it's stored?

4      A.  It's stored in the database which is going

5  to be in nonvolatile memory.

6      Q.  Thank you.

7      A.  It may also be in volatile memory,

8  depending on the implementation of the system,

9  caching and so forth.  It's not a -- it's hard to

10  answer that question as asked.

11      Q.   When the user moves on from document

12  orientation to custom text box, the document

13  orientation selection option is not lost, is it?

14      A.  I don't recall where exactly all of these

15  things are stored.  In other words, if you selected

16  documentation -- document orientation and then hit

17  the refresh button on a browser, it may revert to

18  the default setting.

19      Q.  Okay.  Is it your intent that the user has

20  to reselect everything, or is the normal operation

21  of this that once a selection is made, he moves --

22  he or she moves on to the next one?

23      A.  That's -- that's -- that's the goal.

24  However, it's not always under your control because

25  the user can do things with their browser that can

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                68

1    interfere with that process.

2        Q.  But as you said previously, it's stored in

3    a memory somewhere and you move on to the next

4    selection, right, in general?

5        MR. XU:  Objection, vague.

6        A.  I don't know that I can put it in that

7    order because there is a submit button at the bottom

8    and I don't recall at what point the selection is

9    actually stored.

10       Q.  Says in your document that options in bold

11   are required, correct?

12       A.  I --

13       Q.  On Exhibit 9.

14       A.  I don't mean to interrupt here, but I saw

15   your lips moving before I heard sound and I want to

16   make sure I have the full question.

17       Q.  Sure.

18       A.  Okay.

19       Q.  Question is, Exhibit 9 states, options in

20   bold are required, correct?

21       A.  Yes, that's correct.

22       Q.  All right.  So a user would have to select

23   all required options and then hit submit if he's

24   following your direction, correct?

25       A.  The bold options, yes.  I believe there's

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                69

1  a warning message that pops up if you haven't

2  selected a --

3      Q.  Thank you.  Yes.  Right.  So your intent

4  is that all of the user options in bold are required

5  and if they don't do that, you get a warning and the

6  order's not submitted, correct?

7      A.  Upon pressing the add to cart button, I

8  believe, is when that warning message will occur.  I

9  think I disagree with your ordering of the steps

10  here.

11      Q.  Well, let's take them one at a time then.

12      A.  Okay.

13      Q.  The user presses a button for a document

14  orientation at some time in the ordering process,

15  and that option is stored in memory and used in the

16  ordering process, correct?

17          MR. XU:  Objection, vague.

18      A.  A user selects an option, and that option

19  is eventually stored as part of the order process.

20      Q.  Then a user would -- or at some point the

21  user selects the custom text box, correct, by

22  selecting one of the radio buttons, correct?

23      A.  Yes.  They don't have to do it in a

24  certain order.

25      Q.  Correct.  I understand that.  So he

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    70

1   selects -- he or she selects by pressing or clicking

2   on, depending on whether it's a touch screen or a

3   computer, custom text form radio buttons and selects

4   that option, right?

5   A.   Yes.

6   Q.   And what happens then?

7   A.   Well, it's up to the user.

8   Q.   What happens at the program level when a

9   button is selected for the custom text box option?

10   A.   The -- again, I don't recall the details

11   of this particular segment of code, but it's going

12   to mark a property of one of the radio options as

13   selected.

14   Q.   And what does that result in happening?

15   What happens?

16   A.   Then a circle is drawn within that -- next

17   to the selected font.

18   Q.   And then what happens?

19   A.   Then -- again, it's up to the user.  They

20   can close the browser window.  They can hit refresh.

21   They can --

22   Q.   In the ordinary use of the business which

23   you started, Dr. Garlick, in which you intended this

24   form to be filled out, let's not look at exceptions.

25   Let's look at how you intended this system to

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                71

1   operate.  Okay?

2      A.   Okay.

3      Q.   All right.  So these questions are pretty

4   direct and simple.  All right?  When a user selects

5   the custom text font option by pressing a radio

6   button, what does your system do?

7         MR. XU:  Objection, vague.

8      A.  I believe I answered that.  It --

9      Q.   Answer it again, please.

10     A.   It draws a circle next to the selected

11  font and marks in the HTML that a radio button

12  attribute or one of the radio button options was

13  selected.

14     Q.   And then what happens after the HTML marks

15  that?

16     A.   This is event driven software, so it waits

17  for user input.

18     Q.   All right.  Then after all the rest of the

19  options are selected and submit is hit and selected,

20  what happens?

21     A.   Then code will determine which options

22  have been selected.  I believe this one has a field

23  where you can enter a custom text.  So that text

24  will be collected and it will -- that information

25  will be stored in a database, stored in a memory

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                72

1  object, and ultimately passed on through the order

2  system so that the people who build the frame can

3  know the options that were chosen.

4     Q.  So is it fair to say that the information

5  that is passed on to those who build the system,

6  that they are instructed as to how to build the

7  frame based on those options?

8        MR. XU:  Objection, vague.

9     A.  They're provided with information that

10  lets them build the frame.

11    Q.  You're a teacher and you instruct your

12  students, correct?

13    A.  I believe that's a term that's used in

14  association with teaching.

15    Q.  Is the data that's passed on to those who

16  complete the system, do those options instruct them

17  how to build the frame?

18        MR. XU:  Objection, vague.

19    A.  I -- I don't know about the terminology

20  here that -- it's data that's provided.

21    Q.  And what happens with the data that's

22  provided?  Who receives it?

23    A.  So the production facility receives it.

24  They print it out and they build the frame according

25  to the -- to the data.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    73

1    Q.  So they build the frame according to the

2  data, correct?

3    A.  Yes.  They'll have the size information,

4  the color information, so forth.

5    Q.  So the options selected by the user is

6  converted to data that is provided to those who

7  build the frame, and it guides them how to build the

8  frame.  Is that correct?

9      MR. XU:  Objection, vague.

10    A.  It's information that they use in order to

11  build the frame.

12    Q.  Explain what you mean.

13    A.  They have a general template for building

14  frames, and they need to know the mat color, the

15  size of the opening, things like that, and that

16  information is provided by the -- by the email.

17    Q.  And it's your testimony that that does not

18  instruct them how to build a frame?

19    A.  I don't know what term we want to use.

20  It's -- it's information that -- it's data points

21  that are used.  It doesn't tell them how to assemble

22  a frame or something like that.  It tells them --

23    Q.  Does it tell them what orientation to put

24  the document?

25    A.  It tells them how to cut the opening based

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                74

1  on which size is larger or which side is wider.

2      Q.   Does it tell them which color frame mat to

3  use, mat to use?

4      A.   Yes.

5      Q.   Does it tell them what frame to use?

6      A.   Yes.

7      Q.   Does it tell them which font to use?

8      A.   Yes.

9      Q.   And does it tell them which document

10  orientation to cut the material?

11      A.   Yes.

12      Q.   All right.  So it is a simple fact that

13  the options selected by the user inform, guide, and

14  tell those that create the frame how to do it in

15  accordance with the order.

16      A.   The instruction for building a frame is

17  their knowledge of how to assemble frames.

18      Q.   Dr. Garlick, I withdraw the question.

19  We're going to ask it again.  We're going to ask it

20  again simply.  When the user submits the order, the

21  order informs the person who completes it which

22  document orientation to use, correct?

23      A.   The information informs them -- I would

24  say it's the email that informs them.

25      Q.   All right.  So is it your testimony that

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    75

1  when a user selects the radio button for document

2  and orientation, he is not informing the system

3  which orientation for the document to use?

4      A.  The user is informing the system of which

5  orientation they would like.

6      Q.  Thank you.  And is the user informing the

7  system which text font to use?

8      A.  Yes, I would say, would say so.

9      Q.   And the user selection of the options for

10  mat color will inform the system and guide the

11  system as to which color to use, right?

12      A.  The -- I'm sorry.  Could you repeat it?

13        THE REPORTER:  Question:  "And the user

14  selection of the options for mat color will inform

15  the system and guide the system as to which color to

16  use, right?"

17      A.  The user selection will guide -- the user

18  decides which mat color they want by selecting one

19  of those options.

20      Q.  And that selection of the user option

21  instructs the system which color to use, correct?

22        MR. XU:  Objection, vague.

23      A.  The user is informing the system of which

24  mat color they would like.

25      Q.  And how does he do that?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    76

1    A.  By selecting one of them.

2    Q.  And the user selects one of the options

3  for frame to inform the system which frame to use,

4  right?

5    A.  The user -- the user decides which frame

6  they want.  They make a selection, and the user

7  tells the system which frame they want.

8    Q.  Well, what tells the system is the

9  selection of the radio button, correct?

10    A.  I would say it's the user selecting one of

11  them.

12    Q.  All right.  So the user selecting one of

13  the radio buttons informs the system as to which

14  frame to use?

15    A.  I suppose so.  I don't know.  We're

16  getting really out there on --

17    Q.  Dr. Garlick, you're an expert on this,

18  okay?  So if anybody's out there, it's me, all

19  right?  I mean, you're the one who knows how this

20  stuff operates.  So if you don't understand a

21  question, just tell me and I'll do my best to

22  rephrase it.  So I'll start again.

23        The user selection of the option for a

24  frame informs the system which frame to use,

25  correct?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                77

1    A.   The user informs the people building the

2   frame of which one they want by selecting a frame.

3    Q.   Dr. Garlick, I had asked you to answer my

4   question yes or no or tell me if you don't

5   understand.  Okay?  So let's try this again.

6        MR. XU:  Objection.  The witness can

7   choose -- can answer whatever he thinks the right

8   answer it.

9        MR. LISA:  Actually, not so, Mr. Xu and

10  that's not objection.  The witness is supposed to

11  answer fairly yes or no a question that calls for a

12  yes or no answer.  And if he doesn't understand

13  that, then he can let me know that.

14   Q.   So Dr. Garlick, we're going to try it

15  again.

16   A.   I'll do my best.

17   Q.   And if you don't under -- if you can't

18  answer the question, simply ask me to rephrase it.

19   A.   I will.

20   Q.   All right?  So the user selection of an

21  option for the frame instructs the system which

22  frame to use, correct?

23   A.   The user instructs through the frame

24  selection.  So I guess the answer to your question

25  is no because I disagree with the phrasing of it.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                78

1    Q.  Which part do you disagree?

2    A.  That it is -- that it is -- it feels like

3  you're taking the user out of the process here.  It

4  is the user choosing one of these frames, and that

5  data is then passed along and the user has informed

6  the people building the frame of which frame they

7  want based on that selection.  I don't know that I

8  have a further answer for this.

9    Q.  Well, then we'll try a different question.

10        You call the various radio buttons below

11  options, correct?  So you have no objection to me

12  calling them options, do you?

13    A.  No, no objection.

14    Q.  And the user selects an option by either

15  clicking on, if it's a computer, or pressing on if

16  it's a phone, the radio button, correct?

17    A.  The user selects one of those by clicking

18  or pressing, yes.

19    Q.  Okay.  So we can agree that the user

20  selects one of the options by either clicking or

21  pressing on the radio button, correct?

22    A.  The user select -- I think that was the

23  same question.

24    Q.  Actually I put two parts together.  Can

25  you repeat the question, Ms. Shelton?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    79

1      THE REPORTER:  Question:  "So we can agree

2   that the user selects one of the options by either

3   clicking or pressing on the radio button, correct?"

4      MR. XU:  Objection, vague.

5   Q.   Yes or no?

6   A.   Yes.

7      MR. XU:  The witness can choose his

8   answer.

9   A.   Yes, the user chooses their option by

10   clicking or pressing on one of the selections.

11   Q.   And when the user selects his option by

12   pressing or clicking on one of the radio buttons,

13   that results in the system being informed as to how

14   to -- strike the question.

15      Could you repeat his answer, please?

16      THE REPORTER:  Answer:  "Yes, the user

17   chooses their option by clicking or pressing on one

18   of the selections."

19   Q.   And what happens after that?

20   A.   This is what we've gone over before.  I

21   have the same answers that I had before.

22   Q.   It instructs the system how the user wants

23   the frame built, correct?

24      MR. XU:  Objection, vague.

25   A.   I feel like that's -- that's not what I

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                80

1  said before.

2    Q.  I'm asking you if that's correct.

3    A.  I feel like I've answered this question

4  several times now.

5      MR. LISA:  I'm asking if what I just told

6  you, which is not the same as what you've answered

7  previously, so I'm asking Ms. Shelton to repeat the

8  question again.

9      THE REPORTER:  Question:  "It instructs

10  the system how the user wants the frame built,

11  correct?"

12      MR. XU:  Objection.  Same objection.

13    A.  It's data that's stored in a database.

14    Q.  Let's stop it again.  I'm asking a

15  question.  If the answer's no, if in your expert

16  opinion the answer is no, feel free to say no.

17  Okay?

18      The question is, that instructs the system

19  how the user wants the frame built, yes or no?

20      MR. XU:  Same objection.  And the witness

21  can answer --

22      MR. LISA:  You've made your objection.

23      MR. XU:  The witness can use his own words

24  to answer.

25    Q.  Answer the question, Dr. Garlick.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                81

1    A.  I'm sorry.  When you turn your head, the

2  audio goes out.  I apologize.

3    Q.  The selection of the option instructs the

4  system how the user wants the frame built, correct?

5       MR. XU:  Same objection.

6    A.  I don't think an option does the

7  instruction, does instructions.  It's a piece of

8  data.  So, no is the answer.

9    Q.  So in your professional opinion, when the

10  user selects an option as required by your system

11  and the options are submitted, it does not instruct

12  the system how to build the frame?

13       MR. XU:  Objection, vague.

14    A.  When -- a user's selection is used -- is

15  stored by the system and is used by the production

16  facility to pick a mat color.  I --

17    Q.  Which is part of building the frame,

18  correct?

19    A.  Yes.

20    Q.  You agree that it's reasonable to refer to

21  the radio buttons on the screen that are selected by

22  the user as user options, correct?

23    A.  I feel like I've answered the question

24  about these being options three times now.

25    Q.  I'm asking a different question.  Do you

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                82

1  agree that it's fair for people skilled in this art

2  to refer to the various radio buttons shown on

3  Exhibit 9 as user options?

4      A.  Well, we covered that the options in bold

5  are required.  These are options, the user selects

6  them, so yes, a user option.

7      Q.  Thank you.  Look at Exhibit 9A, please.

8      A.  Let's see.  Okay.  9A.  All right.

9      Q.  Do you recognize those screenshots?

10     A.  I do, yes.

11     Q.  Can you explain what you see, please.

12     A.  This looks like a screen capture from a

13  mobile device of the TV frame website.

14     Q.  What is the TV frame website?

15     A.  Source TV frames.com.

16     Q.  And what is that?

17     A.  That is a site that I spun off, I guess,

18  from the diploma framing business to frame

19  televisions.

20     Q.  And do you recognize that, again, you have

21  the ability for users to select options through

22  various menus or buttons?

23     A.  Yes.  The users choose a size for their TV

24  and mat color and frame option.

25     Q.  So again, in this different example, it's

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                83

1  the user who selects options and those options guide

2  or direct the system what they're ordering, correct?

3      MR. XU:  Objection, vague.

4      A.  The user selects options and it's similar

5  to the last site.  The data is stored associated

6  with those user options and collected in an email

7  that's sent to production.

8      Q.  For what purpose?

9      A.  For -- for knowing which options the user

10  has chosen so that that fabric can be pulled off the

11  shelf.

12      Q.  Okay.  Is data stored as a result of those

13  selections by the user?

14      A.  Yes.

15      Q.  Now, in your declaration, Exhibit 2, you

16  refer to what you believe a person having an

17  ordinary skill in the art would be.  Is that

18  correct?

19      A.  Yes.

20      Q.  Let's turn to that if you would.

21  Specifically it's paragraph 37, I believe, of

22  Exhibit 2.

23      A.  Yes.  Okay.  I'm there.

24      Q.  All right.  And you say there that you

25  believe a person of ordinary skill in the art for

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                84

1  the '761 patent and the '472 patent as of

2  October 17, 2005, would have a bachelor's degree in

3  computer science, computer engineering, electrical

4  engineering, or other similar degrees, and two years

5  of experience in wireless client/server data

6  transmissions.  And you add that more work

7  experience can compensate for less education and

8  vice versa, correct?

9    A.  That's correct.

10    Q.  So someone who took a bachelor's degree in

11  computer science, can you give me an idea of what

12  level of coursework they would have in the field

13  that you've assigned for the person having ordinary

14  skill in the art here.

15    A.  I'm sorry.  I'm not sure that I understood

16  your question.  Were you saying that I had a

17  bachelor's in computer science?

18    Q.  No, no, no.

19    A.  Okay.

20    Q.  You assigned -- I've asked you what

21  level -- I'll ask it again.

22      What level of coursework would a person

23  having ordinary skill in the art have if they had a

24  bachelor's degree in computer science?

25    A.  Well, I would say that a common

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                85

1   curriculum, and this is going to vary from school to

2   school, but a common curriculum for a bachelor's

3   degree in computer science is going to involve some

4   programming courses, some computer networking

5   courses, algorithms, algorithm analysis, some

6   hardware courses would be involved also, computer

7   architecture, sort of the fundamentals of a computer

8   science degree.

9       Q.   And would -- as part of that, would they

10  have probably done some lab courses and setting up

11  computers or controllers or microprocessors and

12  programming them?

13      A.   Perhaps.

14      Q.   Do you think it would be if you're getting

15  a bachelor's of science degree in computer science

16  required that you take lab courses that involve

17  programming?

18      A.   I would say that would be very common

19  among the computer science curricula that I have

20  reviewed.

21      Q.   All right.  I'd like to mark as Exhibit 10

22  a document titled computer processor history.  So a

23  person having ordinary skill in the art as of the

24  time that you've identified, do you have an

25  understanding of which of the common microprocessors

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                86

1 they would have worked with at that time?

2     MR. XU:  Objection, vague.

3     A.  So we're talking about -- I'm not sure I

4 understand.  You reference a time period and -- I

5 think I'm going to need some clarification on the

6 question.

7     Q.  Sure.  You've identified the person of

8 ordinary skill in the art as of October 17th, 2005,

9 as a bachelor's degree in computer science with two

10 years of work experience, right?

11     A.  Yes.

12     Q.  I'm asking, what would a person of

13 ordinary skill in the art have worked with by way of

14 microprocessors at that time?

15     A.  So, much of the coursework involved in

16 computer science is not going to be processor

17 specific.  In other words, we're talking about

18 programming in C or Java or something like that.

19 Well, C at the time.  And that would not be tied to

20 a certain architecture.

21     Q.  So I asked a different question though.  A

22 person having ordinary skill in the art is actually

23 in the field for two years, you said, right?

24     A.  A person of ordinary skill in the art

25 would have -- I need to go back and reference it

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                87

1  again, but --

2      Q.   With a bachelor's degree and two years of

3  experience.

4      A.   And more school can substitute for

5  experience.

6      Q.   Right, right.  So this question I've

7  directed to the person having ordinary skill in the

8  art, and that is, as you understand that, what

9  computer processors would they have been working

10  with at that time?

11      A.   I don't know that I can recall the model

12  numbers of processors from certain times.  They're

13  going to be Motorola processors.  The 68,000 series

14  comes to mind.  I don't know -- I don't recall if

15  that's the right time frame, but yeah, I don't know

16  that I can correlate processor model numbers with

17  years.

18      Q.   Why don't you refer to exhibit --

19  plaintiff's Exhibit 10 and see if that refreshes

20  your recollection at all.  And in particular, are

21  you familiar with or have you worked with any of

22  those in the period around October 17, 2005?

23      A.   So I see from 2003 and 2004 and '5, we

24  have the AMDs, the Intel, the Pentium line and so

25  forth.  I had those processors in machines that I

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 88

1  owned.  But again, from a -- if we're talking about

2  a coursework perspective.

3      Q.  We're not?

4      A.  C programming is not --

5      Q.  We're not.  I've asked a specific

6  question.

7      A.  Okay.

8      Q.  Which of those do you recall having worked

9  with?

10      A.  I recall having Pentium machines.  I don't

11  recall which iteration of that architecture or that

12  product.  I also had some AMD processors in machines

13  that I worked with.  So that's the best of my

14  recollection.

15      Q.  So would you agree that the processors

16  prior to 2006 would have been well known to those of

17  ordinary skill in the art as you've defined that

18  person?

19          MR. XU:  Objection, vague.

20      A.  That the -- could you repeat the question?

21      Q.  Can you repeat the question, please,

22  Ms. Shelton.

23          THE REPORTER:  Question:  "So would you

24  agree that the processors prior to 2006 would have

25  been well known to those of ordinary skill in the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                89

1  art as you've defined that person?"

2      MR. XU:  Same objection.

3      A.  I believe a person of ordinary skill in

4  the art would -- would have used some of these

5  processors.  I -- I don't know that it would have

6  come in from computer science coursework

7  necessarily.

8      Q.  The person having ordinary skill in the

9  art as you've defined them has coursework and work

10  experience, correct?

11      A.  They could have both, either or.

12      Q.  Well, it says and two years of experience,

13  more work experience can compensate for less

14  education and vice versa.  But as I understand it,

15  your definition of a person having ordinary skill in

16  the art does not include no work experience.

17      A.  No, I think it's written more education

18  could substitute for work experience.

19      Q.  So in your view, a person of ordinary

20  skill in the art could have no experience in the

21  field working?

22      A.  I think that more school could substitute

23  for work experience, that's correct.

24      Q.  And it's your testimony that a person

25  having ordinary skill in the art would have worked

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                90

1  with some of the microprocessors listed on

2  Exhibit 10 prior to 2006?

3     A.  Yes, I think that in a desktop environment

4  that these listed model numbers were in use and may

5  have been familiar to someone.

6     Q.  And do you agree that those model numbers

7  listed on Exhibit 10 refer to specific

8  microprocessor devices?

9   A.  Yes.

10   Q.  And those are in fact structures, right?

11     MR. XU:  Objection, vague.

12   A.  I don't know what you mean by that.

13   Q.  Well, taking, for example, if you look at

14  page 4 of Exhibit 10, and let's refer to the Athlon

15  64 X2 3800 plus, a couple up from the bottom.  Do

16  you see that?

17   A.  We're looking at.

18   Q.  2005?

19   A.  2005.

20   Q.  2005, correct.  So if you look at the

21  entry for 2005 for the AMD product identified there,

22  you would agree that that identifies a specific

23  microprocessor, correct?

24   A.  Yes.

25   Q.  And you'd consider that to be a specific

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                91

1  structure, correct?

2      MR. XU:  Objection, vague.

3      A.  I don't -- I don't know what you mean by

4  structure.

5      Q.  So what do you understand a structure to

6  be?

7      A.  When I hear that word, I think of a

8  building.

9      Q.  All right.  So a computer is not a

10  structure?

11      A.  I don't believe this is a term that's in

12  general use in the --

13      Q.  Well, how would --

14      A.  I don't have any context to give meaning

15  to this word.

16      Q.  Well, it's a specific chip set then.  Is

17  that fair to say?

18      A.  We're mixing terminology here that doesn't

19  necessarily follow.  Chip set can refer to chips

20  external to the processor and so on.  I can't give a

21  good answer as that's worded.

22      Q.  Is it -- is the Athlon 64 X2 AMD product

23  referenced at 2005 on Exhibit 10 a specific product?

24      A.  Specific product.  Yes.

25      Q.  It's a thing that exists in reality,

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    92

1  right?

2  A.  Yes.

3  Q.  You can order it, right?

4  A.  You could order that model number, yes.

5  Q.  And a person -- a person having ordinary

6  skill in the art being told what the Athlon 64 X2

7  3800 plus is would have no difficulty understanding

8  what it is, correct?

9  A.  That's correct.  There would probably be

10  variations of that in terms of clock speed, cache,

11  memory and so forth.

12  Q.  But they wouldn't be left to guess.  They

13  would understand what it is, correct?

14  A.  I would think so.

15  Q.  And would you agree that what's referenced

16  on that exhibit for the date 2005, the Athlon 64 X2

17  3800 plus, can be fairly characterized as a

18  particular hardware device?

19  A.  I would categorize this as hardware.

20  MR. LISA:  Turning to -- why don't we take

21  a short five-minute break because we're going to

22  turn to a new subject now if that's okay?

23  MR. XU:  Sure.

24  MR. LISA:  And then -- or do you want to

25  break for lunch.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    93

1        MR. XU:  What time is it for you there?

2        MR. LISA:  I'd like -- it's 12:00 but it's

3  earlier for I think Dr. Garlick, right?

4        THE WITNESS:  Oh, it's 12:00 here also.

5        MR. LISA:  Why don't we then -- what I'd

6  like to do is go about -- either take a break now or

7  take it in a half hour.  What's your preference,

8  Dr. Garlick?  I'm good to go if you still want to

9  go, but I'm turning to a new subject.

10        THE WITNESS:  Well, if we're turning to a

11  new subject, why don't we take a lunch break and we

12  can come back and take a lunch break now and come

13  back.  Is that -- if that works.

14            (Recess from 12:00 to time    )

15  BY MR. LISA:

16     Q.  Quick question.  Dr. Garlick, did you

17  confer with counsel during the break?

18     A.  I did.

19     Q.  And did you review your prior testimony

20  with counsel?

21     A.  We just -- we just talked generally about,

22  you know, that we thought the deposition may go

23  longer than anticipated and so forth.  So just

24  general discussion like that.

25     Q.  Okay.  All right.  I'd like to mark as

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                94

1  Exhibit 11 a data book for a speech recognition

2  processor so I'm going to put that in front of you.

3  So you should have Tab 11 handy now I think if

4  everything is working right, Exhibit 11.

5      A.  I see that.  I see Exhibit 11.

6      Q.  Exhibit 11 is the computer processor

7  history.  No, that's 10.  Okay.  PX11.  It's a

8  bigger document.  It might take a minute to load.

9         So Exhibit 11, RSC-164 data book, are you

10 able to open that?

11     A.  Yes, I see that.

12     Q.  So Dr. Garlick, Exhibit 11 is a data book

13 for an RSC-164 and RSC-164i, speech recognition IC.

14 Have you ever heard of that product before?

15     A.  I have not.

16     Q.  If you'll look at page 3 of the data book,

17 it says August -- revision 2.5 August 1996.  Do you

18 see that?

19     A.  I do, yes, on page 3.

20     Q.  All right.  And if you would, I'd ask you

21 to just take a second, a minute, and perhaps the

22 best way to do this is to go to the first page and

23 the general description and just read through the

24 first four paragraphs there.

25     A.  Okay.  Give me a minute here.  Okay.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT            95

1    Q.  All right.  Great.  You've been through

2   that.  Thank you.  If you would just cursor down now

3   to table of contents, and I'm not going to obviously

4   go through this entire book, but I just want to get

5   you to see there's a feel for what's included in the

6   data book.

7        On page 1 of it, there was a reference to

8   a soft -- an RSC development kit that allows

9   development to create custom applications.  Are you

10  aware of there being like software and hardware

11  development kits available to those of ordinary

12  skill in the art at the time?

13    A.  Yes.  I would think that a particular

14  piece of hardware might come with some software to

15  assist in developing on that platform.

16    Q.  And that was relatively common back prior

17  to 2006, particularly for the main line hardware

18  processors, right?

19    A.  So this seems to be a more specialized

20  device as opposed to some of the processors that we

21  looked at in the prior exhibit.  So I don't know

22  that we can draw a parallel between those.

23    Q.  Right.  That's why I asked separate.  So

24  I'll ask it again separately.

25    A.  Okay.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    96

1    Q.  So the -- prior to 2006, it was relatively

2  common for the manufacturers to provide development

3  kits for their various processors and controllers,

4  right?

5       MR. XU:  Objection, vague.

6    A.  I would say that that happened in some

7  circumstances.

8    Q.  What circumstances are you aware of at or

9  about that time?

10    A.  Just the -- whether or not the

11  manufacturer provided them.

12    Q.  What was the purpose of these development

13  kits?

14    A.  To make it easier on a software developer

15  to create software for that specific device.

16    Q.  It appears this particular device had a

17  development kit that allows developers to create

18  custom applications for the RSC chips, right?

19    A.  Can you point me to where you reference

20  that in the --

21    Q.  Second paragraph, page 1 of Exhibit 11.

22    A.  Okay.  That references an RSC development

23  kit, yes.

24    Q.  Okay.  Thank you.  Would you please refer

25  now to page 5 of the PDF which is page 1 of the --

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                97

1  it says page 1 on the manual, but it's page 5 of the

2  PDF.

3      A.  Okay.  I'm there.

4      Q.  All right.  And if you look at the first

5  paragraph there, it says the RSC164 is the first in

6  a family of high performance 8-bit microprocessors

7  featuring a high level of integration targeted to

8  high accuracy, low cost speech recognition

9  applications.  Do you see that?

10     A.  I do.

11     Q.  All right.  And if you look at the very

12  next page, the RSC-164 architecture, there is a

13  block diagram there showing the architecture, right?

14     A.  It says a block diagram.  I would --

15  again, it's the first time I've seen this document.

16  I don't know that I can characterize --

17     Q.  Let me ask it differently.  Under a

18  heading number 2, RSC-164 architecture, there is a

19  figure 1 block diagram, correct?

20     A.  Yes.

21     Q.  And then there's description down below of

22  the fact that it's an 8-bit RISC microprocessor, has

23  on chip ROM, A to D converters.  Do you see that?

24     A.  Sorry.

25     Q.  Right below the heading.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                98

1     A.   Okay.  8-bit microprocessor -- yes, I do.

2     Q.   So you would agree that this is in fact a

3   specific microprocessor that would have been

4   available at least to those of ordinary skill in the

5   art in 2006 based on what are you're looking at,

6   correct?

7     A.   I don't know that we can -- they describe

8   it as a microprocessor.  Some might describe it as a

9   controller.  They have the word processor in there.

10   This is a specific device, yes.

11     Q.   It's an actual apparatus, right?

12     A.   I haven't seen any information that this

13   was in production.  This appears to be the manual

14   for something.  I don't know if it was produced or

15   not.

16     Q.   Well, if it -- if you assume it was

17   produced, it would be a specific device, right?

18     A.   This --

19     Q.   Let me rephrase that differently.

20          I'm going to ask you to assume

21   hypothetically that the RSC-164 was in fact

22   manufactured and sold by sensory, the manufacturer

23   listed on page 2, prior to 2006.  Can you make that

24   assumption for a hypothetical?

25     A.   Yes.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                99

1      Q.  And that these manuals also, this manual,

2   Exhibit 11, was also available prior to 2006.  Okay?

3   So as an expert who's offered opinions in this case

4   on what the person having ordinary skill in the art

5   would know, would you agree that a person having

6   ordinary skill in the art in or about 2006

7   theoretically would be aware of the RSC-164 and its

8   related literature like this data book?

9      MR. XU:  Objection, vague.

10     A.  You're asking if a person of ordinary

11   skill would be familiar with this specific device,

12   and I don't -- this is a specialized piece of

13   hardware and I don't know that we could assume that

14   every POSITA would be familiar with this hardware.

15     Q.  Do you know whether a person having

16   ordinary skill in the art is theoretically aware of

17   all related literature as if it's hanging on a wall,

18   so to speak?  Have you seen that before as a

19   requirement?

20     A.  I'm not sure I understand the question.

21     Q.  Let me ask it differently.

22     A.  Okay.

23     Q.  You're -- if I understand your response,

24   your concern is that a person having ordinary skill

25   in the art as it relates to Mr. Konicek's invention

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    100

1  may not have been aware of this.  Is that your

2  point?

3      A.  May not have been aware of this hardware,

4  yes.

5      Q.  Is that your point, yes?

6      A.  It is.

7      Q.  Yes.  The answer was yes.  Okay.

8      A.  I'm answering yes to the question that a

9  person of ordinary skill in the art may not have

10  been aware of this particular -- of this hardware.

11      Q.  But regardless of whether the person of

12  ordinary skill in the art is aware of this hardware,

13  you would agree that what appears to be disclosed in

14  Exhibit 11 is a specific hardware microprocessor

15  that was available prior to 2006?

16      A.  If we make the assumption that the RSC-164

17  and RSC-164i were actually produced pieces of

18  hardware as we've discussed, then I would consider

19  those to be specific hardware, yes.  In general, it

20  describes this as containing an 8-bit RISC

21  microprocessor which is more of a general term.  It

22  doesn't describe what specifically that piece of

23  hardware is.

24      Q.  It does say -- well, let me skip that.

25  I'd like to mark as Exhibit 11A another document

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                101

1  entitled RSC-164i.  So it's -- it should show up

2  here pretty quickly, Dr. Garlick.  It's 11A.  All

3  right.  That should be there?

4     A.  All right.

5     Q.  So I've marked as Exhibit 11A a shorter

6  five-page data sheet for the RSC-164i.  Have you

7  ever seen this before?

8     A.  I have not.

9     Q.  Here it refers to it as a general purpose

10  microcontroller.  Do you see that?

11    A.  I do, yes.

12    Q.  And the -- if you read below the general

13  description, it says the RSC-164i from the

14  interactive speech family of are products is a low

15  cost microcontroller designed for use in consumer

16  electronics.  Do you see that?

17    A.  Yes.

18    Q.  Do you think a person having ordinary

19  skill in the art at the time who was working in

20  speech communications, I'm sorry, speech recognition

21  in consumer electronics would have been aware of

22  this?

23    A.  I'm not sure what you mean.  Aware of this

24  document?

25    Q.  Aware of this document or -- yeah, you can

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    102

1   start there.

2       A.   If they were involved in a related field,

3   perhaps.  For a general practitioner, I would say

4   probably not.

5       Q.   How about somebody building a device

6   that's described in the Konicek patent

7   specification?  Would they be aware, the person of

8   ordinary skill in the art, as the court is supposed

9   to apply, of a product like the RSC-164i?

10          MR. XU:  Objection, vague.

11      A.   Perhaps.

12      Q.   And you've never -- you weren't aware of

13  this device prior to today, right?

14      A.   That's correct.

15      Q.   If we turn to your declaration, Exhibit 2,

16  and in particular at paragraph 41.

17      A.   Okay.

18      Q.   You state in paragraph 41, figure 3 of the

19  patents-in-suit depicts a, quote, camera controller

20  40, close quote, as an empty box and a specification

21  does not provide any detail regarding the structure

22  and composition of the, quote, camera controller,

23  close quote, other than to say it's preferably a

24  microprocessor.

25          Do you see that?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

　　　　ROUGH DRAFT　　　　　　　103

1　A.　Yes.

2　Q.　And why did you make that statement?

3　A.　I was looking for explanation of claim

4　constructions, and I looked to the diagram and to

5　the specification and that's what I found in

6　reference to a camera controller.

7　Q.　Well, why does that matter to your

8　opinion?

9　A.　Well, in looking for that information, I

10　did notice that the specification described it as

11　preferably a microprocessor.

12　Q.　Well, in your view that's not sufficient

13　to identify a particular piece of hardware or that

14　the microprocessor is a hardware device?

15　A.　Well, I was looking for the explanation of

16　what this is because it is described largely in

17　terms of functionality.　And I was looking to see if

18　there was, in context of controlling, a flow chart,

19　a piece of pseudocode, something like that that

20　would instruct how the camera controller was

21　controlling.

22　Q.　In paragraph 39, you're refer -- you state

23　that you under -- I understand that a limitation of

24　patent claim can be expressed as a means for

25　performing a function.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                104

1      So is it your testimony that the reference

2   to a camera controller in the claim is a means word?

3      A.   That was my instruction for analysis from

4   Mr. Xu.

5      Q.   Is it -- so that was -- you were told to

6   assume that a controller was a functional -- was a

7   means language term, a nonce word, N-O-N-C-E.  Have

8   you heard that before?

9      A.   In computer science terms.  I don't

10   believe in legal terms.

11      Q.   Explain your answer.  I'm sorry.

12      A.   In computer science terms, that can refer

13   to a number used once.  I'm sure it has a different

14   legal meaning.

15      Q.   Your declaration doesn't state that you

16   were told to assume that a controller was equivalent

17   to a means?

18      A.   I was asked to analyze the term in that

19   framework.

20      Q.   Where in your declaration does it say

21   that?

22      A.   That is also my opinion that this word

23   controller is a -- basically a placeholder.  You can

24   substitute the word "thing" for it.  And so I was

25   asked to interpret this in that framework, and

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                105

1  that's what I did.

2      Q.   Did you make any effort to confirm whether

3  that instruction was reasonable or not?

4      A.   It's reasonable to me.

5      Q.   Why is it reasonable to you?

6      A.   Because from my understanding of the law

7  based on what I've written here, controller is a --

8  is a means for doing something.  The specification

9  describes its functionality in terms of operations

10  that are performed, and so as I said previously,

11  that's what I looked for in the specification and

12  this -- this is my opinion, that this is a -- from

13  my understanding of a means plus function term, that

14  this is how that should be applied.

15      Q.   What is the basis for that understanding?

16      A.   The information here that I've presented

17  in paragraph 39.

18      Q.   Is that your testimony, that a controller

19  is the equivalent as to a means?

20      A.   From the understanding that I've presented

21  in paragraph 39.  And from my knowledge and from my

22  review of the patent, the term controller is very

23  generic and it is described in terms of its

24  functionality.  And that's how I was asked to

25  interpret the claim.  That's how I interpreted the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                106

1   term.  And I believe that to be the correct

2   interpretation based on my understanding of the law.

3       Q.  Paragraph 39 doesn't mention the word

4   controller anywhere.

5       A.  Well, this is under the section of

6   controller right above it, Section A.

7       Q.  So what about microprocessor?  Do you

8   believe a microprocessor is a generic term in terms

9   of ordinary skill in the art?

10      A.  It's going to depend on the context.  So,

11  you know, previously you presented a specific AMD

12  device, but if we just say controller or processor

13  and those can be different things, those are

14  generally regarded as -- or potentially meaning two

15  different things, and -- I'm sorry.  Can you repeat

16  the question?

17      Q.  Sure.  Ms. Shelton, could you repeat the

18  question for Dr. Garlick, please.

19      THE REPORTER:  Question:  "So what about

20  microprocessor?  Do you believe a microprocessor is

21  a generic term in terms of ordinary skill in the

22  art?"

23      A.  Again, I believe it depends on the

24  context.

25      Q.  You made a statement that you said

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                107

1   previously you presented a specific AMD device.  So

2   is it your testimony that unless you identify a

3   specific device that it's going to be --

4   microprocessor as a term would be construed

5   generically?

6       MR. XU:  Objection, vague.

7       A.  It's going to depend on the context in

8   which it's used.

9       Q.  Well, what if you actually -- what if a

10   user actually identifies a specific device like the

11   AMD device in your prior answer?

12      A.  I don't know that just giving a model

13   number is going to clarify that.  And from my

14   understanding as put in paragraph 39, when something

15   is just described in terms of what it does, then you

16   could substitute the word "thing" in there or -- and

17   in that context it's used generically.

18         I'm sure there are contexts where things

19   could be described in terms of a flow chart, an

20   algorithm, a pseudocode that would describe how

21   things are controlled.

22      Q.  If the patent claim that you analyzed had

23   said a AMD processor by model number that was

24   configured to do the operations recited thereafter

25   in the claims, would that make a difference to you,

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    108

1  any difference at all?

2      A.  Well, as I answered before, I don't think

3  that just inserting a model number is what is needed

4  here.  I think it's needed to describe it by

5  something other than what it performs.  The

6  functions or the outcome of this wouldn't tell a

7  POSITA how it was implemented.

8      Q.  Did you base your opinion here on the

9  conclusion, at least in part, that Mr. Konicek did

10  not identify a particular processor?

11        MR. XU:  Objection, vague.

12      A.  Again, I don't think this is model number

13  specific.

14      Q.  You complained in your patent -- in your

15  declaration that he did not provide any detail

16  regarding the structure and composition of the

17  camera controller other than to say it's preferably

18  a microprocessor.  You said that, right?

19      A.  Yes.

20      Q.  Why did you say that?

21      A.  Because, as I said before, I was looking

22  for some description of how this was done other than

23  just the results, and that's what I found.  I wanted

24  to include it for completeness.  And -- but there --

25  like I said, there wasn't a flow chart, pseudocode.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                109

1    Q.  That statement refers to specifically that

2    the specification does not provide any detail

3    regarding the structure and composition of the

4    camera controller other than to say it's preferably

5    a microprocessor.  Says nothing about code,

6    pseudocode, flow charts, nothing.

7        A.  I believe I describe that later.  Let's

8    see.

9        Q.  I'm not talking about later.  I'm talking

10   about that particular sentence, Dr. Garlick.

11       A.  Okay.

12       Q.  You referred in that sentence to the

13   absence of any detail regarding the structure and

14   composition of the camera controller, right?

15       A.  Let me go back to where we are here.

16   Okay.

17       Q.  Do you see it?

18       A.  We're talking about the first sentence in

19   paragraph 41?

20       Q.  Paragraph 41, first sentence, correct.

21       A.  Okay.  I see that sentence.

22       Q.  So you in fact considered it relevant to

23   your opinion that the specification does not provide

24   any detail regarding the structure and composition

25   of the camera controller other than to say it's

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              110

1  preferably a microprocessor, correct?

2    A.   That's my -- that's my statement there.

3    Q.   You believe your statement, don't you?

4    A.   Yes.

5    Q.   It's accurate and true, isn't it?

6    A.   I believe so, yes.

7    Q.   And you relied on the fact that the

8  specification does not provide any detail regarding

9  the structure and composition of the camera

10  controller other than to say it's preferably a

11  microprocessor in forming your opinions, right?

12    A.   That's -- that's correct.  I -- like I

13  say, I was looking for details.

14    Q.   That's fine.  You said that's okay.

15  That's -- that's all I called for.  By the way, you

16  used the word structure there.  Do you see that?

17    A.   Yes.

18    Q.   Before you said when I used the word

19  structure you think only of a house.  Is that really

20  what you meant here?

21    A.   No, I did not mean house here.

22    Q.   All right.  What did you mean by

23  structure?

24    A.   In this context?

25    Q.   Yes.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                111

1    A.   The -- the details of how a controller

2   controls, how does it accomplish its task other than

3   to just describe the outcome.

4    Q.   So in your view, structure and composition

5   is software?

6    A.   Not necessarily.  Just -- it could be

7   pseudocode.  It could be a flow chart.  It could be

8   an algorithmic description.

9    Q.   Can it be a physical structure?

10    A.   If that helped to clarify how the

11   operations are performed.

12    Q.   Well, were you instructed on what

13   paragraph 112, paragraph 6 states regarding

14   construing claims as means plus function language?

15    A.   With regard to what's presented in

16   paragraph 39 and later, that's -- that's what I

17   based my opinion on.

18    Q.   I asked specifically whether you have an

19   understanding of what paragraph 112-6 of the patent

20   code requires for claims to be construed as a 112-6

21   means plus function term.

22    A.   That seems to be a legal question.  I'm

23   not an attorney.  I'm not expressing an opinion on

24   the law.  I'm -- I'm expressing an opinion based on

25   what's included in the declaration.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              112

1    Q.  So your testimony under controller in

2  paragraphs 39, 40, 41, and 42 are not based on an

3  understanding of what the law provides for

4  construing claim terms?

5      MR. XU:  Objection, mischaracterizes prior

6  testimony.

7    A.  Yeah, that's not what I said.  What I said

8  was I'm not presenting a legal opinion.  I have been

9  given information that I've presented here in the

10  declaration, and I'm providing an opinion based on

11  those statements.

12    Q.  So when you said in paragraph 39 I

13  understand that a limitation in a patent claim can

14  be expressed as a, quote, means for performing a

15  function, what do you understand?  What is your

16  understanding?

17    A.  Right.  I'm just referring to the

18  declaration.  That a limitation in a patent claim

19  can be expressed as a means for performing a

20  function, and that appeared to me from my

21  understanding, based on these paragraphs, to be the

22  case here because there was a fairly generic term

23  that was used in conjunction with the results of

24  that.  And so I looked to the specification, which I

25  understand is the proper way to construe such terms.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                113

1    Q.   And you didn't find any specific structure

2   or composition for the camera controller other than

3   to say it's preferably a microprocessor, right?

4    A.   I -- like I said, I did not find details

5   on how the controller controls.

6    Q.   Well, again, we'll go back to what you

7   said.  Was it relevant or not that Mr. Konicek did

8   not describe the controller other than to say it's a

9   microprocessor, in your view?

10    A.   Is it relevant to say that.

11    Q.   Was it relevant to your conclusions that

12   you reviewed figure 3 of the patent and it depicts

13   the camera controller as an empty box and that the

14   specification does not provide any detail regarding

15   the structure and composition of the camera

16   controller other than to say it's preferably a

17   microprocessor?

18    A.   And --

19    Q.   Structure and composition.

20    A.   The question was do I find that relevant?

21    Q.   Yes.

22    A.   My purpose for including this statement

23   was to indicate all the information that I could

24   find there and I feel like if I had left something

25   out we'd be discussing why I left out something that

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                114

1  was described in the specification for that.  I

2  wanted to be complete.  I wanted to present a

3  complete picture of what I saw in the specification

4  regarding this.  And as I say, the specification

5  does not provide any detail other than that.  So,

6  yes, I find that relevant.

7      Q.  Like you to refer back to Exhibit 4A, the

8  Konicek '761 patent.  I'm sorry.  '472 patent.

9      A.  Okay.  Exhibit 4A, the '472?

10     Q.  Right.

11     A.  Okay.  I'm with you.

12     Q.  Okay.  If I remember your testimony

13  previously, you said you didn't review any of the

14  specific references cited above the text of the

15  patents, right?

16     A.  Not in isolation, but again, as I answered

17  before, as they were referenced in patent history.

18     Q.  Did you happen to notice in reviewing the

19  file history whether any of the information

20  disclosure statements cited the RSC-164 products?

21     A.  I -- I didn't specifically notice that.

22     Q.  If you would refer to page 15 of the

23  patent.

24     A.  15 on the PDF?

25     Q.  Page 15 of the patent itself.  I don't

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                115

1  know what the --

2      A.  Okay.

3      Q.  -- PDF number would be.  Assuming it's the

4  same number, but --

5      A.  I don't know that I have page numbers on

6  the patent.

7      Q.  At the top of the patent.

8      A.  I have the -- I have the PDF page numbers

9  but not --

10     Q.  All right.  I'll find it for you.

11     A.  Okay.

12     Q.  It's the same, page 15.

13     A.  This is figure 1A, kind of a camera image?

14  Is that the correct one?

15     Q.  It's the page before that.  Do you have

16  Exhibit 4A open or 4?

17     A.  I have 4A open.  Oh, okay.  I see -- I see

18  the page numbers now.  They stop after that page.

19     Q.  Thank you.

20     A.  Sorry.

21     Q.  All right.  So page 15 is correspondent to

22  page 15 in the PDF.  If you look partway down on the

23  left column, there is reference to the RSI64 data

24  sheet.  Do you see that?

25     A.  I have on the left --

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                116

1    Q.  Left-hand column?

2    A.  Okay.

3    Q.  About a third of the way down the column,

4  RSC-164i data sheet.

5    A.  Yes, I see that.

6    Q.  General purpose microcontroller featuring

7  speech recognition.

8    A.  Yes.

9    Q.  You see that?

10    A.  I do.

11    Q.  So -- and that was actually cited in the

12  patent specification.  So that -- you weren't aware

13  of that, were you?  In the patent file history.  I'm

14  sorry.  So you weren't aware of that, were you?

15    A.  I don't think that I had individually

16  identified this reference or had it called to, you

17  know --

18    Q.  Called to your attention?

19    A.  Noticed it, yeah, in my review.

20    Q.  If you would turn to column 1 of the

21  patent, which is PDF page 24.

22    A.  Okay.  I'm concerned I have a different

23  version because there is page 23 for me on the PDF.

24  But --

25    Q.  Are you 4 or 4A?  10 or 10A?  I'm sorry, 4

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    117

1   or 4A?  I'm sorry?

2       A.   This is Exhibit 4A, Tab 10A, the '472

3   patent, but when I pull up the first page of text,

4   this is like with column 1 and column 2, that, when

5   I hold my mouse over it, it says page 23 of 32.

6       Q.   Okay.  Mine says 24, but it's column 1.

7   Just look at column 1.

8       A.   I'm there.

9       Q.   All right.  Now go to column 1, line 55.

10      A.   55.  Okay.

11      Q.   And I'd like you to read for the record

12  what's at lines 55 to line 58.

13      A.   Okay.  "Voice recognition techniques are

14  well known in the art and have been applied to

15  cameras.  See, for example, U.S. Patent Nos.

16  4,951,079, 6,021,278, and 6,101,338 which are herein

17  incorporated by reference."

18      Q.   Did you take note of that part of the

19  description when you reviewed the patent?

20      A.   I reviewed that section, but I did not

21  specifically call out those patent numbers outside

22  of their inclusion in any history for the patent.

23      Q.   Is it -- did you read those patents?

24      A.   No, I did not individually read those

25  patents.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                118

1    Q.  Do you have any understanding of what

2   incorporation by reference means in a patent?

3    A.  I wouldn't answer what seems to be a legal

4   question.

5    Q.  I'm asking what you understand it to be.

6    A.  So I understand that that information can

7   be -- is referenced as part of this patent.  I

8   understand that there were many patents associated,

9   I guess, with this endeavor, and those may be

10   auxiliary patents.

11    Q.   Well, were you instructed at any time that

12   text that is incorporated by reference in a patent

13   is to be treated as if it's repeated in the patent?

14    A.  I'm -- I don't -- I don't believe that,

15   and I wasn't instructed to review those patents.

16   That wasn't part of my task.

17    Q.  You don't believe that.  What does that

18   mean?  You don't personally believe it or you

19   weren't instructed?

20    A.  I think I lost track of our conversation.

21   Could you repeat?

22    Q.  Were you ever instructed that essential

23   material may be incorporated by reference into a

24   patent and is treated as if it is actually repeated

25   in the patent?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                119

1    A.   I don't recall ever being given that

2   instruction.

3    Q.   And do you understand that if it's

4   incorporated by reference or if U.S. patents are

5   incorporated -- strike that.

6       Do you have an understanding whether if

7   U.S. patents are incorporated by reference, they are

8   to be treated as part of the disclosure?

9    A.   I don't know that I have a firm legal

10   understanding of that.  I understand in general what

11   a reference is, but again, I was not asked to review

12   those patents and that wasn't part of my task.

13    Q.   So to be clear, then, the opinions that

14   you offered in your declaration were made without

15   any consideration of the text of those patents,

16   correct, that were incorporated by reference as

17   identified at column 1, lines 55 to 58?

18    A.   I was not asked to review those patents,

19   and those -- and the information contained in those

20   is not a part of my declaration.

21    Q.   And so your opinions were made in your

22   declaration without considering the patents that

23   were incorporated by reference by Mr. Konicek at

24   lines 55 to 58 of column 1 of his patent, correct?

25    A.   I was not asked to review them.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    120

1    Q.   The answer calls for a -- Dr. Garlick,

2    this is an answer that the court is going to expect

3    you give a yes or no answer to regardless.  All

4    right?  It's a fair question.  And I'm -- we're

5    entitled to know.

6         Were your opinions based -- so I'll ask it

7    again and try and be simple.  Is it a fact that the

8    opinions you have provided the court in your

9    declaration did not consider the text incorporated

10   by Mr. Konicek at columns 55 to 58 of his column 1

11   of his patent, Exhibit 4A?

12   A.   I did not review those patents and so

13   consequently, information contained in them is not

14   reflected in my declaration and that wasn't part of

15   my task.

16   Q.   And it's not -- they're not reflected as a

17   basis for your opinion either, correct?

18   A.   That's correct.

19   Q.   If you would please return to column 8 of

20   the patent, Exhibit 4A.

21   A.   Okay.

22   Q.   Top of column 8, would you read lines 4 to

23   9.

24   A.   "According to another aspect of the

25   present invention, the electronic viewfinder (EVF)

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    121

1    typically used on modern digital cameras includes a

2    gaze tracking capability which is well known in the

3    art.  See, for example, U.S. Patent No. 6,758,563 to

4    Lavola which is herein incorporated by reference."

5         Q.   Did you see that part of the text when you

6    reviewed the specification?

7         A.  I did.

8         Q.   Did you review the patent to Lavola that's

9    identified in column 8 of Exhibit 4A?

10        A.  I did not.

11        Q.   And again, it is correct that the opinions

12   you've provided to the court in your declaration do

13   not consider the disclosure incorporated by

14   Mr. Konicek at column 8 of his patent, Exhibit 4A,

15   correct?

16        A.   That's correct, because I was only asked

17   to review the two patents, as I stated in my

18   declaration.

19        Q.   I'd like to mark as Exhibit 12

20   United States patent 6021278 to Bernardi, et al.

21   So let me know when you've got that.

22        A.   Okay.  I have Exhibit 12 open.

23        Q.   All right.  I don't.  I'm still working on

24   it.  There we go.  I've got it.

25           Can you please confirm by number that the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                122

1  patent to Bernardi 6021278, Exhibit 12, is the same

2  patent that is incorporated by reference by

3  Mr. Konicek at column 1 of his '472 patent which is

4  Exhibit 4A?

5      A.   Those numbers appear to match.

6      Q.   All right.  And you've not seen Exhibit 12

7  previously, correct?

8      A.   Again, I don't have a recollection of the

9  entire history of the patents if some of the

10  documents were contained there, I may have briefly

11  looked at it.  But again, you know, as I stated

12  before, those were in excess of 10,000 page

13  documents in various languages and I don't recall

14  every one.  I did not specifically print this patent

15  and read it in its entirety.

16      Q.   Are your opinions then not -- let me

17  strike that.  Then it's fair to say that since you

18  don't remember reading it or looking at it, that it

19  didn't form a part of your opinion that you're

20  offering to the court in your declaration,

21  Exhibit 2, correct?

22      A.   Yes.  As stated in my declaration, the

23  materials considered were the '472 patent and the

24  '761, I believe.

25      Q.   I ask you to refer to column 3 of this

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                123

1  patent which is page 12 of the PDF.

2     A.   All right.  It's page 11 for me but I see

3  12.

4     Q.   That's okay.  Column 3 beginning at line

5  20.

6     A.   Okay.

7     Q.   Can you just read into the record there

8  down to line 29.

9     A.   Okay.  "Figure 4 is a block diagram"?

10  Is that the right --

11     Q.   Correct, yes.

12     A.   Okay.  "Figure 4 is a block diagram of the

13  voice recognition camera of the present invention.

14  The user inputs voice commands through the

15  microphone 30 and the microcontroller 50 such as a

16  sensory RSC-164 chip recognizes the voice command

17  and operates the intended function.  Such voice

18  recognition can be that as in U.S. Patent No.

19  4,951,079.  In the preferred embodiment, the

20  microswitch 45 sends a signal to the microprocessor

21  50 for indicating the current state of the

22  microswitch 45.  If the microcontroller 50

23  determines that the microswitch 45 is activated, the

24  image would be automatically rotated 180 degrees"

25  and so on.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    124

1    Q.  So on.

2    A.  Okay.

3    Q.  So you see that this particular patent to

4  Bernardi, Exhibit 12, Patent No. 6,021,278, actually

5  identifies the microcontroller 50 as a sensory

6  RS-164 chip.  Do you see that?

7    A.  Yes, I do.

8    Q.  And you do realize now that this patent to

9  Bernardi, Exhibit 12, patent 602-1278, is

10  incorporated by reference in Mr. Konicek's patent

11  specification?

12    A.  I see the reference in -- to this in the

13  other -- in Mr. Konicek's patent.

14    Q.  So is it fair to say that prior to today,

15  you had no idea that Mr. Konicek's patent in fact

16  identified to the reader this patent, Exhibit 12,

17  which was incorporated by reference, and also the

18  sensory RSC-164 chip by incorporation by reference?

19      MR. XU:  Objection, vague.

20    Q.  Let me put it this way.  The fact that

21  this patent was incorporated by reference by

22  Mr. Konicek and also references the sensory RSC-164

23  chip is news to you as of today, correct?

24    A.  I had not previously specifically reviewed

25  this reference to the sensory RSC-164 chip.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              125

1    Q.  That's not the question I asked.  The

2   court -- I want to tell the -- let the court know,

3   Dr. Garlick, were you aware prior to today when you

4   provided the testimony in your declaration that

5   Mr. Konicek incorporated by reference this patent,

6   including the sensory RSC-164 chip, yes or no?  Were

7   you aware of this fact when you made your testimony?

8       MR. XU:  Objection, vague.

9    A.  I had not specifically reviewed this

10   reference to the sensory RSC-164.

11    Q.  I'd like you to pull your declaration up

12   again, okay, if you can.

13    A.  Sure.  1?  2?  Okay.  Exhibit 2?

14    Q.  Right.  Go to the statement right above

15   your signature.

16    A.  Okay.

17    Q.  It's on page 17 of your -- I'm not quite

18   sure what page of the declaration it is, but it's

19   last -- right before your Exhibit 1.  So above your

20   signature you make a statement, right?

21    A.  Yes.

22    Q.  What does it -- would you read that into

23   the record, please.

24    A.  Sure.  I declare under penalty of perjury

25   under the laws of the United States of America that

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    126

1    the foregoing is true and correct.

2        Q.   And in paragraph 41 of your declaration,

3    you say that the specification does not provide any

4    detail regarding the structure and composition of

5    the camera controller other than to say it's

6    preferably a microprocessor.  Do you see that?

7        A.   Yes.

8        Q.   And you say any detail, correct?

9        A.   Yes.  The specification of this patent

10   does not provide any detail other than -- and by any

11   detail, I mean a -- some pseudocode, a flow chart

12   and so forth.

13       Q.   Why didn't you tell the court about the

14   incorporation by reference and the RSC-164 product?

15       A.   Because I wasn't asked to review that

16   patent and it wouldn't have made a difference here

17   in my opinion.

18       Q.   Have you studied -- have you studied that

19   patent?  You've not studied Exhibit 12, have you?

20       A.   Exhibit 12.

21       Q.   The one that's incorporated -- one of the

22   five patents incorporated by reference.  You haven't

23   studied that patent, have you?

24       A.   No, I did not specifically study that

25   patent.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                127

1      Q.  You don't know whether it makes a

2  difference or not, do you?

3      A.  My opinions here are based on the '472

4  patent and the '761 patent.  I believe I have the

5  numbers correct on those.  And within those patents,

6  that is the statement that I'm making.  And it

7  wouldn't -- like I said before, it wasn't make a

8  difference.  If there's a model number described in

9  one of these patents directly.  What I'm looking for

10  is how it does this.  And a model number doesn't

11  tell me that.

12      Q.  When you were instructed as to what law to

13  apply on your testimony in the section on

14  controller, were you informed that indefiniteness

15  must be proven by clear and convincing evidence?

16      A.  What I was instructed to is contained

17  here.  I don't know that that specific instruction

18  was conveyed.

19      Q.  So in performing -- I'm sorry.  Strike

20  that.  So in offering your opinions on

21  indefiniteness in your declaration, you did not

22  apply a standard of -- you were not instructed to

23  imply as a standard that it must be proven by clear

24  and convincing evidence, correct?

25      A.  I was informed that --

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT            128

1    Q.  Dr. Garlick, I don't need -- I'd like to

2    have a simple answer to my question.  The court, if

3    you were sitting in -- you're supposed to answer as

4    if you were sitting in a courtroom.  So you're to

5    answer a question that fairly calls for a yes-or-no

6    answer, generally the courts will insist that you

7    provide that and in fairness you should try to

8    provide that and if you can't, you should ask me to

9    rephrase the question.  Otherwise you're going to be

10   viewed as being nonresponsive.  So can we try and do

11   that?

12         MR. XU:  Steve, you should let the witness

13   answer his question.

14         MR. LISA:  The witness --

15         MR. XU:  He has been answering questions

16   in his own ways using his words.

17         MR. LISA:  Okay.  Jason, you might want to

18   repeat that because you froze.

19         MR. XU:  Sorry.  I'm just saying you

20   should let the witness answer your questions.

21         MR. LISA:  I would love for the witness to

22   answer my question.

23         MR. XU:  And he has been answering your

24   questions and I have not instructed him not to

25   answer any of your questions, so --

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    129

1      MR. LISA:  When the judge sees his

2  answers, he will form an opinion as to whether he's

3  fairly responding to questions or not.  So that's

4  fine.  All right?

5      Q.   Were you advised or informed, Dr. Garlick,

6  to address your indefiniteness opinions using a

7  clear and convincing evidence standard, yes or no?

8      A.   I don't believe I was given that specific

9  instruction.

10     Q.   Thank you.  Did you consider whether the

11  court in this district has entered any decisions or

12  opinions regarding whether or not words like a

13  control word were to be construed equivalently to a

14  means type clause?

15     A.   There's a lot in that question.

16     Q.   I'll ask it --

17     A.   Yeah, could you break that apart, please?

18     Q.   Were you instructed as to any governing

19  law regarding the term controller and construing

20  controller in the context of means plus function

21  analysis?

22         MR. XU:  Objection, vague.

23     A.   My understanding of means plus controller

24  or, sorry, means plus function is what I've included

25  in the declaration here.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                130

1    Q.   Like to mark as Exhibit 13 a decision by

2    the United States District Court for the Western

3    District of Texas, Midland Division, True Chemical

4    Solutions versus Performance Chemical Company.  That

5    will be appearing shortly.

6         All right.  That should be there now?

7    A.  I see that.

8    Q.   Do you see that this is a claim

9    construction order?

10   A.  I do.

11   Q.   If you would turn to paragraph -- to page

12   5 of the order, please, bottom page 5 of the order.

13   A.   Okay.  I see a section C, indefiniteness.

14   Q.   Right.  You've offered opinions on

15   indefiniteness, right?

16   A.  Yes.

17   Q.   And I'd ask you to read to yourself that

18   first paragraph.

19   A.  (Witness complies.)  I see that.

20   Q.   And do you see in particular that it

21   states, quote, whether a claim is indefinite is

22   determined from the perspective of one of ordinary

23   skill in the art as of the time the application for

24   the patent was filed?

25   A.  Yes.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 131

1     Q.  Then it continues, quote, indefiniteness

2  must be proven by clear and convincing evidence,

3  close quote.  Do you see that?

4     A.  I do.

5     Q.  And do you have any understanding as to

6  what that burden is?

7     A.  I'm not an attorney.  I'm not going to

8  offer what appears to me to be legal opinions on

9  this.  This --

10     Q.  And you weren't instructed as to what that

11  burden is in this case, correct?

12     A.  That's correct.

13     Q.  If you would, please turn to page 11 of

14  the -- let me know when you get to page 11.

15     A.  Okay.  I'm there.

16     Q.  All right.  Do you see term 7 that's being

17  construed there is, quote, controller in

18  communication with each pump, close quote?  On the

19  top, right at section G.

20     A.  Okay.  Term 7, controller in communication

21  with each pump.

22     Q.  The very first paragraph of text states,

23  quote, True Chem contends the controller, quotes, is

24  a means plus function term while PCC contends

25  otherwise.  True Chem then contends that if Section

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 132

1  112 paragraph F applies to quote controller, close

2  quote, then it is indefinitely because it lacks an

3  algorithm to perform the function.  Do you see that?

4     A.  Yes.  Let me read this one more time.

5  Okay.  Yes, I see that.

6     Q.  So do you see there that the argument

7  regarding whether there's an algorithm to perform

8  the function follows only because there would be a

9  conclusion that the word controller is a means plus

10  function term, do you see that?  Two-step analysis.

11     A.  I have a general understanding of that

12  process that --

13     Q.  Okay.  All right.  So the following

14  paragraph states, as described above, there is a

15  presumption that section 112 paragraph F does not

16  apply when the word means or another similar word

17  does not appear, correct?

18     A.  That's what's written.

19     Q.  Do you see that?  And you said the same

20  thing, right, in your opinions, that there's a

21  presumption?

22     A.  I see that line written there and I

23  believe a similar statement appears in the

24  declaration.

25     Q.  The following line, the court states, this

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 133

1    is the court's opinion, in this case a person of

2    ordinary skill in the art (POSITA) would not

3    understand the, quote, controller, close quote was

4    written in means plus function language.  Do you see

5    that?

6       A.  I do.

7       Q.   Period.  Then continues, to a POSITA with

8    a background in electrical engineering, a controller

9    is a well-known and well-understood term that refers

10   to an electrical device (E.G.system on a chip or

11   application specific integrated circuit that

12   controls the operations of other components in the

13   system.  Do you see that?

14      A.  I do.

15      Q.   So in this case what is the court, to your

16   understanding, saying?

17      A.   You want me to summarize the court's

18   opinion?

19      Q.   Well, do you under -- let me ask it this

20   way.  Do you agree with that statement?

21      A.  I think this is highly context dependent.

22      Q.   It's actually not.  I'm asking if you

23   agree with a court's statement that a POSITA with a

24   background in electrical engineering, a controller

25   is a well-known and well-understood term that refers

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                134

1   to an electrical device (E.G system on a chip or

2   application specific circuit that controls the

3   operation of other components in the system.  Do you

4   agree with that statement?

5   A.  I would have to see the context in which

6   that is -- that is presented.  This is a case that

7   I've never seen before.

8   Q.  This is --

9   A.  If their controller described how it

10  controlled, then --

11   Q.  That's not the question, sir.  A POSITA

12  has no idea what is claimed or disclosed in this

13  spec.  POSITA is a person of ordinary skill in the

14  art at the time of the inventor's invention, and

15  that's the way that statement is phrased.

16       So I am asking you whether you agree with

17  the court that to a POSITA with a background in

18  electrical engineering, a controller is a well-known

19  and well-understood term that refers to an

20  electrical device (E.G system on a chip or

21  application specific circuit) that controls the

22  operation of other components in the system.  Do you

23  agree with him or not?

24       MR. XU:  Objection.  Asked and answered.

25  A.  Yeah, I think I've provided my answer

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    135

1   here.  This is going to depend on the context in

2   which the term is used, which I -- which I haven't

3   seen.  It's -- I think, you know, outside the scope

4   of the patent, there may be a general understanding

5   of what a controller is.  I think within the scope

6   of the patent, it's described as a controller, a

7   processor, and it's -- it's not -- it's not clear

8   for those reasons and for the reasons that we don't

9   know how it controls.

10     Q.  So let's go outside the scope of the

11  patent and just talk about the person of ordinary

12  skill in the art for which you have offered an

13  opinion as to what he knows and doesn't know.  Okay?

14       So outside whatever patent was involved in

15  the judge's decision of Exhibit 13, do you agree

16  that a POSITA with a background in electrical

17  engineering at or around the time of 2006 would

18  agree that a controller is a well-known and

19  well-understood term that refers to an electrical

20  device such as a system on a chip or application

21  specific integrated circuit that controls the

22  operations of other components in the system?

23     A.  Again, I think it's dependent on the

24  context in which it's presented.  There are probably

25  thousands of different kinds of controllers, and

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                136

1   they would vary widely.  And this -- in the context

2   of the patent, it's a generic term and outside the

3   context of the patent also.  It's just a -- it's

4   like chip or thing, device.

5       Q.   So it's your testimony then that the term

6   controller is the same as a thing or chip?  That's

7   your testimony.

8       A.   My testimony is that it depends on the

9   context.

10      Q.   Just said it is a thing or a chip.  It's a

11  generic term like a thing or chip.  Is that your

12  testimony?

13      A.   Depending on the context, it's used

14  generically.

15      Q.   You said here that a person of ordinary

16  skill in the art has a bachelor's degree, for

17  example, in electrical engineering and several years

18  of experience which is exactly what this court says

19  here, background in electrical engineering.  Right?

20      A.   Uh-huh.  Yes.

21      Q.   All right.  So is it your testimony that a

22  person of ordinary skill in the art having a

23  background in electrical engineering in or around

24  2006 would consider a controller a generic term like

25  a chip or thing?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                137

1     A.   I think it depends on the context.

2     Q.   What if the controller is connected to a

3   keyboard and memory and a display?  Does that help

4   give you some context?

5     A.   Well, then I know that we're talking about

6   something in the electronics realm because

7   controller can be a person at a company also.

8   The -- but.

9     Q.   So let's give some more context.  Let's

10   say then that it is a controller that is connected

11   to, coupled to -- strike that.

12        Let's say the controller is coupled to a

13   memory and a touch sensitive display and the

14   inventor states that it is preferably a

15   microprocessor like an RSC-164.  Does that give you

16   context to say what the controller is?

17     A.   It gives, you know, the context that it is

18   within a -- the realm of electronics.  It -- I think

19   it's a generic term that's used as a placeholder

20   that doesn't provide any details for how it

21   controls.  And even if we assign a serial number to

22   it or -- it doesn't tell me how it controls, how it

23   does what it's supposed to do or what it's described

24   as doing.

25     Q.   So that we're court -- we're clear then

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT               138

1  for the court, it is your testimony that the term

2  controller as used in the patents-in-suit is a

3  generic term that does not let you know what its

4  structure is?

5      A.  That's correct.

6      Q.  And that there is no structure disclosed

7  in the spec for it, correct?

8      A.  That's correct.

9      Q.  Do you know what a controller is

10  regardless of how it controls?

11      A.  Again, there may be a general

12  understanding of a controller, you know, outside of

13  this context, but you need to know what it does in

14  order to determine its capabilities, its

15  requirements, and so forth.  So it's highly

16  dependent on the context.

17      Q.  So in your view then, Exhibits 11 and 11A,

18  which show the RSC-164 microcontroller, does not

19  depict a controller?

20      A.  No, I didn't say that.  These are

21  described as controllers.

22      Q.  Then let me ask it that way.  Do you agree

23  that the RSC-164 as shown in Exhibits 11 and 11A are

24  properly characterized as controllers, yes or no?

25          MR. XU:  Vague.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    139

1    A.  One of them's described as a controller.

2  The other one's described as a -- had microprocessor

3  written there.  Those can generally be two different

4  things.  And so -- I'm sorry.  What was the

5  question?

6    Q.  Would you agree that the devices shown in

7  Exhibits 11 and 11A would be understood by a person

8  of ordinary skill in the art as being a controller?

9       MR. XU:  Same objection.

10    A.  I would think that these specific devices

11  would be -- they are described as controllers by the

12  manufacturer.

13       MR. LISA:  Thank you.  Why don't we take a

14  short break for about five minutes.  Okay?

15            (Recess from 2:30 to time    )

16  BY MR. LESKO:

17    Q.  Hello, Dr. Garlick.

18    A.  Hello.

19    Q.  I'm Justin Lesko, one of the attorneys for

20  Cutting Edge Vision, and appreciate your time today.

21  Just have a few questions for you.

22       First question for you is, during the

23  break did you discuss your testimony with counsel at

24  all?

25    A.  During this most recent break, I did not.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    140

1    Q.   Okay.  So I'd like you to pull up

2  Exhibit 12 again, which is the Bernardi patent that

3  you were discussing with Mr. Lisa.  Let me know when

4  you're there.

5    A.   Okay.  I have Exhibit 12 pulled up.

6    Q.   Okay.  So I'm going back to the same

7  paragraph that you were discussing with Mr. Lisa, so

8  we're at column 3, starting on line 25.

9    A.   Okay.  Would you like me to read that?

10    Q.   Sure, yeah.  There's just one sentence

11  there.  It starts at line 25 and can you just read

12  that sentence.

13    A.   Okay.  "In the preferred embodiment, the

14  microswitch 45 sends a signal to the microprocessor

15  50 for indicating the current state of the

16  microswitch 45."

17    Q.   Okay.  And a POSITA reading that sentence

18  in 2005, you know, the POSITA is reading that, what

19  would -- how would they -- what would they

20  understand that to mean?

21       MR. XU:  Objection, vague.

22    A.   That a -- an electrical signal has been

23  sent to a microprocessor indicating the current

24  state of the switch.

25    Q.   Okay.  Thank you.  So like to pull up

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              141

1  another exhibit here.  Just give me one minute.

2  Steve is not working my exhibits, so I'm going to be

3  a little slower than Steve was.

4        (Exhibit no.    marked)

5    Q.  Okay.  So I just introduced plaintiff's

6  Exhibit 14, if you could refresh your folder there.

7    A.  Sure.

8    Q.  Let me know when you're there.

9    A.  All right.  Okay.  I have Exhibit 14

10  pulled up.

11    Q.  So on -- okay.  So on page 5 of the

12  document -- first of all, can I ask you, do you

13  recognize what this document is?  Have you seen this

14  before?

15    A.  Yes.  This appears to be my declaration in

16  a previous case.

17    Q.  Okay.  And you recall submitting that, and

18  I assume you submitted this declaration under oath

19  at that time?  Is that right?

20    A.  Yes.  Give me a second here to review.

21    Q.  Sure.  Take your time.

22    A.  Okay.  Sorry.  Could you repeat your

23  question?

24    Q.  Sure.  Do you remember this declaration?

25    A.  I do.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT               142

1     Q.   Okay.  Do you remember, was this submitted

2   under oath in this case?

3     A.   Are you asking if I gave a deposition with

4   regard to this or --

5     Q.   Here, let's just go to page 24 of the

6   document.  It's the last page of Exhibit 14.

7     A.   Okay.

8     Q.   So paragraph 48, what does that say?  Can

9   you read that to me?

10    A.   "I declare under penalty of perjury that

11   the foregoing is true and correct."

12    Q.   And that was your belief at the time you

13   submitted this declaration, right?

14    A.   Yes.

15    Q.   Now, turn back to page 6 for me.  And let

16   me know when you're there.

17    A.   Let's see.  I am on page 6 of the document

18   and page 6 of the PDF, but I think that may be

19   different for you.

20    Q.   Are you looking at paragraph 17 on this

21   page?

22    A.   Okay.  That's on page 5 for me.  Okay.

23   I'm at paragraph 17.

24    Q.   The third sentence starts, the token end a

25   request to verify the in store purchase are

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                143

1  transmitted to a server which provides the retailer

2  electronic device a response indicating whether the

3  token is valid and the retailer electronic device

4  receives the indication.

5       Do you see that?

6  A.  I do.

7       Q.  The retailer electronic device receives

8  the indication, what does that mean?

9  A.  So it's been awhile since I have reviewed

10  this material.  It's -- I think I'd have to go back

11  and review the material related to this.  It was

12  awhile ago, to give you a definitive answer.

13       Q.  Let me ask you a more specific question.

14  A.  Okay.

15       Q.  Says here the retailer electronic device

16  receives the indication.  Reviewing this testimony,

17  can an electronic device, just generally, receive an

18  indication?  Is that your understanding?

19       MR. XU:  Objection, vague.

20  A.  I'm sorry.  I didn't hear the -- Mr. Xu.

21       MR. XU:  I just said objection, vague.

22  A.  Oh.  The question was can a retailer

23  electronic device receive an indication?  I think,

24  again, based on my limited recollection of this

25  material in this circumstance, that was what I --

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                144

1  what I wrote here.

2      Q.  So in general, would a person of ordinary

3  skill in the art understand an electronic device can

4  receive an indication?

5      A.  Depending on the context.  In this

6  context, I believe so.

7      Q.  So are electronic devices to your

8  understanding, let's say in 2005, are electronic

9  devices capable of receiving an indication from some

10  other device?

11      A.  I think it's probably more generally

12  referred to as a signal.  Sometimes it's described

13  as voltage.  So the choice of words here I think

14  is -- was not significant.

15      Q.  What type of signal do you mean?

16      A.  It could be a data signal, a control

17  signal, just -- it's going to be voltage on a wire

18  at the lowest level.

19      Q.  Would you also call that an electronic

20  signal?

21      A.  I would think so.  I mean, these are all

22  sort of general terms that I don't ascribe specific

23  meaning to.  You know, it's not that it would be one

24  and not the other.  You know, I don't know that I

25  have a better answer for that.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT            145

1    Q.  Okay.  And in this circumstance says

2   electronic device receives the indication, and it

3   says a server, quote, provides the retailer

4   electronic device the response indicating whether

5   the token is valid.

6        So my question is, did the electronic

7   device receive the indication in this case from the

8   server according to your testimony?

9        MR. XU:  Objection, vague.

10    A.  The question was, was it transmitted to

11   the server?

12    Q.   From the server to the electronic device.

13    A.   Well, the sentence says the token and a

14   request to verify the in store purchase are

15   transmitted to a server.

16    Q.  Yeah, and then keep reading, please.

17    A.  Okay.  Which provides the retailer

18   electronic device a response indicating whether the

19   token is valid and the retailer electronic device

20   receives the indication.

21        Okay.  So yes, the server would be

22   providing the retailer electronic device the

23   response.

24    Q.  Also the indication was provided from the

25   server to the electronic device?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    146

1    A.   I think it's described here as a response.

2    Q.   It says the retailer electronic device

3  receives the indication.  So what -- I think you

4  said that was a signal?  Is that right?

5    A.   Again, from my recollection, and I would

6  need to review the materials related to this because

7  I don't recall the details of the case.  I think

8  I -- I didn't ascribe particular meaning to these or

9  I mirrored the language that was used in the patent.

10   Q.   Okay.  Like to turn to another page of the

11  same document.  Can you turn to page 20, please.

12   A.   Sure.  Okay.  Paragraph 43?

13   Q.   One second.

14   A.   Okay.

15   Q.   Looking at actually paragraph 42, please?

16   A.   Okay.

17   Q.   You see that?

18   A.   I do.

19   Q.   So this -- if you could read here starting

20  at 42, starting with the word Rothschild.  Can you

21  read this sentence back to me, all the way through

22  claim 1?

23   A.   Okay.  "Rothschild also does not disclose

24  or render obvious the retailer device transmitting

25  to the server information indicating that the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                147

1  customer's in-store purchase of goods and services

2  has been inspected and approved by the user of the

3  retailer device (claim 1)."

4      Q.  So this says information indicating.  To a

5  person of ordinary skill in the art at the time of

6  invention, what does information indicating mean in

7  2005?

8         MR. XU:  Objection, vague.

9      Q.  Let me ask you another question.  I'm

10  sorry.  Withdraw that question.

11         Is it your understanding that information

12  can indicate based on reading this testimony?

13         MR. XU:  Objection.

14    A.  So this is a quote from someone else's

15  language, right?  And --

16    Q.  Well, you must have understood it, right,

17  because you said Rothschild does not disclose or

18  render obvious this language.  So presumably if that

19  was your testimony, did you understand this

20  language?

21    A.  Yes.  It would be my opinion that -- and

22  again, it's going to depend on the context -- that

23  in general an indication is a signal, and that is

24  not something that's generated simply from

25  information.  If we take this in context here, we

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              148

1   have a device transmitting, and that is more of an

2   active process as opposed to an indication simply

3   from information.

4        So I -- and again, this is a quote from

5   someone else's claim.  So I think it's going to

6   depend on context, but in general, I tend to think

7   of an indication more as something that's been

8   actively produced, I guess, but context dependent.

9    Q.  So Dr. Garlick, do you ever use the term

10  mobile device?

11   A.  Yes, I believe so.

12   Q.  What does that term mean to you?  Or first

13  let me ask you, mobile device, would that be a

14  commonly-used term in 2005?

15   A.  I think probably in 2005 it would have

16  possibly been that people referred to things more as

17  a cell phone, but in general, a mobile device is,

18  you know, a very general term for something that can

19  be taken with you.  But I don't think that mobile

20  device and cell phone are necessarily mutually

21  exclusive synonyms.

22   Q.  Would you characterize a cell phone as a

23  type of mobile device?

24   A.  Yes.

25   Q.  Okay.  And what are the usual components

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                149

1   of a cell phone, just high level hardware

2   components?

3       A.  It's going to depend a lot on the specific

4   product.  But in general, it would need -- we're

5   talking about a cell phone?

6       Q.  Yes.

7       A.  Okay.

8       Q.  Or cellular device, let's say, cell phone,

9   cellular device.

10      A.  I would say at the minimum it would need a

11  cellular radio and some type of -- some type of

12  processing.

13      Q.  Some type of processing.  What do you mean

14  by that?  Can you explain that?

15      A.  Some hardware to run some software.

16      Q.  How do you usually refer to that hardware

17  that runs the software on a cell phone or, I'm

18  sorry -- yes, on a cell phone.  Excuse me.

19      A.  How would I refer to -- well, an Apple

20  device would have a specific CPU associated with it.

21  It's going to -- it's going to depend highly on the

22  specific device in terms of what hardware is

23  contained within it.

24      Q.  Okay.  Let's say -- is it typical for

25  there to be a processor in a cellular device?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    150

1      A.   Again, there are cellular devices that are

2   related to, say, internet of things that are very

3   small devices that would have something that I would

4   characterize as very small capability for running

5   any type of code.  So again, I don't know that I

6   could characterize it in kind of an easy

7   distinction.

8      Q.   Let's say consumer cell phones.  Let's

9   just use that as an example.  Do you think consumer

10   cell phones that people commonly use, are those

11   devices, in your view?

12      A.   I mean, device is a very general term.

13   I -- sorry.  Could you repeat the question?

14      Q.   Is a consumer cell phone an example of a

15   device?

16      A.   As device is a very general term and

17   encompasses many things, I would say yes.

18      Q.   Do most of those cell phones have a

19   camera?

20      A.   Again, probably highly dependent on model

21   number, time frame, time period, cost and so forth.

22   At present, yes.

23      Q.   Okay.  In 2005 were there cell phones with

24   cameras that existed?

25      A.   I believe so.

{CUEDVI/00003/00653377}

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    151

1    Q.  Okay.  And was there cell phones at that

2  time with touch screens that you were aware of?

3    A.  This would have been limited.  Not in

4  probably widespread use, but I'm sure there may have

5  been examples.

6    Q.  What about the hardware you're talking

7  about, controller hardware?  Would that be included

8  in a cell phone?

9    A.  Again, like I said, controller is a very

10  general word, and so the ability to process some

11  instructions would have been present on most

12  devices.

13    Q.  What do you mean by process instructions?

14    A.  I think I answered that before.  To run

15  software, to perform the instructions of software.

16    Q.  So if I describe to you a cell phone that

17  had a lens, cellular interface, a camera, a memory

18  and a touch sensitive display, would you understand

19  what I've just described to be a device?

20      MR. XU:  Objection, vague.

21    A.  Again, as device is a very general term, I

22  think it -- I think it encompasses the microphone

23  that I'm speaking into.  So in that sense, I suppose

24  it would cover that as it covers almost everything.

25    Q.  Okay.  So setting aside that device is a

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                152

1  broad term, which is what you said, you put

2  something together that included a lens, a cellular

3  interface, an image sensor, a memory, a touch

4  sensitive display and a controller, that something

5  can form a device?

6      MR. XU:  Objection, vague.

7      Q.  Or could be characterized as a device?

8  Excuse me.

9      MR. XU:  Same objection.

10     A.  So as you have described it here, I think

11  that would fit the categorization.  As that term is

12  used in the patent, I think it is -- what is being

13  described is not clear.

14     Q.  Right.  I wasn't asking you that.  I just

15  asked generally speaking, setting aside the patent,

16  the components I listed taken together, you'd

17  consider that to be properly characterized as a

18  device?

19     A.  Well, that's the start of the patent,

20  right?  So I -- I consider device to cover a wide

21  swath of things, and so that would include the

22  things that you have listed.  But as I stated, in

23  the context of the full claims, it was unclear.

24     Q.  So I'd like to ask you a yes or no

25  question.  Yes or no, a lens, a cellular interface,

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                153

1  an image sensor, a memory, a touch sensitive

2  display, and a controller form something.  Is that

3  something capable of being characterized as a

4  device?

5      MR. XU:  Objection, asked and answered.

6  Q.  Yes or no?

7  A.  I don't think I have anything to add to my

8  previous answer.

9  Q.  A lens, a cellular interface, an image

10  sensor, a nonvolatile memory, a touch sensitive

11  display and a controller form something.  Can the

12  something be called a device?

13      MR. XU:  Same objection.

14  A.  I would say yes in the sense that that

15  term is very generic.

16  Q.  Thank you.  If you'd pull up Exhibit 4A,

17  which is the '472 patent.

18  A.  Yes.  I'm there.

19  Q.  Please go to column 12, line 62.

20  A.  12, 62.  Okay.  I'm there.

21  Q.  If you could read lines 12, 62 to 66.

22      MR. XU:  Read out loud or for him to --

23  Q.  Read it out loud, please.

24  A.  "In an enhancement to the above disclosed

25  embodiments of this aspect of the invention, the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                154

1  inventive camera system is operable for being

2  instructed to automatically initiate a connection to

3  the internet, LAN, printer, et cetera."

4     Q.  In this statement, what is being

5  instructed to automatically initiate a connection to

6  the internet, according to this sentence?

7     A.  I suppose in this sentence it would refer

8  to the inventive camera system.

9     Q.  When you formulated your opinion in your

10  declaration, you said you read the patents and the

11  file histories.  Did you read this sentence here?

12     A.  Yes.

13     Q.  Did you mention it in your declaration at

14  all?

15     A.  I don't believe so.

16     Q.  Why not?

17        MR. XU:  Objection, vague.

18     A.  It didn't seem relevant.

19     Q.  Turn to column 17 of this patent.  This

20  is, I think, the last page of the document.

21     A.  Yes.

22     Q.  I'm sorry.  We have to actually switch

23  here too.  Can you switch to Exhibit 4.

24     A.  Okay.

25     Q.  And go to -- now, this is the '761 patent.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              155

1    A.  Yes.  Okay.  And if you wouldn't mind if

2    we could take a break at your next break in the line

3    of questioning.

4    Q.  Sure.

5    A.  Thanks.

6    Q.  So now I'm looking at -- can you go to

7    column 16.

8    A.  Yes.  Okay.  I'm there.

9    Q.  So at line 66 -- or starting at line 58 is

10   claim 1 of the '761 patent.  Is that right?

11   A.  Yes.

12   Q.  Okay.  And looking at element FI, says --

13   could you read FI to me starting at line 66?

14   A.  Yes.

15   Q.  I'm sorry.  I'm telling you the wrong --

16   yes, go ahead.  Sorry.

17   A.  Okay.  So F is a controller configured to

18   receive via the text sensitive display a user

19   selection of an upload option that instructs the

20   device to -- that instructs the device to confine

21   automatic picture upload to periods without

22   potential cellular network access fees.

23   Q.  This says instructs the device, right?

24      MR. XU:  Objection, vague.

25   A.  Yes.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    156

1     Q.   And if you scroll up, I'm going to stay in

2   the same patent here.  At line 56 it says -- I'm

3   sorry.  Go to column 12, line 56 of this Exhibit 4,

4   please, the '761 patent.

5     A.   Okay.  Okay.  That's the line we looked at

6   before.

7     Q.   So this says here, right, the inventive

8   camera system is operable for being instructed.

9     A.   Yes.

10     Q.   And then the claim we just read said

11   receive a user selection of an option that instructs

12   the device.  Is that right?

13     A.   Yes.

14     Q.   So in that reading, we established that

15   there's a -- you know, when you put these elements

16   together it's a device.  So can the inventive camera

17   system be the device according to this sentence at

18   56 through -- I'm sorry, 12, 56 through 58?

19         MR. XU:  Objection, vague.

20     A.   I think it could be.  I think that there

21   are other things that fit here.  Like I mentioned,

22   device is a very general term, and so I think

23   several things, as I mentioned in the declaration,

24   can be what's referenced to as the device.

25     Q.   You didn't reference this section at all

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                157

1   in your declaration.  Is that right?

2      A.  Sorry.  Which section are we talking

3   about?

4      Q.  This column 12, the inventive camera

5   system is operable for being instructed.

6      A.  No, I don't believe I cited to that.

7      Q.  Are there other examples -- you've read

8   the spec, right?

9      A.  Yes.

10     Q.  So let's turn to column 13, lines 16

11  through 22 of this same document, '761 patent.

12     A.  Okay.  So column 13, line 16?  It doesn't

13  look like a sentence starts there.

14     Q.  There's a sentence that says for example.

15  Do you see that sentence?

16     A.  Yes.  Okay.  For example, the inventive

17  camera system can be instructed to automatically

18  send the pictures to an email account, internet

19  picture hosting site, web-based photo printing site

20  and so on.

21     Q.  Correct.  Thank you for reading that.  So

22  when you look at that sentence, what's being

23  instructed in that sentence?

24        MR. XU:  Objection, vague.

25     A.  The inventive camera system.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                158

1    Q.  Did you cite that in your declaration?

2    A.  No, I don't believe I cited that sentence.

3    Q.  So let's look at column 5, line 31.

4  There's a sentence that starts there, "In another

5  example."

6    A.  Okay.  "In another example, perhaps the

7  phrase and word watch the birdie and, quote, click,

8  quote instruct the camera to take the picture."

9    Q.  What's being instructed in that sentence

10  you just read?

11      MR. XU:  Objection, vague.

12    A.  It appears to be the camera.

13    Q.  And then line -- column 5, lines --

14  starting at line 58 there's another sentence that

15  starts, for example.  If you could read that to me.

16    A.  "For example, the user would teach the

17  camera system by speaking the word, quote, snap,

18  quote, close to the camera and inform the camera

19  that this is a picture-taking command and would then

20  stand far from the camera and say snap, thus

21  teaching another utterance and so on."

22    Q.  Right after where you stopped, it says and

23  instruct the camera that this is also a

24  picture-taking command.  Do you see that?

25    A.  Oh, I do.  I --

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                159

1    Q.  Okay.  So what's being instructed there?

2    A.  It appears to be the camera.

3    Q.  Did you cite this sentence or the one we

4  talked about just a few minutes ago in your

5  declaration?

6    A.  I did not.

7    Q.  Are you aware of any instances in this

8  patent specification where something other than the

9  camera or the camera system is instructed or there's

10  the word "instruct" used with it?

11       MR. XU:  Objection, vague.

12    A.  I would need to go through and search the

13  document.

14    Q.  Was that part of your process when you

15  wrote your declaration?  Did you look for that word,

16  instruct, at all?

17    A.  I don't recall the specific searches that

18  I performed.  This matching of the term "instruct"

19  was not the only focus of my analysis.  And if we

20  could take a break when it's convenient for you.

21    Q.  Sure.  I just want to finish what we're

22  talking about if you don't mind, if you can.

23    A.  Sure.

24    Q.  So but the '761 patent, the sentence says,

25  received via the -- in claim 1, received via the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                160

1  touch sensitive display -- no, I'm sorry.  Claim

2  1 -- excuse me.  Can you strike that?

3      Claim 1, element F1 says received via the

4  touch sensitive display a user selection of an

5  upload option that instructs the device.  Is that

6  correct?

7   A.  Sorry.  The question is, is that what

8  claim 1 contains?

9   Q.  Is that what claim 1 says, instructs the

10  device?

11   A.  Yes.

12   Q.  So can you go back to the '472 patent --

13   A.  Yes.

14   Q.  -- which would be Exhibit 004A.

15   A.  Okay.  Back at the '472?

16   Q.  Column 17, please.

17   A.  17.

18   Q.  At line -- around line 14, there's FI, and

19  it describes here an upload option that instructs

20  the camera system to confine.  Is that correct?

21   A.  Yes, I see that.

22   Q.  When you were discussing the device in

23  your declaration, did you mention this parallel

24  language in the '472 patent?

25   A.  No, I don't believe that's in my

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                161

1  declaration.

2     Q.  Why not?

3        MR. XU:  Objection, vague.

4     A.  I don't know that I can answer why certain

5  things weren't in a document.  There -- I'm also

6  uncertain of the legal principles regarding

7  construing terms across the patents, and so this

8  didn't seem relevant to me as something that I

9  considered in my analysis of the '761.

10    Q.  So you were aware of this but you

11  considered it irrelevant.  Is that right?

12        MR. XU:  Objection, mischaracterizes

13  testimony.

14    A.  Yeah, I don't know that I could

15  characterize it that way.  I also see some

16  differences here in the language of the section, and

17  so they do appear similar, but again, from my

18  analysis of the '761, I didn't include it in the

19  report, in the declaration.

20    Q.  What do you understand the intrinsic

21  record to mean when you're reviewing a patent?

22    A.  Sir, if I could answer this question and

23  then we could have a break?  Does that sound

24  acceptable?

25    Q.  Sure.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT            162

1    A.  Okay.  Could you repeat the question,

2  please?

3    Q.  What's your understanding of what

4  comprises the intrinsic record when you're

5  considering a patent or reading a patent?

6    A.  It's my understanding that that is the

7  patent itself and the patent history.

8    Q.  What about related patents?  Are those

9  part of the intrinsic record, to your understanding?

10    A.  I don't know that I have legal knowledge

11  of what the word related means there.

12    Q.  In the same family, sharing the same spec.

13    A.  Would those be part of the intrinsic

14  evidence?  They're not something that I was asked to

15  analyze for this.

16    Q.  Okay.  So you don't know whether or not

17  they're part of the intrinsic record?

18    A.  I would -- I'm not familiar with the legal

19  terminology that underlies that question.

20    Q.  So were you instructed that a POSITA

21  reviews question of indefiniteness in light of the

22  intrinsic record?

23    A.  Could you repeat?

24    Q.  Are you aware of the legal standard that

25  the question whether a claim is indefinite -- or I'm

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    163

1   sorry.  The question -- strike that.  The indefinite

2   question, indefiniteness question is viewed from the

3   perspective of a person having ordinary skill in the

4   art.  Are you aware of that?

5       A.   The indefinite -- could you repeat that?

6       Q.   The question of indefiniteness is viewed

7   from the perspective of a person having ordinary

8   skill in the art.

9       A.   That's my understanding, yes.

10          And, sir, I'm going to go to the rest room

11   and turn off my camera if you don't allow me to have

12   a break.

13      Q.   Okay.  Let's have a break.

14      A.   Thank you.

15          (Recess from 3:40 to time   )

16   BY MR. LESKO:

17      Q.   Okay.  Dr. Garlick, during the break did

18   you discuss your testimony at all with counsel?

19      A.   I did not.

20      Q.   Can you pull up for me Exhibit 2, your

21   declaration.

22      A.   Okay.  I have it.

23      Q.   Please turn to paragraph 18.

24      A.   Okay.

25      Q.   Can you read the second sentence there in

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                164

1   that paragraph?

2      A.   Sure.  "I understand a patent satisfies

3   the definiteness requirement of its claims read in

4   light of the specification delineating the patent

5   and the prosecution history inform with reasonable

6   certainty those skilled in the art at the time of

7   the invention about the scope of the invention."

8      Q.   Thank you.  That's still your

9   understanding today.  Is that right?

10     A.   Yes.

11     Q.   So further down in this same document,

12  paragraph 46.  Let me know when you're there.

13     A.   Okay.  I'm there.

14     Q.   The second sentence of the paragraph 46,

15  can you read that?

16     A.   "Thus, reading the patent claims and

17  specification, a POSITA would be left to wonder what

18  the device refers to, controller, touch sensitive

19  display, camera system, cellular interface,

20  something that contains a camera system, or any of

21  the components recited before the introduction of

22  the device."

23     Q.   Now, here you say reading the patent

24  claims and specification.  You don't mention the

25  file history.  Did you review the file history in

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                165

1   the -- I'm sorry, the prosecution history in forming

2   this opinion that you have here in paragraph 46?

3       A.   Yes.  As I mentioned before, I've reviewed

4   at a high level the prosecution history.

5       Q.   So you don't mention in this section of

6   your declaration addressing the device the

7   prosecution history at all.

8           Was there anything in the prosecution

9   history that would lead one reading it to think that

10  the device was the controller?

11          MR. XU:  Objection, vague.

12      A.   So this sentence refers to the use of the

13  device within that claim.  And within that claim, it

14  is unclear what that is.  And the evidence is

15  contained within this section is what I used to form

16  that opinion.

17      Q.   So this section does not mention anything

18  about the prosecution history.  Is that right?

19      A.   I believe that's correct.

20      Q.   So let's just do this one at a time.  Was

21  anything -- since you read the prosecution history,

22  you don't mention it here.  Did anything in the

23  prosecution history lead you to think that the

24  device in the claim refers to controller?

25      A.   I wouldn't say that it was specifically

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT               166

1   something that led me to believe that it was A or B.

2   It is that it is difficult to determine what is

3   being described by device because as I point out

4   here, device is used in many, many contexts within

5   the patent and it's unclear.

6       Q.  So the sentence says you'd be left to

7   wonder what the device refers to, and there's a list

8   here.  There's a list of items.  Is that -- do you

9   agree with me?

10      A.  Yes.

11      Q.  So I'd like to look at the items one at a

12  time, if you could, with me.  So -- and I know you

13  mentioned here that the patent claims and

14  specification.  We don't need to discuss those.  I'm

15  referring only to the prosecution history.  Do you

16  understand me?

17      A.  Yes.

18      Q.  What I'm saying?  Okay.  Controller,

19  prosecution history, you know, office action

20  responses, IDSs, examiner office actions, you know

21  what all those are, right?

22      A.  I have an understanding of those terms.

23      Q.  So any of those documents that are part of

24  the prosecution history, in any of them did someone

25  call the controller a device that you're aware of?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                167

1          MR. XU:  Objection, vague.

2      A.  Not that I recall or not that I included

3  in my report.

4      Q.  If they did, would you have included it in

5  your report?

6      A.  I think that would have been relevant

7  information.

8      Q.  Is there any --

9      A.  Depends on the context though.

10      Q.  How does it depend on the context?  I

11  don't know if you have to qualify that answer.  You

12  said that it would be relevant information.  And why

13  would it be relevant information?

14      A.  Well, the point here is that it was

15  difficult to determine what was meant by device.

16  And if there was something that indicated that it

17  was definitely one of these things or multiple

18  things or whatever, then I would find that relevant,

19  but it would depend on what it said.  So that's what

20  I meant by --

21      Q.  Of course.  And I think we're in

22  agreement.  So the point is that the prosecution

23  history can inform what the device might be based on

24  what you stated in your own declaration, right, as

25  to the law?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    168

1     A.  I would think so, yes.

2     Q.  So if the prosecution history mentioned

3   that the controller is the device, that would be

4   relevant, we agree, right?

5     A.  Well, we have references to device being

6   used for --

7     Q.  In the spec.  I'd like you to set aside

8   the spec.  Remember I asked you to set aside the

9   spec?

10     A.  Sorry.

11     Q.  Let's focus on the prosecution history if

12   you don't mind.

13     A.  Sorry.  I forgot that caveat.  So could

14   you repeat the question?

15     Q.  Would it be relevant if the prosecution

16   said the device is a controller?  Would that be

17   relevant hypothetically based on your understanding

18   of the law?

19     A.  I would -- I would think so, yes, but I

20   would base --

21     Q.  That's good.  Thank you.

22     A.  I have more.  I would base that on its

23   context in the claim and how it was used.  Device is

24   used all over the place, and so it's going to depend

25   on how it is contextualized and in what context it

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                169

1   happens, because device refers to many things.

2      Q.  Okay.  But the prosecution history --

3   let's just see -- let's try this a little easier for

4   you.  Is the prosecution's history, is the mention

5   of the device or device in the prosecution history

6   relevant to the indefiniteness question in your

7   view?

8      A.  I feel like we're asking questions about

9   hypothetical appearances of a word in a certain

10  context in a certain document, and I -- again, it

11  all depends on the context.  If there's something

12  that said in claim 1F this means that and I didn't

13  see that, I don't know that that would be what it --

14  what it would contain.  But what I'm saying is this

15  is very dependent on context because the term device

16  is a very generic term that gets used frequently.

17     Q.  So if someone said in the prosecution

18  history the device in claim 1 is the touch sensitive

19  display, it doesn't say that -- let's say it doesn't

20  say that in the spec, it doesn't say it in the

21  claim.  Based on your understanding of the

22  prosecution history is relevant, would that be a

23  relevant point to include in your declaration is

24  someone said in the prosecution history the device

25  is the touch sensitive display?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                170

1    A.  I would think that would be relevant

2  information.  I would analyze it in the context that

3  it was presented.

4    Q.  Of course.  I understand.

5        So with respect to your list here,

6  controller -- let's start with controller, touch

7  sensitive display, and cellular interface, those

8  three items.  Do you understand what I'm talking

9  about?  Controller, touch sensitive display,

10  cellular interface.  Those are three items on your

11  list.  Is that right?

12    A.  Yes.  It looks like we've omitted camera

13  system?  Is that --

14    Q.  Right.  I'm talking about the other three.

15  Controller, touch sensitive display, cellular

16  interface, those three items.

17    A.  Yes.

18    Q.  Are you aware of any part of the

19  prosecution history, just the prosecution history

20  referring to those items as the device?

21    A.  In my review of the documents, I did not

22  find relevant portions that provided more indication

23  of what device may be.  And if they were presented

24  in the prosecution history, that is likely a

25  different context than what they were presented in

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 171

1  the claim, and so I would have to make an analysis

2  based on that.

3      Q.   Right.  But here in your declaration,

4  there's no analysis of prosecution history for

5  either a controller, touch sensitive display or

6  cellular interface as a device.

7      A.   This is based on my opinion from reading

8  the claim and the idea that it seems like some other

9  terms can be substituted in here and could also be

10  possible.

11     Q.   Asking a very specific question.  In the

12  prosecution history, based on your review -- you

13  reviewed the prosecution history.  You said so.  Is

14  that right?

15     A.   I reviewed it at a high level and

16  performed searches of the document.

17     Q.   So you reviewed at a high level the

18  prosecution history.

19     A.   Yes.

20     Q.   You performed a few searches of the

21  prosecution history.

22     A.   I don't recall how many.  I would

23  characterize it as more than a few.

24     Q.   How many, ballpark?

25     A.   Ten.  Probably a few more.  A dozen.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT             172

1    Q.  Okay.  So from your review, your dozen

2   searches, prosecution history, there's nothing in

3   the prosecution history you thought was worth citing

4   in this section covering the device?

5    A.  That's correct.

6    Q.  If there was, would you have cited it?

7    A.  If I found something that I thought was

8   relevant that I should cite to, yes, I would have

9   cited to it.

10    Q.  So paragraph 48 here of your declaration,

11  you say -- can you turn to that in Exhibit 2?

12    A.  Paragraph 48 of the declaration?

13    Q.  Yes.

14    A.  Yes, sir, I'm there.

15    Q.  You say that the camera device in claim 1

16  of the '761 patent would include a cellular

17  interface as specified in claim 1B.  However, there

18  is no such cellular interface or any networking

19  interface in the functional block diagram of the

20  claimed camera system in figure 3 of the '761

21  patent.  Do you see that?

22    A.  I do.

23    Q.  Aside from that figure, is a cellular

24  interface being part of a camera system mentioned in

25  the '761 patent, just in the text?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 173

1    A.  I'd have to go back and look.  I don't

2   recall the -- every instance of a combination of

3   terms.

4    Q.  So let's pull up the '761 patent.  It's

5   Exhibit 4.

6    A.  Okay.  I've got Exhibit 4 open.

7    Q.  Starting at line or column 12, line 28.

8   Starts alternatively.  Do you see that sentence?

9    A.  I do.

10    Q.  Says, "The invention contemplates the use

11   of wired LAN, cellular" -- "Alternatively the

12   invention contemplates the use of wired LAN cellular

13   data networks, et cetera, as the interconnection

14   technology used by the inventive camera system."

15        Do you see that?

16    A.  I do.

17    Q.  So does the spec say based on that

18   sentence, reading that sentence, do you think the

19   spec says the camera system can use cellular data

20   networks?

21        MR. XU:  Objection, vague.

22    A.  I would say this sentence describes a

23   cellular data network used by the inventive camera

24   system.

25    Q.  And what about 13, 16 through 22?  I'm

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                174

1   sorry, 13 -- column 13, line 10?  Excuse me.

2       A.   Would you like me to read it?

3       Q.   Yes.

4       A.   "In the second embodiment above, the

5   inventive camera system automatically connects to

6   the internet preferably via Wi-Fi, although cellular

7   network, et cetera, connection is also contemplated

8   when it has a predetermined number of pictures and

9   can so connect and will send the pictures to

10  virtually any internet destination without user

11  intervention."

12      Q.   So does that describe a cellular network

13  being part of the camera system?

14      A.   I would say that line does, yes.

15      Q.   Or using the cellular -- I'm sorry -- that

16  the camera system can use the cellular network?  Is

17  that fair to say according to that line?

18      A.   Yes.  I believe that line does.

19      Q.   Are you also aware that figure 3 in the

20  '472 patent is a little bit different than figure 3

21  in the '761 patent?

22      A.   I am aware of that, yes.

23      Q.   Do you know why?

24      A.   I don't know that I could answer why, no.

25      Q.   So Dr. Garlick, are you familiar with the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                175

1   concept of data roaming?

2     A.   With regard to a cellular network?

3     Q.   Yes.

4     A.   Yes.

5     Q.   What is data roaming?  Well, just tell

6   you.  Let me ask you this.  What is data roaming?

7     A.   So it's my understanding that it is

8   receiving or possibly transmitting data outside of a

9   usual network or a carrier's network.  It's using

10  data in a place distant from some reference.

11     Q.   Are you aware of data roaming fees?  Have

12  you heard of them?

13     A.   I've heard that term before, yes.

14     Q.   So you're familiar with what data roaming

15  fees are?

16     A.   In a general sense.

17     Q.   So in association with data roaming, which

18  you just described, are there sometimes data roaming

19  fees?

20         MR. XU:  Objection, vague.

21     A.   I would say it depends on the activity of

22  the user.

23     Q.   So if the user is uploading data while

24  data roaming, is it possible to incur a data roaming

25  fee as a result?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 176

1     A.  It's my understanding that these have

2   largely been eliminated, but the answer is for a

3   cellular carrier, I guess, that provided that

4   capability and for a user that performed that

5   operation, it's my understanding that there could be

6   additional fees associated with that.

7     Q.  Are there any specific situations you're

8   aware of where data roaming has a fee associated

9   with it?

10     A.  I don't know that I could give you

11   specifics.  I think it would depend on the carrier

12   and the user and so forth, the plan also that a user

13   had.

14     Q.  Let me give you an example.  So

15   international, if you're traveling internationally

16   and you're roaming, is there typically a fee

17   associated with that?

18     A.  Again, I think it depends on the carrier,

19   the plan.  Yeah, I think it depends.

20     Q.  Do you ever travel overseas?

21     A.  I have, yes.

22     Q.  Have you ever incurred a data roaming

23   charge as a result of using your phone overseas?

24     A.  I believe I did.  It was probably ten

25   years ago or so.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                177

1    Q.  Have you traveled overseas recently?

2    A.  Not recently.

3    Q.  So just introduced Exhibit 15.  Can you

4  refresh your folder and pull up Exhibit 15.

5    A.  Sure.  Okay.  I see it.

6    Q.  So take a minute to just skim the

7  document.  And from what you can see, who authored

8  this document?  Not a person.  I'm asking, you know,

9  who's -- what's the, I guess, entity that authored

10  this document.

11    A.  Okay.  This appears to be an FCC document.

12    Q.  Okay.  Are you familiar with who the FCC

13  is?

14    A.  Yes.

15    Q.  Okay.  And what is it?

16    A.  The federal communications commission.

17  It's a government entity that oversees

18  communication.

19    Q.  Would you say that being that it's the

20  government entity overseeing communications, they

21  have a pretty good idea of how communications,

22  including cellular systems, operate?

23      MR. XU:  Objection, vague.

24    A.  I don't know that I can vouch for the

25  credibility of the FCC, but in general, I would --

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    178

1  I have no reason not to believe this document.

2     Q.   Okay.  This is the U.S. government entity,

3  I guess, in charge of communications.  Would you

4  agree with that?

5     A.   I think that's a fair general assessment.

6     Q.   Turn to page 3 of this document.

7     A.   Okay.

8     Q.   See where it says last updated?

9     A.   Yes, I do.

10    Q.   Can you read that date to me?

11    A.   Appears to be 4/21/20.

12    Q.   Would you say it as words if you don't

13  mind?  Just easier nor the record.

14    A.   I think this is referring to April 21st of

15  2020.

16    Q.   And turn back to page 1 --

17    A.   Okay.

18    Q.   -- if you could, please.  If you look at

19  the second bullet point, says roaming rates for the

20  countries you plan to visit.  If you're willing to

21  pay the charges, verify with your carrier that

22  international roaming is activated before you

23  travel.  Then it says in these other bullet points,

24  For most U.S. customers, domestic service plans do

25  not cover usage abroad."  It says, "Rates may be

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    179

1  much higher because of additional roaming fees on

2  foreign mobile networks and may vary from country to

3  country and network to network.  Higher rates may

4  apply to all your phone's functions including voice

5  calls, voicemail, text messages, and internet

6  access."

7        Does that seem accurate to you, based on

8  your understanding?

9    A.  So like I mentioned, I haven't traveled

10  internationally in quite awhile.  So I can't answer

11  from personal experience, but that's what the

12  document says and I have no reason not to believe

13  this.

14    Q.  Would this describe a possible situation

15  where you'd have roaming charges for using a

16  network?

17      MR. XU:  Objection, vague.

18    A.  Sorry.  Could you repeat the question?

19    Q.  Is it possible after reading this

20  document, would you say it's possible for charges to

21  be incurred as a result of roaming?

22    A.  So this document seems to reference

23  international roaming.  I would say given that

24  caveat, yes.

25    Q.  Would you say data roaming always results

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT               180

1  in charges if you upload or use data -- I'm sorry.

2  Scratch that.  Can you strike that question.

3        Does data roaming always result in charges

4  so use of a roaming network and uploading data while

5  roaming, does that always result in charges?

6        MR. XU:  Objection, vague.

7     A.  I'm sorry Mr. Xu.  I didn't hear.

8        MR. XU:  Objection, vague.

9     A.  I don't know.  I think that would depend

10  on a user's plan and the cellular company and so

11  forth.

12     Q.  Is there a potential for roaming-related

13  fees when you use a roaming network?

14     A.  This document seems to describe fees that

15  may be incurred for international roaming.

16     Q.  So you understand the just sort of

17  ordinary meaning of the word "potential" if you're

18  using it in conversation?

19        MR. XU:  Objection, vague.

20     A.  I mean, generally I have an idea what a

21  potential is.

22     Q.  So if you're looking at a weather forecast

23  and it says potential thunderstorms, what does that

24  mean?

25        MR. XU:  Objection, vague.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    181

1    A.  Something that could happen.

2    Q.  Okay.  Let's say you're looking at this

3  weather forecast and you want to go for a walk that

4  day, right?  You know you're going to be walking

5  around a lot and the forecast says potential

6  thunderstorms.  Can you -- what would you do to

7  prepare yourself for your walk?

8        MR. XU:  Objection, vague.

9    A.  I guess in that scenario you could

10  evaluate the risk.  You could look outside to see if

11  you thought that report was accurate.  You could

12  prepare yourself for it.  You could stay home.  You

13  could carry an umbrella.  You could do any number of

14  things.

15    Q.  So you can prepare yourself for the

16  potential storm before it happens.  Is that right?

17    A.  Yes, I would say so.

18        (Exhibit no.    marked)

19    Q.  So pull up plaintiff's Exhibit 16.

20    A.  Okay.  All right.  I have that pulled up.

21    Q.  So what we were just talking about a

22  minute ago, a phone manufacturer doesn't know the

23  roaming conditions -- doesn't know about a user's

24  plan with respect to roaming conditions.  Would you

25  agree with that?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              182

1    A.  I'm sorry.  I didn't catch.  What doesn't

2   know?

3    Q.   A cell phone manufacturer, let's say an

4   Android phone manufacturer doesn't know each user's

5   data roaming plan or whether their plan involves

6   data roaming charges.  Do you agree?

7    A.  I would agree that the manufacturer does

8   not know what plan a user would purchase with their

9   cell phone.

10   Q.  Can you -- would a Android manufacturer be

11   able to prepare for the possibility of such data

12   roaming charges?

13      MR. XU:  Objection, vague.

14   A.  And I -- on my previous answer, I believe

15   there are some devices that may be manufactured to

16   go in conjunction with a specific network.  So I

17   don't think that's what we're talking about here,

18   but I just wanted to clarify that answer because

19   that thought just entered.  And so could you repeat

20   the current question?  I apologize.

21      THE REPORTER:  Question:  "Would a Android

22   manufacturer be able to prepare for the possibility

23   of such data roaming charges?"

24      MR. XU:  Objection, vague.

25   A.  Would an Android phone manufacturer be

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                183

1  able to anticipate -- we're talking about the

2  manufacturer of the hardware?

3      Q.   Yes.

4      A.   Or the operating system?  Because when you

5  say Android phone, that implies a hardware that is

6  running the Android operating system.  So I'm not

7  sure if you mean the hardware, the software, the

8  combination.

9      Q.   Let's say the combination.

10     A.   And the question is could that combination

11  be aware of the roaming -- I'm sorry.  Could you --

12     Q.   If you wanted to put together a

13  combination hardware and software device, could you

14  modify it because of the potential for data roaming

15  fees?

16         MR. XU:  Objection, vague.

17     A.   I don't know what you mean by modify it.

18     Q.   Put it together in a way that takes into

19  account the potential for data roaming fees.

20         MR. XU:  Objection, vague.

21     A.   I don't think I understand the question.

22     Q.   Let's go back to the example we just

23  talked about.  You said if you had a potential storm

24  you would carry your umbrella as a potential.  You'd

25  say there's a potential storm today so I'm going to

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                184

1   carry my umbrella.

2        By that same token, if you were saying

3   there's potential data roaming fees, can a system

4   manufacturer prepare for that possibility just like

5   you prepared for the possibility of a storm?

6        MR. XU:  Objection, vague.

7   A.  I don't know that I can answer this.  I

8   don't know what you mean by prepare or modify the

9   functionality of the device.  I just -- we're using

10  an analogy and moving it to hardware that doesn't

11  really -- it doesn't really make sense.  I don't

12  know is my answer.

13  Q.  All right.  So going back to Exhibit 16.

14  It's a little fuzzy here so apologies.  If you look

15  at page 11 of the exhibit.

16  A.  Is that number 35601 at the bottom?

17  Q.  35600.

18  A.  600.  Okay.  I'm there.

19  Q.  Okay.  There's a definition here of

20  "potential."  Can you see it toward the bottom of

21  this?  Refers to a potential problem.  See that?

22  A.  I do.  I'm going to need to zoom in here a

23  bit.  Let me see.  Sorry.  I have bad eyes.  Okay.

24  I'm zoomed in.

25  Q.  So it says they're capable of being but

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                185

1   not yet in existence, latent.  It refers to a

2   potential problem.  Do you see that?

3       A.  I do.

4       Q.  Does that seem to match with your

5   understanding of what potential means?

6       A.  I don't think I'd have an argument with

7   that definition.

8       Q.  Okay.  And can you avoid a potential

9   problem if you need to?

10      A.  I think you could take steps to avoid a

11  potential problem.

12      Q.  Okay.  So going back to the discussion

13  about data roaming, do you have some understanding

14  of what types of plans users have for their cellular

15  phones or smartphones?

16      A.  At a -- at a high level.  It's been

17  several years since I shopped for that, so I would

18  say at a high level.

19      Q.  So are you aware of some plans where data

20  uploads are generally free to the user?

21         MR. XU:  Objection, vague.

22      A.  I'm not familiar with the specifics of

23  certain carriers' cell plans.

24      Q.  Let's talk about your own plan.  So if

25  you -- you probably have internet with your own cell

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                186

1  phone plan.  Is that correct?

2     A.   Yes.  I can receive cellular data.

3     Q.   Can you send it as well?

4     A.   Yes.

5     Q.   And each time you send data, cellular

6  data, do you receive a charge associated with the

7  gigs that you sent?

8     A.   So I believe, and I would need to consult

9  the bill, that I have a certain amount of data that

10  is included.  And then if I go over that, there is

11  an additional charge.

12     Q.   So would that additional charge be an

13  increase from over your earlier -- so let's say

14  you -- first you upload, you loaded something up

15  during your free period of -- or your free -- let me

16  start again.

17          You uploaded data and you're under your

18  limit.  Are you charged for that?

19     A.   Well, I'm charged as a component of the

20  monthly bill that I receive.

21     Q.   Are you charged a fee specific to that

22  upload?

23     A.   I don't know.  I'm charged, I believe,

24  based on the amount of that allowance for data, I

25  guess.  So I don't really know how to accurately

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT              187

1  answer.  I'm charged -- I don't know how AT&T breaks

2  that down into which portion of the money goes to

3  which service or whatever.

4      Q.  So you pay a monthly fee, right?  That's

5  your base fee, I guess you might call it, for your

6  data plan?

7      A.  Yes.

8      Q.  So let's set that aside and we're talking

9  upload by upload.

10     A.  Okay.

11     Q.  Or use by use.  If your -- let's say you

12  needed to load some data, upload some data to the

13  internet and you are at that point in time under

14  your limit.  Will you be charged a fee specific to

15  the data you upload at that point in time?

16     A.  Not a fee in addition to the regular

17  monthly fee in that circumstance.

18     Q.  And later in the same month, you're above

19  your plan but you really have to upload this data,

20  so you upload it.  Are you charged a fee specific to

21  that second upload?

22     A.  As that consumed data allotment in excess

23  of the fees charged for the base, then I would

24  assume there would be an additional fee associated

25  with that.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                188

1    Q.  Comparing that to the second upload to the

2   first upload, is there an increased fee for the

3   second upload?

4       MR. XU:  Objection, vague.

5    A.  Do you mean like per kilobytes or just in

6   total bill amount?

7    Q.  Per kilobyte.  So upload one, there's a

8   cost per kilobyte and upload two, there's a cost.  I

9   think you said upload 1 is zero is the cost per

10  kilobyte and upload 2 you told me there's a fee for

11  those kilobytes.

12   A.  That's not what I said.  I've never

13  mentioned the word kilobyte.  There may be -- in

14  other words, if your base charge is a hundred

15  dollars and you have allotment for a hundred

16  kilobytes, you could say that you're charged a

17  dollar a kilobyte and then anything over that incurs

18  an additional dollar per kilobyte fee.

19       So it gets back to my previous answer;

20  that is, it depends on how the cell phone company is

21  allocating the money that I pay, what they describe

22  it as.  Do they describe this -- I mean, it's not

23  free to them to transmit data.  And so, you know,

24  characterizing it as anything under a certain amount

25  is -- without charge, I don't know that I agree with

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                189

1  that.  I think it depends on -- it depends on the

2  circumstance and the carrier and how they've

3  allocated their accounting, I guess.

4      Q.  So let's say -- let's talk about a

5  different scenario.  Let's say your -- let's go back

6  to what we were looking at before, these

7  international roaming charges.

8      A.  Okay.

9      Q.  Comparing the -- scratch that.

10        MR. LESKO:  Do you want to take a break

11  for a few minutes?  Are you ready for one or should

12  we keep going?

13        THE WITNESS:  Sure, I'm ready for a break

14  if --

15        MR. LESKO:  Okay.  Can we just take a

16  five-minute break?  Would that be okay?

17        THE WITNESS:  Sure.

18          (Recess from 4:43 to 4:52)

19  BY MR. LESKO:

20      Q.  Okay.  Dr. Garlick, can you pick up -- can

21  you pull up, excuse me, Exhibit 4A.

22      A.  The '472 patent?

23      Q.  Yes.

24      A.  I'm there.

25      Q.  Column 14, line 37, if you'd go there.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT               190

1  Let me know when you're there.

2    A.  Okay.  Okay.  I'm there.

3    Q.  Says cellular service providers typically

4  charge a fee for internet access or emailing and so

5  an automatic feature to connect to the net or send

6  email for the purposes of transmitting pictures can

7  improve revenue generation for these companies.

8        What does that mean to you, improve

9  revenue generation?  How would that work, in your

10  view, reading this?

11        MR. XU:  Objection, vague.

12    A.  Sorry.  The question is what does it mean

13  to improve revenue generation?

14    Q.  Well, it says providers charge a fee for

15  internet, so an automatic feature to connect to the

16  net or send email for the purposes of transmitting

17  pictures can improve revenue generation.

18        How would an automatic feature like this

19  improve revenue generation?

20        MR. XU:  Same objection.

21    A.  Well, I read that as a device or something

22  connecting and -- connecting to the network

23  necessarily uses the services of a cellular service

24  provider and therefore they would receive money for

25  that.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                191

1     Q.  They would receive money for connecting in

2  general or for the sending?  How do you read that?

3     A.   Just for internet access in general or

4  emailing.

5     Q.  So if internet access though was part of a

6  base fee, let's say, why would use improve revenue

7  generation?  Let's say it's implied that you're

8  always paying for the use before the -- I'm sorry.

9  Let's say you have a base fee to connect to the

10  internet that's part of your plan.  So the fact that

11  you actually do connect and send pictures over the

12  internet, how would that improve revenue generation

13  in that circumstance?

14      MR. XU:  Objection, vague.

15     A.  Well, just having something that uses the

16  service in general.  I mean, I could -- I could

17  envision devices that don't have a feature to

18  connect to the network, and those would not provide

19  revenue to a cell phone company.

20     Q.   So a cell phone that doesn't connect to

21  the network at all?  Is that what you're referring

22  to?

23     A.  Well, I think -- I don't -- I don't see it

24  talking about cell phones in particular.

25     Q.  So go -- start at line 14, 28.  I'll read

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                192

1  to you.  "Additionally, other aspects of the present

2  invention taught for the improved camera system are

3  applicable to the improved cell phone herein

4  disclosed, particularly the aspect of the present

5  invention associating multiple different utterances

6  to a single command.  The aspect of the invention

7  allowing for automatic connection to a LAN or the

8  internet is also contemplated for use with cell

9  phone cameras.  This aspect of the invention

10  ameliorates the prior art storage space limitation

11  which severely hampers the utility of the cell phone

12  camera."

13       Then there's the sentence you just read.

14  So are we talking about cell phones in this

15  paragraph in the sentence at 14, 37 of the patent?

16     A.  I don't really know.  It starts out with

17  an improved camera system, then it mentions cell

18  phone cameras.  I just read there as you could have

19  a camera that doesn't have internet or doesn't have

20  a cellular connection and you could have a camera

21  that does, and the ones that do would make money for

22  the cell phone companies.

23     Q.  Could you turn to your declaration which

24  is Exhibit 2.

25     A.  Yes.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                193

1    Q.   Paragraph 56, sorry, on page 15 for me

2    anyway?

3    A.   Okay.

4    Q.   If you'd go to 56.

5    A.   Yes, I see that.

6    Q.   The last sentence says, both seem to

7    indicate that selecting an image from a group is

8    sufficient to condition the upload of the group of

9    images.

10        Do you see that statement?

11   A.   I do.

12   Q.   How did you reach that conclusion?

13   A.   Through review of the claim terms.

14   Q.   So can you take me through it?  Were you

15   looking at the language in the claim itself in both

16   cases?

17   A.   Yes.

18   Q.   Can you kind of take me through the

19   process of how you got there?  Maybe let's start

20   with '472 patent, claim 1.

21   A.   Okay.  Okay.  So in 1(f) -- 1(f)(ii), we

22   have a group of image sensor captured pictures being

23   enabled for upload.  Then in 1(f)(ii)(3), at least

24   one image sensor captured picture stored in the

25   local memory has been designated through the touch

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                194

1  sensitive display as part of the group.

2        And so it's unclear to me what the group

3  is and -- in other words, it seems that a group of

4  pictures is uploaded after one or more of those

5  pictures are selected.  And that's unclear.

6      Q.  So when you read the claim, it says to you

7  a group of pictures is uploaded after one or more is

8  selected.  Is that what you said?

9      A.  I don't know that we have to assign an

10  order to it.

11      Q.  Okay.

12      A.  The group of pictures is uploaded during a

13  period where all three conditions are met.  One of

14  those conditions is that at least one picture has

15  been selected.  So once at least one picture is

16  selected, a group of pictures is uploaded.

17      Q.  And of course the other two conditions

18  have to be met as well, right?

19      A.  That's my understanding.

20      Q.  That's from reading the claim language?

21      A.  Yes.

22      Q.  The plain language of the claim?

23      A.  Well, during periods in which all three of

24  the following conditions are met, then the things at

25  the start of (f)(ii) will occur is my reading.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                195

1    Q.  From just reading the plain words of the

2  claim, right?

3    A.  Yes.

4    Q.  Can you pull up -- or actually it seems

5  like you've got this handy so can we talk a little

6  bit about claim 1 of the '761 as well?

7    A.  Sure.  Let me pull it up real quick.

8    Q.  And that's also -- I don't know if you

9  have your own copy there, but we can look at

10  Exhibit 4 in the back or the claims.

11    A.  Okay.  We're on the '761.  I'm at the

12  claims section.

13    Q.  Okay.  So claim 1, so your statement that

14  we read in your declaration a few minutes ago,

15  paragraph 56 of your declaration, Exhibit 2, you

16  say, the '761 patent claims are similarly worded.

17       So can you walk me through the same

18  process of how you got to the determination that in

19  '761 it indicates that selecting an image from a

20  group is sufficient to condition the upload of the

21  group of images?

22    A.  Sure.  Let me look through this real

23  quick.

24       Okay.  So here we just kind of have a

25  similar construct of lack of clarity about what is

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    196

1  uploaded because we cause an upload of one or more

2  pictures after receiving an indication from the

3  local memory that a user has elected an option to

4  designate at least one picture from the group of

5  pictures stored in the local memory to be uploaded.

6        Again, it's not clear what is uploaded and

7  how that relates to what has been or if anything has

8  been designated by the user.  And it's unclear what

9  the "group of" is.

10    Q.  Well, before we talked about conditions,

11  right?  And this one says -- this claim says "after

12  receiving."  So the upload that's caused here, does

13  it have to happen after ii3, according to the claim?

14    A.  I would say based on the language at the

15  end of (ii), after receiving those items 1, 2, and

16  3, that the connection and upload occur.

17    Q.  You would say in this claim -- this is a

18  statement in your declaration -- that the '761

19  patent, like the 47 patent -- '472 patent, excuse

20  me, seems to indicate that selecting an image from a

21  group is sufficient to condition the upload of the

22  group of images.

23    A.  I'm sorry.  Was there a question?

24    Q.  Just asking you to confirm the statement

25  in your declaration that when you read the language

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    197

1   of claim 1 in the '761 patent, it indicates to you

2   that selecting an image from a group is sufficient

3   to condition the upload of the group of images.

4       A.   It's slightly different wording here, but

5   it's the same concept, which is that it is unclear

6   what is uploaded and how that relates to any

7   selection that has occurred.

8       Q.   Well, is it the same concept in that this

9   claim indicates that selecting an image from a group

10  is sufficient to condition the upload of the group

11  of images?

12      A.   What we have, one or more pictures

13  uploaded, and then I'm not sure that we've even

14  designated any pictures because we've elected an

15  option to designate.  That to me is sort of an

16  option that says would you like to designate at

17  least one picture from the group?

18        And this is -- this is very wordy, and so

19  selecting one picture here, if that's what is meant

20  by option to designate, then that would condition

21  the upload of one or more pictures.

22      Q.   Does it condition the upload of the group

23  of pictures?

24      A.   It's not clear here what "group" is, and

25  so it conditions the upload of one or more pictures

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                198

1   if those are forming a group, then yes.  It's

2   unclear what that group is.  I don't know that I

3   have a better answer.  It's confusing.

4       Q.   So whatever the group is, it happens after

5   this condition or after this indication is received?

6   So let me just say that again.  Whatever the group

7   is that gets uploaded, it happens after the

8   indication in ii3 happens?

9       A.   Could you repeat that?  I'm sorry.

10      Q.   Whatever the group is that gets uploaded,

11   that has to happen after the (ii)(3) indication is

12   received according to the claim.

13      A.   I think (3) will happen to condition (ii).

14   Other than that, I don't really know what this is

15   saying.

16      Q.   There's language at the end of the claim

17   that says to be uploaded to the remote picture

18   hosting service.

19      A.   Yes.

20      Q.   What does that modify, in your view?

21          MR. XU:  Objection, vague.

22      A.   (Witness reviewing document)

23      Q.   So we're running out of time here.  I

24   can -- let's just withdraw that question and move

25   on.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT               199

1       So Exhibit 4A, can you turn to Exhibit 4A

2  for a minute.

3       A.  '472 patent?

4       Q.  Yes.

5       A.  Yes.  Okay.

6       Q.  So at 12 -- column 12, lines 3 through 7

7  says -- are you there?

8       A.  Yes.

9       Q.  It says, the camera system preferably

10  includes the ability for the user to indicate to the

11  camera which pictures to offload so that the camera

12  offloads only those pictures that are so indicated

13  by the user.  Do you see that?

14      A.  I do.

15      Q.  Says the word "includes."  Are you

16  familiar with includes?  What does that mean to you?

17          MR. XU:  Objection, vague.

18      A.  That it preferably has the ability, that

19  it may be -- I don't know.  It could -- can we pull

20  up the dictionary again?

21      Q.  Let me ask you a question.  Does the word

22  includes -- if it includes an ability, does that

23  exclude other abilities?

24      A.  I don't know.

25      Q.  Well, I'll just give you an example.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                200

1   Let's say the camera also has a voice recognizer and

2   in this sentence says -- so let's say my camera can

3   recognize words.  My camera also includes the

4   ability for the user to indicate to the camera which

5   pictures to offload.  Is it fair to say that that's

6   a possibility?  So includes -- the word includes

7   doesn't prevent the camera from having other

8   features, right?

9       MR. XU:  Objection, vague.

10      A.  I feel like I'm trying to get into the

11  head of the author of this language, and I don't

12  know that I can do that to -- I feel like you're

13  asking me to tell you what they meant and --

14      Q.  You don't have to get into the head of an

15  author.  So let's just say there's a person having

16  ordinary skill in the art and you're supposed to

17  read it from that perspective, the specification,

18  right?

19      A.  Uh-huh.

20      Q.  Is that your understanding?

21      A.  Yes.

22      Q.  Does includes signal, especially in patent

23  law, does includes signal something to a person

24  having ordinary skill in the art?  Does that have

25  any meaning, includes, that you're aware of?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                201

1    A.  Well, you referenced patent law.  I

2  don't -- I don't know a legal definition of this.

3    Q.   So when you analyze patent claims, do you

4  look at words like comprising and includes?

5    A.  Yes.

6    Q.  Okay.  And what do those mean versus words

7  like consisting of?  Do you know the difference when

8  you read a patent claim?

9    A.  I suppose I could -- I could discern the

10  difference in those terms.

11    Q.   What's the difference between comprising

12  or includes versus consisting of?  Can you explain

13  it?

14    A.  I don't know.  You're asking me to define

15  some very vague terms here, and I --

16    Q.  I'm not actually.  I know you read patent

17  claims and apparently I think you say you can

18  discern what they mean from the perspective of a

19  person having ordinary skill in the art.

20         So does includes and comprising, including

21  and comprising signal something to you when you read

22  a patent claim that would be different from

23  consisting of when you read a patent claim?

24         MR. XU:  Objection, vague.

25    A.  You're asking how includes and comprising

{CUEDVI/00003/00653377}

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                202

1  are different from consisting of?

2     Q.  Yes, when you read a patent claim, how are

3  including and comprising different from consisting

4  of?

5     A.  I think I would have to see the context of

6  this to understand because here we have also the

7  modifier preferably, which I know has legal

8  implications.  And so I feel like I'm being asked to

9  define -- to perform claim construction on includes,

10  and -- or to define it, and in this context with the

11  modifier preferably and so forth, I'm not sure I can

12  give you a good answer.

13     Q.  So when you read a patent claim generally,

14  I'm not asking in this context, when you read patent

15  claims for any case you've been retained for as an

16  expert witness, if you see including in a claim and

17  you see consisting of in a different claim, is it

18  clear to you what the difference is between those

19  two phrases, including versus consisting of?

20        MR. XU:  Objection, vague.

21     A.  I would say that those terms are similar,

22  but it -- given the context here with preferably,

23  I -- I don't --

24     Q.  I'd say the context here has zero to do

25  with my question.  Are you aware of that?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    203

1   A.  Well, you're asking for a definition, and

2   I'm saying that the definition is somewhat dependent

3   on the context.  And here we have not just includes

4   but preferably includes, and I understand that

5   preferably has some legal meaning and --

6   Q.  Can you close the document for me here,

7   the patent?

8   A.  Sure.  Okay.

9   Q.  So when you read a patent claim, not art,

10  not that portion of the spec, not anything else,

11  just read a patent claim that has the word

12  including, does that -- and it lists three items,

13  does that mean a device that has four items wouldn't

14  infringe that claim?

15      MR. XU:  Objection, vague.

16  A.  I don't know because if it had the word

17  optionally including in front of it, then it's a

18  different scenario.

19  Q.  So including and consisting of don't have

20  special meaning when you read patent claims?  Those

21  terms don't signal anything special to you?

22  A.  I don't know what you mean by signal

23  something special.

24  Q.  Well, just signal that there's -- like

25  that has a meaning in claim drafting, including has

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    204

1   meaning in claim drafting and consisting of has a

2   different meaning in claim drafting.

3      A.   And sorry.  What was the question?

4      Q.   In claim drafting, are you aware of a

5   difference between including and consisting of, just

6   those two words in a vacuum?

7         MR. XU:  Objection.  He's just a technical

8   expert.

9      A.   Yeah, I -- I don't know.  This feels like

10  a legal terminology question and I don't -- I'm not

11  an attorney.

12     Q.   So what does a person having ordinary

13  skill in the art understand including to mean in a

14  patent claim?

15        MR. XU:  Objection, vague.

16     A.   Just in general what does a person of

17  ordinary skill consider that word to mean?

18     Q.   Yes.

19     A.   The things that are included or

20  incorporated.

21     Q.   Does that mean the things that are

22  incorporated are all the things of the whole?  Never

23  mind.  Let's withdraw that question.  Too confusing.

24        Let's move on.  So the claim recites a

25  user selection of an upload option, the '472 patent

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                205

1   claim.

2       A.   I'm sorry.  Let me pull that up.

3       Q.   Let me take that back.  I apologize.  So

4   it says here, looking at '472 patent, claim 1,

5   element (ii)(3) in Exhibit 4A, column 17?

6       A.   I'm sorry.  Let me -- I had that document

7   closed.

8       Q.   Exhibit 10.

9       A.   Okay.

10      Q.   Exhibit 4A.

11      A.   4A.

12      Q.   Column 17 and we're looking at line 34.

13  Do you see that?

14      A.   Okay.  Yes.

15      Q.   Okay.  It says at least one image sensor

16  captures pictures stored in the local memory has

17  been designated through the touch sensitive display

18  as part of the group of pictures to be uploaded to

19  the picture hosting service.

20          So the claim refers to the touch sensitive

21  display as part of the designation process.  Would

22  you agree?

23      A.   I agree that the touch sensitive display

24  is involved in this process.

25      Q.   So picture selection is done through the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    206

1  touch sensitive display in this case, right,

2  pictures are uploaded?

3       MR. XU:  Objection, vague.

4     Q.  Can you answer the question?

5     A.  I'm sorry.  I'm still -- I'm still

6  reading.  Could you repeat the question?

7     Q.  Ms. Shelton, can you repeat the question?

8       THE REPORTER:  Question:  "So picture

9  selection is done through the touch sensitive

10  display in this case, right, pictures are uploaded?"

11       MR. XU:  Objection.

12     A.  Yeah, there was -- there was extra

13  information added on to that question.

14     Q.  I apologize.  Let me ask it again.  I'm

15  sorry.

16     A.  Okay.

17     Q.  The claim says -- so according to this

18  claim, the picture is designated through the touch

19  sensitive display, at least one picture is

20  designated through the touch sensitive display

21  according to this claim.  Is that correct?

22     A.  Yes.

23     Q.  Can you turn to 11, column 11 of this same

24  document.

25     A.  Okay.  I'm there.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                 207

1    Q.  So starting at line 36, says another

2  aspect of the present invention is to employ a wink

3  detecter as part of the viewfinder of the camera.

4  It says at line 42, the wink detector is

5  contemplated to be used for shutter trip and/or AF

6  activation or lock, among other things.

7          Then on line 46 of the same paragraph, it

8  says, in this case the wink detector preferably acts

9  as a user selection detector device and that the

10  user may select an item pointed by the gaze

11  tracker pointer where that is otherwise highlighted

12  by the gaze tracker simply by winking.

13          So based on this description, do you

14  understand the wink detector to be a tool for

15  selecting?

16          MR. XU:  Objection, vague.

17    A.  They describe it here as a user selection

18  detector device.

19    Q.  Is that a yes?

20    A.  I think you used the word tool, and I

21  don't see that here.  So, no.

22    Q.  Okay.  So it's a selection device.  The

23  wink detector is a selection device?

24    A.  That's what this line says.

25    Q.  It's a user selection device according to

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                208

1   this line.  Do you agree?

2      A.   This line says the wink detector

3   preferably acts as a user selection detector device.

4      Q.   And if the item -- it says here select an

5   item.  If the item was a -- let's say a menu button,

6   would that work consistent with this description?

7         MR. XU:  Objection, vague.

8      Q.  It may be helpful to read at 50.  It says,

9   "It is contemplated that the detected wink would

10  preferably function in the camera system similarly

11  to a left mouse click on a computer system when

12  dealing with menus and icons."  Do you see that?

13     A.  I do.  And could you repeat the original

14  question?

15        MR. LESKO:  Ms. Shelton, would you read

16  that back.

17        THE REPORTER:  Question:  "It says here

18  select an item.  If the item was a -- let's say a

19  menu button, would that work consistent with this

20  description?"

21     A.   So you're asking if we replaced a selected

22  item and -- I'm sorry.  Which selected item are we

23  referring to?

24     Q.   Selected item at forty -- line 48 here.

25  Says a user may select an item pointed to by the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                  209

1   gaze tracker.

2       A.   Okay.  And the question was can we

3   substitute that for something.  Could you repeat

4   that part?

5       Q.   Maybe I could just ask it more clearly.

6   Can you use -- based on this description, is this --

7   would a POSITA understand the wink detector can be

8   used to select items on a screen?

9       A.   I believe that's what it says here.

10      Q.   Okay.  Now let's go to column 9 of this,

11  Exhibit 4A, at line 32.

12      A.   Okay.  I'm there.

13      Q.   So let's just start at 32.  Says, another

14  aspect of the present invention adds touch bed

15  technology to the prior art camera system.  Then

16  let's skip down to be efficient here to 39 in the

17  same column, line 39.  In a first preferred

18  embodiment, the EVF or LCD display displays the menu

19  that's above and the user moves the cursor or mouse

20  pointer around this image by use of his finger or on

21  the touch pad.

22      A.   I see that.

23      Q.   This operation is virtually identical to

24  that of the mouse in laptop computers and is well

25  understood in the art.  That's what it says here at

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    210

1  line 42.  Are you with me?

2      A.  Yes.

3      Q.  Is this touch pad another method of

4  selection disclosed here in the '472 patent?  And to

5  be more specific, does it look like this is a user

6  selection method?

7          MR. XU:  Objection, vague.

8      Q.  Does this describe -- what we just

9  described, does this describe the touch pad as a

10  user selection device?

11          MR. XU:  Objection, vague.

12      Q.  Let me try that again.  Does this section

13  describe a touch pad as a device that can be used as

14  part of the camera system for making selections?

15          MR. XU:  Objection.

16      A.  I see it described as something similar to

17  the touch pad mouse pad.  Oh, okay, on laptop

18  computers.

19      Q.  Here, let me try to help you here.

20      A.  Okay.

21      Q.  It says -- and I missed this before so I

22  apologize.  Says here in column 9, line 46, it is

23  also preferred that the touch pad software implement

24  tapping recognition, also well known in the art, so

25  that the user may operate this shutter button, make

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                211

1  a selection, et cetera, simply by tapping the touch

2  pad with his index finger.  Do you see that?

3      A.  I do.

4      Q.  Does that describe the touch pad being

5  used by a user to make a selection?

6      A.  Yes.

7      Q.  Thanks.  Okay.  So let's go to 835 to --

8  column 8, line 35?

9      A.  Oh, sorry.  Same patent?

10     Q.  Yes.

11     A.  Okay.  This was what number?

12     Q.  We're still in Exhibit 4A.

13     A.  4A.  Okay.

14     Q.  Says the icon is selected by the user

15  gazing at the icon for some predetermined amount of

16  time.

17     A.  I'm sorry.  Could you give me the column

18  number again and the line number?

19     Q.  Yes.  Column 8, line 35.

20     A.  35.  I'm there.

21     Q.  The icon -- it says, I quote, the icon is

22  selected by the user gazing at the icon for some

23  predetermined amount of time.

24     A.  I agree.

25     Q.  Okay.  Does that seem like a -- no.  Is

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                212

1  that another user selection mechanism, gazing at the

2  icon?

3        MR. XU:  Objection, vague.

4     A.  I would say it's an icon selection

5  mechanism.

6     Q.  Okay.  Here in the same column, 8, of

7  Exhibit 4A at line 45, says the user preferably then

8  utters a command indicating his acceptance or

9  rejection of that mode in this example such as yes

10  or no.  If the command uttered indicates acceptance,

11  the camera system implements the command.

12        So would uttering a command be a selection

13  mechanism here?

14        MR. XU:  Objection, vague.

15     A.  The command is the thing that we're

16  wondering if that is a selection mechanism?  I'm

17  sorry.  Could you repeat the question?

18     Q.  Does the patent describe here speech

19  recognition as a selection mechanism for a user?

20        MR. XU:  Same objection.

21     A.  I would say it indicates the acceptance or

22  rejection of a mode.  That's how it's described

23  here.  I don't know that I have other context to

24  ascribe different words to it.  The command

25  indicates the acceptance or rejection of a mode.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                213

1     Q.  Let's go to column 5 of Exhibit 4A.

2     A.  Okay.

3     Q.  At line 14.

4     A.  All right.

5     Q.  Says, more specifically, move Christmas

6  would indicate that the currently referenced

7  photograph is to be moved to the Christmas folder.

8  Do you see that?

9     A.  I do.

10     Q.  So to move Christmas, select a photograph

11  to be moved to the Christmas folder according to

12  this statement.

13     A.  It would indicate that the

14  currently-referenced photograph is to be moved to

15  the Christmas folder, yes.

16     Q.  So is that a way of selecting a photograph

17  to be moved to the Christmas folder in your view?

18     A.  It seems to me like it's already been

19  selected because it's currently referenced.  But

20  again, I don't know that I have context to ascribe

21  different words other than what's used here to this

22  process.

23     Q.  It says -- continues on line 16 of column

24  5, an alternative example is John move new year's,

25  indicating that the picture named John, either

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                214

1  directly named or by association, depending on

2  embodiment, be moved to the folder named new year's.

3        So that statement John move new year's,

4  did that select picture named John to be moved to

5  the folder named new year's?

6        MR. XU:  Objection, vague.

7    A.  Again, I don't know that we can add more

8  words to this than what are here.  It moves a

9  picture named John.

10        MR. XU:  Karen, let us know the time?

11        THE REPORTER:  I show we have six minutes

12  left.

13        MR. LESKO:  Can we go off the record for

14  just a minute since we're running out of time?

15        MR. XU:  Okay.

16        MR. LESKO:  Thanks.

17        (Off record from    to  )

18  BY MR. LESKO:

19    Q.  So if you look at claim 1 of the '472

20  patent, it refers to a group in line -- or in

21  element (f)(ii) and it refers back -- then it refers

22  to the group in element (f)(ii)(3).  Do you see

23  that?

24    A.  Yes.

25    Q.  So in your view is that the same group

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                215

1  based on antecedent basis?

2     A.  I don't know.  I don't know.

3     Q.  In your declaration did you say that

4  there's an antecedent basis issue in claim 1 of the

5  '472 patent?

6     A.  With regard to group, I said that in the

7  '761 patent that it's -- that it's unnecessary to

8  use that term in paragraph 62.  I just have to

9  confess to general confusion about what is being

10  specified to be uploaded, if anything, and what

11  groups are.  And so I don't know that I'm going to

12  have a good answer for questions that try to make

13  sense of that because for the reasons I've pointed

14  out, it is -- it is confusing to try to determine

15  when one or more images have been designated that a

16  group of images is uploaded.  And --

17     Q.  Okay.  So I think we're going to be

18  wrapping up here.  Jason, just want to remind you,

19  we're looking for -- Steve Lisa referred earlier to

20  a list of potentially privileged docs.  We want a

21  privilege log with respect to those documents.  Do

22  you remember what I'm talking about?

23        MR. XU:  Yes.  I thought Dr. Garlick's

24  answer has cleared that up because I think he

25  answered that the documents he reviewed after

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                216

1  engagement of this case he did not consider --

2  consider any of those documents for the claim

3  construction declaration.  I thought that he

4  answered that question, so I thought that issue was

5  clear.

6       MR. LISA:  Jason, I think -- hold on.

7  Steve here.  Let me mute my phone.  Okay.  All

8  right.

9       So the answers are what caused the list.

10  So that we're clear, we want a list, just a list

11  that would qualify as a withheld -- as a privilege

12  log of documents that your expert was given because

13  he limited his answers to preparation of his opinion

14  for this declaration.  And so if he -- and wouldn't

15  answer the broader question as to whether or not he

16  was given other documents that he reviewed or looked

17  at or considered after his retention.

18       And so we would like a list of those

19  documents.  And if necessary, we can go back through

20  the transcript and see his answers to the questions

21  that he wanted to answer, not to the questions that

22  I asked on that topic.

23       So if there were documents given to the

24  witness that were not provided to us that you're

25  withholding because they are privileged, then those

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                    217

1   we're likely to take to the Court and we're going to

2   have them submitted to the Court with your log.

3   Okay?  Because we think we're entitled to have them,

4   but the judge will decide whether you're right or

5   not under Rule 26.  And that's what the issue is.

6        So I don't want to fight about it.  I'm

7   not asking you to disclose the material of what's in

8   those.  We want to know whether there were documents

9   given to this witness that he looked at and

10  considered, and we can debate in front of the judge

11  whether they're privileged or not.

12       MR. XU:  So I just want to make clear.  So

13  your request is -- I just want to make sure.  Your

14  request is that you want a log of all the documents

15  that the expert has received from us after his

16  retention on this case regardless of the purpose,

17  even though it may or may not be in connection with

18  the claim construction?

19       MR. LISA:  Well, if it's in connection --

20  no, if it's in connection to the declaration and you

21  gave it to us, we don't need it.  The debate we're

22  going to have is whether Rule 26 allows him to

23  review, look at and consider documents and then say

24  since this is the final draft of my declaration, I

25  didn't rely on it in this, my final draft, my

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                218

1  declaration.

2        So if there were earlier drafts that were

3  looked at, if in deciding how to write it you went

4  through ten drafts of it, he looked at other

5  documents, then you guys narrowed it down, we're

6  still entitled to it, in my view.

7        MR. XU:  Okay.  But only regarding --

8  relating to the claim construction declaration,

9  because I just want to make sure that the scope is

10  clear.  Because I think this might be --

11        MR. LISA:  I think that's right.  I don't

12  disagree with you.

13        MR. XU:  I just want to make sure because

14  you can imagine we might give him documents for

15  other purposes.

16        MR. LISA:  Sure, validity, infringement.

17  I get it.  I'm not saying that.  I'm talking about

18  for the forming of an opinion and for deciding what

19  to say about claim construction, we're entitled to

20  those documents.  You may just decide to agree with

21  us and give them to us, but that's up to you.  Okay?

22  But that request still exists.

23        And the other thing I think we want to

24  make clear is that should Dr. Garlick provide a

25  supplemental declaration, we may and reserve the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                219

1  right to consider deposing him again if he issues a

2  supplemental declaration, which I don't know if he

3  will, but if he comes back and corrects and changes

4  all this testimony in a declaration, then we would

5  want to depose him again.

6        MR. XU:  So you're talking about --

7        MR. LISA:  Reserve the right.

8        MR. XU:  You're talking about a

9  supplemental to his current declaration?

10        MR. LISA:  Correct, correct.

11        MR. XU:  Okay.

12        MR. LISA:  So if we submit an expert

13  declaration, then Dr. Garlick -- and a brief and

14  Dr. Garlick decides to recast or change or submit

15  another declaration, then obviously we would take

16  the position we're entitled to depose him again and

17  the judge can tell us how much time we get.  But

18  we're not waiving that right.  That's all I'm

19  saying.  We can save that fight for later should it

20  occur.  Okay?

21        MR. XU:  We disagree.  You had seven hours

22  on the record for him, and that's it.  But I agree.

23  We will have that fight if it comes to that.

24        MR. LISA:  Okay.  Thank you, Dr. Garlick.

25  Thanks, Jason.  Thank you.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                220

1       THE REPORTER:  Mr. Xu, would you like to

2   purchase a copy of the transcript?

3       MR. XU:  Yes.

4       THE REPORTER:  And then is two weeks okay

5   for the final?  I know a rough draft was ordered

6   which will go out this evening.

7       MR. LESKO:  I think we need a final

8   sooner, don't we?

9       MR. LISA:  Jason, if you and I -- 99

10  percent of the time, in my experience, a draft is

11  good enough for a brief that we're writing, but

12  we're all under tight time constraints.  So now that

13  we have a draft coming out, unless we have issues --

14  Jason, you and Justin can talk, but my view would be

15  that we can agree to brief writing based on the

16  draft of the deposition.

17       However, I think what we he don't want to

18  do is have Dr. Garlick disagree with something that

19  was done.  So my request would be that you have

20  Dr. Garlick review the draft declaration and let us

21  know if there are corrections that he wants made

22  based on the draft and then you, TCL and CEV can

23  agree that the parties can proceed with the draft

24  declaration if that's okay, draft transcript.

25       MR. XU:  I think we can agree that we can

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED

ROUGH DRAFT                221

1  do the briefing based on the draft transcript.

2  That's fine.  Regarding -- obviously we will have

3  Dr. Garlick review the final transcript once it

4  comes out, but I just don't know the timing.

5        MR. LISA:  Okay.  Well, if the draft comes

6  out tonight, we have a brief due in a week, I think,

7  right, a little over a week, week from Monday, so we

8  have no choice but to use that to prepare any

9  opposing declaration and write the brief.  If there

10  are errors that are apparent to Dr. Garlick before

11  our brief is due, we would request that you let us

12  know.

13        MR. XU:  Based on the draft?

14        MR. LISA:  Correct, yes, sir.

15        MR. XU:  The rough transcript?  Your

16  request is noted.  I will have to get back to you on

17  that.

18        MR. LISA:  That's fine.  We've made the

19  request.  So that's fine.  Okay.  I guess that's

20  everything.

21

22        (Deposition concluded at 6:04 p.m. CST)

23              -oOo-

24

25